**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| YITZCHAK SIMON, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:23-cv-00955 |
| | ) | |
| TISHAURA ONEDA JONES, | ) | |
| *in her official and individual capacities,* | ) | *Counts: I, II, III, and IV.* |
| | ) | |
| ~~Serve:~~ | ) | |
| ~~Mayor Jones~~ | ) | |
| ~~1200 Market Street~~ | ) | |
| ~~City Hall Room 200,~~ | ) | |
| ~~Saint Louis, Missouri 63103; and~~ | ) | |
| ~~Saint Louis City Counselor~~ | ) | |
| ~~City Hall, Room 314~~ | ) | |
| ~~Saint Louis, Missouri 63103~~ | ) | |
| | ) | |
| and | ) | |
| | ) | |
| YUSEF SCOGGIN, | ) | |
| *in his official and individual capacities,* | ) | *Counts: I, II, III, and IV.* |
| | ) | |
| ~~Serve:~~ | ) | |
| ~~Department of Human Services~~ | ) | |
| ~~1520 Market Street~~ | ) | |
| ~~4th Floor #4065; and~~ | ) | |
| ~~Saint Louis City Counselor~~ | ) | |
| ~~City Hall, Room 314~~ | ) | |
| | ) | |
| ~~and~~ | ) | |
| | ) | |
| ~~ADVANTES GROUP, LLC,~~ | ) | |
| | ) | ~~*Counts: I, II, III, and IV.*~~ |
| ~~Serve:~~ | ) | |
| ~~Registered Agent Spenserv~~ | ) | |
| ~~Springfield, Inc.~~ | ) | |
| ~~2144 E. Republic Rd., Suite B-300~~ | ) | |
| ~~Springfield, MO 65804~~ | ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBIT A**

## FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Yitzchak "Yitzy" Simon (hereinafter "Simon," "Plaintiff Simon," or "Plaintiff") by and through his undersigned counsel, and for and in support of his First Amended Complaint for Damages, states as follows:

### INTRODUCTION

Plaintiff brings this civil-rights action against Tishaura Oneda Jones (hereinafter "Defendant Jones," "Mayor Jones," or "the Mayor"), in her official and individual capacities as Mayor of the City of St. Louis, Missouri, and in the alternative in her individual capacity, for violating his clearly established First Amendment right of freedom of speech in a blatant misuse of her Mayoral authority. Defendant Jones retaliated against Simon for engaging in First Amendment-protected criticism of her Administration's treatment of persons experiencing homelessness, when she unlawfully threatened his employer, a homeless services provider, with the loss of public grant money if they did not immediately fire Simon for speaking out against her.

Plaintiff also brings suit against the Mayor's Director of Human Services, Yusef Scoggin (hereinafter "Scoggin"), and Advantes Group, LLC (hereinafter "Advantes"), a private real estate developer, both of whom schemed and conspired together with Defendant Jones to retaliate against Plaintiff and secure his termination from employment.

Freedom to discuss public affairs and to critique the official acts of public officials lies at the heart of rights protected by the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Retaliation by a government actor in response to such an exercise of First Amendment rights forms the basis for liability under 42 U.S.C. § 1983. A private party may also be held liable under Section 1983 for participating in a joint activity with a government actor to

retaliate against an individual for exercising First Amendment rights. *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922 (1982).

Because of Defendants' actions, Plaintiff's career and reputation in the community were threatened and damaged, in an effort to suppress his viewpoints, to prevent him from building opposition to the Mayor and her administration's inhumane agenda towards persons experiencing homelessness, and to hide the official misdeeds of the Mayor from public view. Defendants' actions are a blatant and egregious violation of the law, as described below, requiring an award of damages to Plaintiff to compensate him for his injuries, and to deter the Mayor from abusing her authority in the future.

## PARTIES

1. Plaintiff Yitzchak Simon is a Missouri resident who lives in the City of Saint Louis, Missouri.

2. Plaintiff was employed as a Coordinated Street Outreach Worker at the St. Patrick Center from March 1, 2022 until March 30, 2023, when his employment was terminated.

3. Plaintiff is a person who—through words and actions—cares deeply about the rights, welfare, and needs of persons who are experiencing homelessness.[1]

4. Defendant Tishaura Oneda Jones is the elected Mayor of the City of Saint Louis, with a term of office ending on April 14, 2025.

5. Defendant Jones is the chief executive of the City of Saint Louis, which is a municipal corporation and a constitutional charter City, organized and existing under the laws of the State of Missouri.

---

[1] This Complaint follows the St. Patrick Center's guidance on using "person first language"; it will refer to "persons experiencing homelessness" instead of "homeless persons." *See*: https://www.stpatrickcenter.org/person-first-language (last accessed May 22, 2023).

3

6.    On information and belief, Mayor Jones is a Missouri resident who lives in the City of St. Louis, Missouri.

7.    At all times relevant herein, Defendant Yusef Scoggin was the Director of the Department of Human Services for the City of St. Louis.

7.8.    Defendant Jones and Defendant Scoggin are sued in their official and individual capacities.

8.    Defendant Advantes Group, LLC is a private real estate developer, organized and existing under the laws of the State of Missouri, who at all times relevant herein, had a significant monetary interest in the real estate near the riverfront area of St. Louis, where some of the events giving rise to this lawsuit took place.

    Defendant Advantes Group, LLC is and at all material times has been a "person," through its representatives, within the meaning of 42 U.S.C. § 1983.

9.    Herein, Defendant Jones, Defendant Scoggin, and Defendant Advantes Group, LLC are collectively referred to as "Defendants."

### JURISDICTION AND VENUE

10.9.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because Plaintiff seeks redress pursuant to 42 U.S.C. §§ 1983 and 1988 for the deprivation, under color of state law, of rights, privileges, and immunities secured by federal statutes and the United States Constitution.

11.10.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because those claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

4

12.11.  The jurisdiction of this Court is proper because Plaintiff's action arises under the Constitution of the United States and federal law to redress the deprivation of rights secured by the Constitution of the United States, the First Amendment to the United States Constitution, and the First Amendment as incorporated against the States and municipal actors through the Fourteenth Amendment.

13.12.  Venue is proper in the United States District Court for the Eastern District of Missouri, pursuant to 28 U.S.C. § 1391(b)(2) because all of the events giving rise to the claims occurred in the City of St. Louis, which is located within the Eastern District of Missouri.

14.13.  Divisional Venue is proper in the Eastern Division because all of the events leading to the claims for relief arose in the City of St. Louis, and Defendants actions were in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

15.14.  Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## BACKGROUND AND ALLEGATIONS OF FACT

16.15.  On any given night, there are hundreds of St. Louis City residents who do not have an adequate bed or shelter to go home to: they are experiencing homelessness.

17.16.  For single adult men experiencing homelessness in St. Louis City, some are able to get into emergency shelter, such as the Biddle Housing Opportunities Center (hereinafter "BHOC"), a facility owned by the City of St. Louis and operated by Peter & Paul Community Services.

18.17.  Operating at full capacity, BHOC only has 101 beds, and during extreme weather, an extra 50 cots in addition to the beds.

19.18.  While BHOC operates as a 24-hour emergency shelter, BHOC does not accept walk-ins and is not open to the public, rather, a single adult man experiencing homelessness must

obtain a referral by calling the United Way Helpline (2-1-1) starting at 7:30 a.m., or by visiting the St. Patrick Center Welcome Center Monday through Friday by 8:00 a.m.

20.19.  The Saint Louis Post-Dispatch has reported that the Mayor's spokesman "acknowledge[s] that 211 has turned callers away," and that the City does not have a full understanding of how many beds are available across shelters on any given night.[2]

21.20.  On many nights, including winter nights when the ground is covered with ice and snow, some persons experiencing homelessness have had to lay on the ground outside of BHOC because they did not have a referral or because there are no available beds inside.

22.21.  Five years after BHOC opened, a St. Louis Public Radio investigation found in June of 2021 that "at least five people froze to death this winter alone – a minimum of one per month from last December through March."[3]

23.22.  Peter & Paul Community Services states that "[m]ore than 1,000 people live on the streets of St. Louis City each day."[4]

24.23.  Both before and after Mayor Jones took office, various individuals and groups have spoken out publicly about the City's lack of a 24-hour walk-in shelter, with some groups leading protests, picket lines, demonstrations near City Hall, demanding that the City do more to address the plight of persons experiencing homelessness.

25.24.  Plaintiff Simon is one of the individuals who has spoken out publicly.

---

[2] https://www.stltoday.com/news/local/government-politics/it-s-hot-and-stormy-in-st-louis-and-the-homeless-are-struggling-to-find/article_b989139c-2336-11ee-82e3-4bfaa4e66410.html (last accessed July 18, 2023).
[3] https://news.stlpublicradio.org/government-politics-issues/2021-06-22/winter-homeless-deaths-expose-divisions-between-st-louis-officials-and-providers (last accessed May 23, 2023).
[4] https://ppcsinc.org/biddle-housing/ (last accessed July 17, 2023).

26.25.  Plaintiff Simon has spoken out by 1) communicating his opinions about the City's practices directly to City officials, including Defendant Scoggin; 2) communicating his opinions to the public through interviews with the news media; 3) attending events that were designed to publicize the City's policies towards persons experiencing homelessness, and 4) volunteering his personal free time to provide direct services to persons experiencing homelessness as a form of protest against the City's policies, all of which are more fully described below.

27.26.  In 1985, the City of St. Louis entered into a consent decree in *Graham v. Schoemehl,* which legally obligated the City to "provide shelter to the homeless, to appropriate money for shelter and services, and to provide related necessary services."[5]

28.27.  In order to uphold their obligations under *Graham*, the City of St. Louis government includes a Homeless Services Division, which promises to "[p]rovide[] a comprehensive approach in responding to the diverse needs of homeless individuals and families in the City of St. Louis."[6]

29.28.  On information and belief, Defendant Scoggin managed, controlled, and directed the Homeless Services Division at all times relevant herein.

30.29.  The City of St. Louis also participates in the St. Louis City Continuum of Care Plan, (hereinafter "STL COC") which is mandated by the U.S. Department of Housing and Urban Development.

---

[5] Deborah H. Karpatkin, *Homelessness in America: A Litigation Memorandum for Legal Service Advocates*, NYLS Journal Human Rights: Vol. 4 : Iss. I, Article 18, 357, 359, note 11 (1986) (citing *Graham v. Schoemehl*, No. 854-00035 (Mo. Cir. Ct. Nov. 15, 1985) (consent decree)).
[6] https://www.stlouis-mo.gov/homeless-services/index.cfm (last accessed May 10, 2023).

~~31.~~30.  The STL COC is a "membership organization comprised of more than 100 organizations and individuals from the private and public sector who work in partnership to prevent and end homelessness in the City of St. Louis."[7]

~~32.~~31.  The STL COC is organized under a Governance Charter, which specifies that membership "is open to any nonprofit, for profit, individual, or governmental entity that is committed to ending homelessness or assisting people who are homeless or at risk of becoming homeless."[8]

~~33.~~32.  According to the STL COC, their organization "strategizes and plans a coordinated, comprehensive approach to providing housing and services for people in danger of becoming homeless or experiencing homelessness."[9]

~~34.~~33.  Additionally, the STL COC works to "promote integrated, community-wide strategies and plans to prevent and end homelessness," and provides "coordination among the numerous local organizations and initiatives that serve the homeless population."[10]

~~35.~~34.  At all times relevant herein, Plaintiff Simon was a non-voting affiliate member of the STL COC, in his capacity as a private citizen who cared deeply about persons experiencing homelessness, and not in his capacity as a Coordinated Street Outreach Worker at St. Patrick Center.

~~36.~~35.  In 2021, when Jones was Treasurer of the City of St. Louis, and a candidate for Mayor, Jones attended the St. Louis Mayoral Candidate Forum on Homelessness, hosted by the STL COC.

---

[7] https://cocstl.org/about-coc/ (last accessed May 10, 2023).
[8] https://cocstl.org/wp-content/uploads/Charter-Executed-8.15.19.pdf (last accessed May 10, 2023).
[9] *Id.*
[10] *Id.*

37.36.  At that event, Jones stated "I'm a person of faith, and you all [are] doing God's work, and out here serving 'the least of these'."

38.37.  Additionally, Jones stated that the STL COC "need[s] a better partner in City government, because [homelessness] is all of our issue . . . I want to be that partner, to make sure that we can take care of all of our citizens."

39.38.  Mayor Jones also stated at the STL COC Mayoral Candidate Forum that "we need to decriminalize homelessness . . . I look forward to having a better relationship with you as Mayor . . . and then also, I want to get out of your way. So, give you what you need, and then get out of your way. Or remove any barriers. That's what government is here for and that's the kind of partner and relationship I'd like to have with the COC."

40.39.  Historically, the City of St. Louis has not been able to—or has been unwilling to—manage the crisis of persons experiencing homelessness without the help of outside organizations and volunteers.

41.40.  Because the City of St. Louis does not have adequate shelter space, some persons experiencing homelessness have no choice but to seek shelter in public spaces.

42.41.  When persons experiencing homelessness are forced to seek shelter in public spaces, private groups and individuals have taken it upon themselves to try to keep those people alive when temperatures drop below 20 degrees Fahrenheit.

43.42.  One such group is St. Louis Winter Outreach (hereinafter "Winter Outreach") which has operated for more than a decade.

44.43.  Winter Outreach sends out volunteers in freezing temperatures who attempt to transport individuals on the street to emergency shelters using their personal vehicles.

45.44.  Winter Outreach also sends out volunteers on freezing winter nights who offer blankets, hats, gloves, and other items necessary for persons experiencing homelessness to survive a frigid night on the street.

46.45.  Another volunteer group that has taken on the responsibility of trying to save the lives of persons experiencing homelessness in St. Louis is Tent Mission, STL (hereinafter "Tent Mission").

47.46.  In addition to providing direct outreach to persons experiencing homelessness who live on the street, Tent Mission has also engaged in political advocacy, by its members giving interviews about the City's practices surrounding homelessness and by organizing protests and demonstrations.

48.47.  Tent Mission has led campaigns against political leaders who Tent Mission's members believed were taking actions that hurt and did not help people who were experiencing homelessness.

49.48.  For instance, Tent Mission led campaigns against the previous Mayor, Lyda Krewson, and against former Seventh Ward Alderman, Jack Coatar.

50.49.  Tent Mission's political campaigns were all protected by the First Amendment to the United States Constitution.

51.50.  At all times relevant, Plaintiff Simon was an active volunteer member of Tent Mission, in addition to his membership in the STL COC and his job at St. Patrick Center as a Coordinated Street Outreach Worker.

52.51.  Plaintiff Simon is well known to City officials as someone who will voice his opinion about the City's treatment of persons experiencing homelessness and complain about problems that he saw with the City's delivery of services to persons experiencing homelessness.

~~53.~~52.  For instance, Plaintiff Simon complained to Defendant Scoggin that the City had received funds to buy bus tickets for persons experiencing homelessness who needed to travel, but that the bus tickets were never available to the people who needed them.

~~54.~~53.  On or around Christmas of 2022, during a winter storm, Plaintiff Simon complained to Defendant Scoggin that emergency winter shelters were not open on weekends or holidays, and that people could freeze to death during these times.

~~55.~~54.  On March 2, 2022, the St. Louis Post Dispatch printed an article titled "New St. Louis rules proposed for clearing of homeless camps."  Plaintiff Simon was referred to in that article as "a homeless advocate," and was quoted in that article as telling a reporter "[t]hey [persons experiencing homelessness] have rights like everybody else . . . [i]f we just have a process in place, people will have time to make their necessary plans" before evicting them.[11]

### The "Riverfront Community" of Persons Experiencing Homelessness.

~~56.~~55.  For decades, some of the persons experiencing homelessness in the City of St. Louis have attempted to live in tent encampments along or near the riverfront, to the north of downtown.

~~57.~~56.  Realizing that there are not enough shelter beds to house all of the people who live in tent encampments, the City of St. Louis has taken a varying approach: sometimes the City has ignored certain tent encampments for years, and sometimes the City has evicted or disbanded some of the tent encampments and destroyed them with bulldozers.

~~58.~~57.  During several such evictions, the City of St. Louis has destroyed the personal possessions of persons living in tent encampments.

---

[11] https://www.stltoday.com/news/local/govt-and-politics/new-st-louis-rules-proposed-for-clearing-of-homeless-camps/article_ec8ad88c-aa5d-5d4a-9987-596b6ca26810.html (last accessed July 17, 2023).

59.58.  For many years, various advocates for persons experiencing homelessness, including Plaintiff Simon, have complained about the City's treatment of persons living in tent encampments.

60.59.  One such encampment formed along the St. Louis City riverfront on Leonor K. Sullivan Boulevard, under a large, roof-covered pavilion that formerly was used for the President Casino, which closed in 2010.

61.60.  Over the past several years, 20-30 people at a time would live in tents under the pavilion (hereinafter "the Riverfront Community"), because the pavilion offered protection from the sun, rain, and snow.

62.61.  For those several years, the City ignored the Riverfront Community and left the people living there alone.

63.62.  On or around March 1, 2023, the City posted a "NOTICE TO VACATE" near the Riverfront Community, informing the people who lived there that the encampment would be "terminated," with a last day of March 10, 2023, and that items "bagged and tagged" would be "stored at a secure location" by the City for up to 90 days.

64.63.  Plaintiff Simon spoke with his supervisor at St. Patrick Center, Savannah Goosen, about the upcoming eviction, and St. Patrick Center began planning to assist the people in the Riverfront Community in moving their possessions prior to the eviction, and with finding other shelter.

65.64.  On March 6, 2023, Winter Outreach and Tent Mission released a joint statement that forcefully criticized Mayor Jones for the announced eviction of the Riverfront Community.

66.65.  The joint statement quoted previous statements from Mayor Jones, such as "as a city, we must wrap our arms around our most vulnerable communities, and provide unhoused

individuals with basic necessities, including food, transportation vouchers, mobile phones, healthcare, including mental health services, and more."

67.66.  The joint statement then stated that "[d]espite Mayor Jones' running on the campaign promise that she would not participate in the violence of unhoused evictions, like a clockwork cycle, the notice is once again posted at the RFC . . . the City has only rolled back services for unhoused persons, quietly canceling the warming bus, closed "warming centers" for "inclement weather," failed to allocate money to shelters they formerly funded, and continuously spread dangerous misinformation regarding shelter availability."

68.67.  In short, despite her promises to the contrary, the policies and actions of the Jones Administration towards persons experiencing homelessness were more harsh and more severe than those of her predecessors.

69.68.  On March 7, 2023, Tent Mission announced a press conference for the following day and asked community members to "call[] on Mayor Jones and elected officials to call off the eviction of Riverfront Community."

70.69.  On information and belief, as a result of Winter Outreach and Tent Mission releasing their joint statement, many City residents called the Mayor's office and asked her to stop the eviction of the Riverfront Community.

71.70.  But all of the Defendants were united in their determination to evict the Riverfront Community, despite criticism of the plan from the public.

72.71.  On information and belief, the City planned the eviction of the Riverfront Community because Advantes private companies had an interest in asked the Mayor to clearing the Laclede's Landing area of persons experiencing homelessness.

73.     Also on March 7, 2023, Fox 2 news reported: "'It's time,' said Gretchen Menges, owner of Advantes Group. Advantes is heavily invested in the Laclede's Landing area. Menges said the tent encampment has been a haven for drug use and a source of crime." "'We have a lot of development going on,' Menges said, 'So we're excited to keep the motion going forward.'"[12]

**Wednesday, March 8, 2023: Two Days Before the Scheduled Eviction**

74.72.  On March 8, 2023, Plaintiff Simon and two other Coordinated Street Outreach workers from St. Patrick Center traveled to the Riverfront Community in the early morning to offer services.

75.73.  Specifically, Plaintiff Simon and the other Coordinated Street Outreach workers from St. Patrick Center distributed supplies to some persons experiencing homelessness, helped individuals fill out housing paperwork, and had conversations with people about where they would go in anticipation of the eviction, and what kinds of help they would need with moving their possessions.

76.74.  Other homeless/unhoused service providers, including the Salvation Army, were also present at the Riverfront Community that day.

77.75.  City workers, including employees of the City's Homeless Services Division and police officers were also present at the Riverfront Community.

78.76.  Some of the persons experiencing homelessness who lived in tents just to the north of the pavilion told the Coordinated Street Outreach Workers that the police officers told

---

[12] Available at: https://fox2now.com/news/missouri/st-louis-riverfront-encampment-will-be-disbanded-friday/ (last accessed May 24, 2023).

them that they needed to move their tents "now" because they were on private property and not under the pavilion.

79.77.  One of the individuals who lived in those tents was not present at the time, so Plaintiff Simon worked to identify who was living in that tent and called them to tell them what the police had said: that they needed to move their tents now.

80.78.  Simultaneously, the outreach worker from the Salvation Army made phone calls to see if a treatment bed was still available if the person living in the tent who was not present needed to go to a treatment bed.

81.79.  Police officers then clarified to Plaintiff Simon and to the outreach worker from the Salvation Army that they had not ordered them to move, but had suggested that they move because a fencing company was going to put up a fence around the Pavilion, and the officers were afraid that the people in those tents would not be able to access their property after the fences were installed.

82.80.  Plaintiff Simon approached the fencing contractors—who were also present— who further clarified that the fence would go up the following day at 8:00 am.

83.81.  Plaintiff Simon then returned to the people living in tents on private property and told them about the fence that would be going up the next day, and everyone decided that it would be best if they moved their possessions to a different location, and out of the way of the fence the next morning, before 8:00 am.

84.82.  One of the City's Coordinated Street Outreach Workers named Richard Dixon— who is or was employed by the City's Homeless Services Division—approached Plaintiff Simon in an agitated manner and angrily said, "I offered them a treatment bed. How long am I supposed to hold this?"

85.83.  Richard Dixon (hereinafter "Dixon") told Plaintiff Simon that the client had already been offered a treatment bed, and that St. Patrick Center was interfering with what he was already doing.

86.84.  On information and belief, Dixon was angry that other service providers were offering services to people who had previously declined services, and because the City wanted to control the eviction process of the Riverfront Community.

87.85.  Plaintiff Simon was surprised by this reaction because Coordinated Street Outreach Workers from the City and from private organizations like St. Patrick Center are supposed to be "on the same team," working together to provide services to persons experiencing homelessness.

88.86.  At the time, Plaintiff Simon—who worked for St. Patrick Center—and Dixon—who worked for the City's Homeless Services Division—had the same job title because their jobs are funded by the same grant from the federal government.

89.87.  Shortly after this interaction, Defendant Scoggin called Plaintiff Simon's cell phone and told him that he believed Plaintiff Simon was "sabotaging the process," by making contact with people at the eviction, and attempting to determine whether there is a shelter where they can go, and attempting to help them secure a bed at available facilities.

90.88.  Defendant Scoggin made it clear that the City wanted to entirely control the process of the eviction, including determining where people who were being evicted would go, even though Coordinated Street Outreach Workers from St. Patrick Center regularly helped persons experiencing homelessness determine whether there was a shelter where they could go.

91.89.  Defendant Scoggin asked Plaintiff Simon, "do you want people to die?"

92.90.  Plaintiff Simon told Defendant Scoggin that he was just trying to help people figure out how to pack up their possessions and was trying to help people figure out where they were going to go to after being evicted, in his capacity as a Coordinated Street Outreach Worker.

93.91.  Plaintiff Simon was surprised by Defendant Scoggin's reaction because Plaintiff Simon was only doing his job and had not sabotaged or interfered with the City's Coordinated Street Outreach Workers in any way.

94.92.  Nevertheless, to calm Defendant Scoggin down, Plaintiff Simon told Defendant Scoggin that he would not help anyone determine whether there is a shelter where they can go or attempt to help them secure a bed there, even though those tasks were part of his role as a Coordinated Street Outreach Worker.

95.93.  Defendant Scoggin told Plaintiff Simon, "We can agree to disagree."

96.94.  Later that day, City employees—on information and belief Dixon and Defendant Scoggin—wrote emails and/or made telephone calls to the management of St. Patrick Center, complaining about Plaintiff Simon's presence at the Riverfront Pavilion Encampment.

97.95.  Plaintiff Simon was not disciplined by St. Patrick Center for this interaction with City employees because Plaintiff Simon was doing his job correctly and because Plaintiff Simon always had polite and professional interactions with City employees.

98.96.  Later that same day, March 8, 2023, Tent Mission held a press conference on the steps of St. Louis City Hall, with community members holding signs criticizing the City's planned eviction, and speakers giving speeches with sound amplification against the planned eviction.

17

99.97.  Having finished his work shift for the day, Plaintiff Simon attended the press conference and opposed the upcoming eviction, because he believed that the City did not have an appropriate plan in place for where the people being evicted would go to.

100.98.       Plaintiff Simon stood on the steps of City Hall holding a sign that read "Housing = Down-Town Safety."

101.99.       At the press conference, speakers criticized the Mayor and her Administration in anticipation of the planned eviction.

102.100.     That same day, Tent Mission shared a photograph of Plaintiff Simon on their Instagram page, showing Plaintiff standing on the steps of City Hall holding the protest sign (Plaintiff Simon depicted below in jeans, black coat, and red scarf, holding sign).



~~103.~~101.      Plaintiff Simon was also shown on the KSDK Channel 5 evening news

protesting in front of City Hall on March 8, 2023.[13]

---

[13] Available at: https://www.ksdk.com/article/news/a-lot-of-people-here-are-a-community-city-of-st-louis-plans-to-shut-down-lacledes-landing-homeless-encampment-friday/63-299c3af5-6bc5-4e5a-80a4-1cb2aea10ed7 (last accessed May 24, 2023).

104.102.     Plaintiff Simon (shown in red below) was also shown on the same broadcast, from footage taken earlier in the day, when he was providing services to the people at the Riverfront Community in his capacity as a Coordinated Street Outreach Worker at the St. Patrick Center.[14]



105.103.     On information and belief, the Mayor follows criticism of her administration closely on social media and often responds in the comments either directly, or through her father, to anyone who disagrees with her positions.

**The City Evicts the Riverfront Community from the pavilion on March 10, 2023.**

---

[14] *Id.*

106.104.      After ignoring the Riverfront Community all winter, the City moved in to evict the Riverfront Community as soon as the warmer weather moved in.

107.105.      On March 10, 2023, just before 9:00 a.m., Dixon returned to the Riverfront Community, along with Defendant Scoggin, and other city workers including Amy Bickford, the Program Manager of Homeless Services, and a group of police officers.

108.106.      The City brought a bulldozer and several city dump trucks to the eviction.

109.107.      St. Patrick Center also responded to the area, including Plaintiff Simon, his direct supervisor, and two other Coordinated Street Outreach Workers.

110.108.      Plaintiff Simon set up a table with supplies, such as water, food, socks, and warming supplies.

111.109.      Plaintiff Simon also assisted people who lived in the Riverfront Community with packing up their belongings in bags and loading them onto City trucks to be transported to storage away from the riverfront and the pavilion area.

112.110.      Even though Plaintiff Simon was opposed to the eviction, he physically helped people remove their possessions from the riverfront area, aiding and assisting the City in completing their eviction because his job was to provide services to persons experiencing homelessness.

113.111.      Plaintiff Simon kept his word to Defendant Scoggin and did not involve himself in helping any of the people determine where they would go to seek shelter, but only offered physical support to people who needed it, including supplies and help with packing their possessions.

114.    Plaintiff Simon noticed that two individuals were standing with the police officers, talking to them as the eviction took place.

21

115.    Plaintiff Simon later identified the two individuals who were standing with the police as Brian Minges and Gretchen Minges, (shown below next to police vehicle) who on information and belief are the owners of Advantes.



116.112.        By early afternoon, all of the persons experiencing homelessness were packed out, and the entire area was cleared of any personal property by the bulldozer.

117.113.        After the eviction, a volunteer from Winter Outreach told KMOV news that there was no housing for twenty-eight of the people who were evicted from the pavilion area, and that many of the evicted people had simply moved north on the riverfront to a new location.

118.114.    On March 14, 2023, Tent Mission began to circulate photographs on social media showing that the City—which had promised to store the personal possessions of the people being evicted—had dumped all of that personal property onto an unsecured city lot, and that it had all been rained on.

119.115.    On March 14, 2023, Tent Mission posted two photos (shown below) on their Facebook page, documenting how the City was storing the personal possessions of people they had evicted, one with a caption reading: "Folks' belongings have been left outside in an unsecured parking lot since Friday without any protection from the rain", and the other with the caption: "Rain damage on community member's belongings:"



120.116.    On March 21, 2023, Tent Mission and Winter Outreach made a joint statement criticizing the Mayor for "bulldozing thousands of dollars of unhoused residents' personal belongings and survival supplies."

121.117.    On information and belief, because of Tent Mission publicizing the dumping of all of the personal possessions of the people who were evicted from the Riverfront

23

Encampment, many St. Louis City residents called the Mayor to complain about the City's actions.

**The City Returns to the New Riverfront Encampment on March 24, 2023.**

122.118.      Because many of the people who were evicted from living under the pavilion had nowhere else to go, the same evening as the eviction, they simply moved their tents to another location to the north of the pavilion and set up a new tent encampment.

123.119.      The City returned to the riverfront on the morning of March 24, 2023, this time without written warning or notice, but again with a bulldozer and dump trucks.

124.120.      City workers, including Coordinated Street Outreach Workers from the Homeless Services Division, and police officers who are assigned to a homelessness detail were also present.

125.121.      Plaintiff Simon was not working for St. Patrick Center that day because he was on vacation.

126.122.      Another advocate for persons experiencing homelessness told Plaintiff Simon that the City had arrived to execute a surprise eviction of the new tent encampment, at the area where the people displaced by the eviction of the pavilion had moved to.

127.123.      Plaintiff Simon came to the riverfront as a private person and citizen, and in his role as a volunteer with Tent Mission, again to help people pack up their possessions, and to help them move them out of the way of the City's bulldozer, just as he had done on March 10th, because he feared that if people were unable to move their property, the City might again

24

bulldoze their property into dump trucks, and/or dump their property onto an unsecure City lot, where their property might again be destroyed by rain.

128.124.    Because of his knowledge from helping persons experiencing homelessness meet their basic needs, Plaintiff Simon knew how important it is for persons experiencing homelessness to have a sense of security about their basic possessions, regardless of their monetary value, because oftentimes those possessions include life-saving medications, personal identity paperwork, and treasured family photographs.

129.125.    When he arrived, Plaintiff Simon noticed that City worker Dixon was taking photographs and videos of Plaintiff Simon with his phone.

130.126.    Plaintiff Simon tried to ask Dixon what was going on, but Dixon refused to speak to him, other than to ask "are you trying to stop people from getting services?" Plaintiff Simon replied that he was not, and walked away from Dixon, who was obviously agitated again.

131.127.    A few minutes later, Plaintiff Simon walked up to the casino to use the restroom and get a cup of coffee.

132.128.    As he was returning down the hill, Dixon again approached Plaintiff Simon and began taking photographs of him with a cellphone.

133.129.    Dixon told Simon, "I'm going to get you fired."

**The Mayor Threatens the St. Patrick Center and Demands They Fire Plaintiff Simon.**

134.130.    At 1:10 p.m. on March 24, 2023, the Chief Executive Officer of St. Patrick Center, Anthony D'Agostino (hereinafter "Mr. D'Agostino")—who was also head of the COC—called Plaintiff Simon on the phone, and told him "You've got to get out of there. The Mayor's office just called me. They are saying that you're down there. I just want you to know that any

actions that you take are happening after the Mayor's office called. But I know you are off work today, and you can do what you want."

135.131.　　Plaintiff Simon was dumbfounded by this phone call because Plaintiff Simon was not doing anything to impede the surprise eviction, even though he disagreed with the Mayor's actions.

136.132.　　Plaintiff Simon was also surprised that Mr. D'Agostino called him personally, because Plaintiff Simon knew that Mr. D'Agostino always communicated with his employees through their supervisors in a chain of command, and never personally.

137.133.　　At 1:33 p.m., Mr. D'Agostino called again and asked Plaintiff Simon "Are you still there? Because the Mayor herself just called me. She said she wants you out of there."

138.134.　　At 2:18 p.m., Mr. D'Agostino called Plaintiff Simon again, and told him that the Mayor had called him several times, demanding that Plaintiff Simon leave the area and asking where Plaintiff Simon was located at that moment.

139.135.　　During one of the phone calls, Mr. D'Agostino told Plaintiff Simon that Mayor Jones stated to Mr. D'Agostino that if he did not fire Plaintiff Simon, she would ensure that St. Patrick Center would not receive public funds from the City of St. Louis, and that she would block St. Patrick' attempts at securing funding to continue their operations.

140.136.　　The Mayor's threat was calculated to cause alarm to the leadership of St. Patrick Center, because Defendant Jones knew that forty-eight percent of St. Patrick Center's just over $25,000,000 budget came from Government Funding in fiscal year 2022.[15]

---

[15] See:
https://static1.squarespace.com/static/6112a5cdf125b67014490db7/t/6425d1c6f8a4fe2675b8b826/1680200139303/FY+2022+Annual+Report.pdf (last accessed May 25, 2023).

141.   Mr. D'Agostino also told Plaintiff Simon that Advantes had also communicated with both the Mayor's office and with St. Patrick Center to complain that Plaintiff Simon was "interfering" with the eviction process.

142.   Mr. D'Agostino told Plaintiff Simon, "Advantes also thinks that you are causing this not to go as planned."

143.137.    Plaintiff Simon was shocked by these statements from the CEO of St. Patrick Center, and he walked away from the scene, hundreds of feet away, up near the Lumiere Casino.

144.138.    Near the casino, while Plaintiff Simon was in the process of helping someone move their personal property away from the scene of the eviction into a volunteer's car, Plaintiff Simon's direct supervisor, Savannah Goosen, (hereinafter "Ms. Goosen") showed up outside the casino, and asked Plaintiff Simon if he would leave immediately with her.

145.139.    Plaintiff Simon declined the offer of a ride but told Ms. Goosen that she could see he was nowhere near where the eviction was happening and he was not going back there.

146.140.    Around 6:00 p.m., Plaintiff Simon noticed that another employee of the City's Homeless Services Division was taking photographs of Plaintiff Simon.

147.141.    The eviction was completed, and everyone left and went home, except for the people who were experiencing homelessness, some of whom were able to get temporary shelters, and some of whom moved on to other sites around the City with their tents.

**Mr. Simon's Employment is Terminated Because of the Mayor's Threats**

148.142.    On Monday, March 27, 2023, Ms. Goosen, called Plaintiff Simon, and told him not to come into work that week, but that they would still pay him for the week.

27

149.143.        On Tuesday, March 28, 2023, Ms. Goosen again called Plaintiff Simon, and told him to come to St. Patrick Center at 10:00 a.m. on Thursday, March 30, 2023.

150.144.        On Thursday, March 30, 2023, several members of the St. Patrick Center Human Resources and Management teams, including CEO Anthony D'Agostino, met with Plaintiff Simon and officially terminated his employment.

151.145.        Plaintiff Simon was given a "Termination of Employment Letter" from St. Patrick Center which stated that, "Your actions on March 24th, 2023 resulted in the threat of Saint Patrick Center losing funding and created conflict with our funders and supporters and is the primary reason for termination . . . simply put, this is considered gross misconduct as you brought St. Patrick Center into serious disrepute with the City of St. Louis and other potential funding sources, which would be a detriment to the organization."

152.146.        Immediately after Plaintiff Simon was fired, he asked Anthony D'Agostino, "Am I being fired because the Mayor called you?" and Mr. D'Agostino replied "It's what's written in the letter."

153.147.        As Plaintiff Simon left the room, Mr. D'Agostino told him "Thank you for your service to the clients for the past two years."

154.148.        On March 31, 2023, Winter Outreach and Tent Mission released a Joint Update on the Tent Mission Facebook page stating that "After the eviction of the Riverfront pavilion camp (RFC), many people relocated—our group personally knew 30+ persons who moved within a two mile radius, still living outside."

155.149.        Mayor Jones is not an unsophisticated layperson, but rather, is a sophisticated political operator, with the capacity to understand the laws.

156.150.    At all times relevant herein, Mayor Jones had access to the advice and counsel of her City Counselor, to provide her with legal opinions as to whether her conduct or a proposed course of conduct complied with the law.

157.151.    Mayor Jones knew that she lacked the authority as Mayor to threaten to withhold public funds from private social service providers if they did not fire one of their employees for speaking out against her, but Mayor Jones nevertheless pursued her unlawful threats.

158.152.    On information and belief, right before the eviction, a member of Mayor Jones's senior staff told Board of Alderman President Megan Green that the Mayor wanted her to know that if Board President Megan Green "interferes with the City evicting the homeless encampments, the Mayor will cut off all communications with you, 'black list' you, and no one will work with you, and you will not be able to get anything done," or words to that effect.

159.153.    On information and belief, because of this threat from Mayor Jones, Board President Megan Green—who has often been an advocate for persons experiencing homelessness—remained silent about the upcoming eviction.

160.154.    On information and belief, the Mayor knew that her actions were a gross abuse of her power.

161.155.    If the Mayor is not punished for making unlawful threats against anyone who has criticized or could potentially criticize her administration, such as those described above which were directed at Plaintiff Simon and his employer, she will be emboldened to continue with heavy-handed tactics against her critics.

162.156.    As a direct and proximate result of the actions of Defendants as set forth herein, Plaintiff Simon has suffered damages that include, but are not limited to lost wages, lost

benefits, emotional distress and pain of the mind, including but not limited to mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of reputation, with additional damages to be established at trial, plus costs and reasonable attorneys' fees, and all other relief as allowed by law.

## CLAIMS FOR RELIEF

### COUNT ONE
--
### First Amendment Retaliation in Violation of 42 U.S.C. § 1983
*Against Tishaura Jones and Yusef Scoggin in their official and individual capacities, and against Advantes Group, LLC.*

163.157.     Plaintiff repeats, re-alleges and incorporates by reference all facts and allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

164.158.     The First Amendment prohibits government officials from subjecting an individual to retaliatory actions on the basis of constitutionally protected rights. Section 1983 imposes liability for certain actions taken under color of law that deprive a person of a right secured by the Constitution and laws of the United States.

165.159.     A public employee acts under color of state law while acting in their official capacity or while exercising responsibilities pursuant to state law and abuses the position given to him by the state.

~~166.~~160.        Jones and ~~,~~ Scoggin~~, and Advantes~~ acted in concert together, under color

of law, to retaliate against Plaintiff Simon for his speech.

~~167.~~161.        Plaintiff Simon exercised rights protected by the First and Fourteenth

Amendments—including, but not limited to, his right to free speech, freedom of expression,

freedom to assemble, and freedom to petition the government for a redress of grievances—by,

among other things, attending meetings of the COC, voicing his opinions and observations at

those meetings, participating in a protest rally on the steps of City Hall, holding signs that

identified his viewpoints on matters of public concern and interest, by joining groups to raise

public awareness of matters of public concern and interest, by expressing his concerns directly to

city officials as he came into contact with them in the course of his job duties and in the course

of his private life, and by volunteering on his day off to help persons experiencing homelessness

pack up their possessions so that they would not be bulldozed and destroyed (collectively,

Plaintiff Simon's "Protected Activities.").

~~168.~~162.        Defendants' actions in threatening Plaintiff Simon as a result of his

Protected Activities and conspiring to have Plaintiff Simon terminated as a result of his Protected

Activities (collectively, Defendants' "Retaliatory Actions"), sought to deprive and did deprive

Plaintiff Simon of rights, privileges, and immunities secured by the Constitution, including

pursuant to the First and Fourteenth Amendments.

~~169.~~163.        Defendants' Retaliatory Actions caused injury to Plaintiff Simon

including, but not limited to, loss of employment, loss of income and benefits, loss of standing in

the community, damage to his reputation, and emotional injury and damages of the mind.

~~170.~~164.        Plaintiff Simon was singled out and targeted by Defendants as a result of

his Protected Activities. Defendants' Retaliatory Actions were a direct result of Plaintiff Simon

31

engaging in Protected Activities, or at a minimum Plaintiff Simon's Protected Activities were a substantial and/or motivating factor in Defendants' Retaliatory Actions.

171.165.     But for Plaintiff Simon's Protected Activities, Defendants would not have engaged in the Retaliatory Actions, and Plaintiff Simon would not have been injured.

172.166.     Defendants' Retaliatory Actions would chill a person of ordinary firmness from engaging in or from continuing to engage in Protected Activities, and Plaintiff Simon has, for example, ceased attending meetings of the COC and engaging in other activities as a result of the Retaliatory Actions.

173.167.     Defendant Jones and Defendant Scoggin knew or should have known and understood, and a reasonable person would have known and understood, that engaging in the Retaliatory Actions, including their actions in conspiring to secure and subsequently securing the termination of Plaintiff Simon from St. Patrick Center as a result of his Protected Activities violated clearly established constitutional rights protected by the First and Fourteenth Amendments.

174.168.     The Retaliatory Actions to which Plaintiff Simon was subjected were taken under color of state law because, among other things: Defendant Jones and Defendant Scoggin discussed retaliating against Plaintiff Simon and planned their course of action in their capacities as public officials.

175.169.     In directly threatening St. Patrick Center with the loss of public contracts and/or funds if they did not immediately fire Plaintiff Simon, Defendant Jones represented that she would take such action to deprive St. Patrick Center of funding through her capacity as an official policymaker as the Mayor of the City of St. Louis.

176.170.      Defendant Jones and Defendant Scoggin knew that they had influence over the actions of St. Patrick Center based on the relationship of dependence that St. Patrick Center had with the Mayor, with the Department of Human Services, and with the City of St. Louis as an administrator of federal funds from HUD.

177.171.      Defendant Jones and Defendant Scoggin knew that the management of St. Patrick Center would be frightened and disturbed by the Mayor's implicit threat that if they did not follow her directions to immediately fire Plaintiff Simon, the Mayor would make them one of her political enemies and would use her power and influence as Mayor against them.

178.172.      Defendants' actions were intentional, willful, motivated by evil and malicious motive and intent, and involved reckless and callous indifference to Plaintiff Simon's constitutionally protected rights, and were designed to damage him.

WHEREFORE, Plaintiff Simon respectfully requests this Court:

a.      Enter judgment in favor of Plaintiff and against the Defendants;

b.      Award Plaintiff monetary damages in an amount that is fair and reasonable to compensate him for the damages he has suffered including lost wages, future wages, and other benefits of employment;

c.      Award Plaintiff punitive damages against the Defendants named herein in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct;

d.      Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law;

e.      Require the Mayor and her staff to undergo appropriate re-training on an annual basis; and

      f.     Allow such other and further relief as the Court deems just and proper.

**COUNT TWO**
**--**
**Conspiracy to Violate Simon's Constitutional Rights**
**Cognizable Under 42 U.S.C. § 1983**
*Against Tishaura Jones and Yusef Scoggin in their official <u>and individual</u> capacities~~, and against Advantes Group, LLC~~.*

~~179.~~<u>173.</u>     Plaintiff Simon repeats, re-alleges and incorporates by reference all facts and allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

~~180.~~<u>174.</u>     After the March 10, 2023 incident at the Riverfront Encampment, upon information and belief, Defendants Jones~~,~~ <u>and</u> Scoggin~~, and Advantes~~ met to discuss the actions they would take against Plaintiff Simon to retaliate against him for his exercise of free speech rights as set forth above.

~~181.~~<u>175.</u>     Defendants conspired together ~~and amongst themselves~~ and as a result reached a mutual understanding to protect the Mayor and her administration from scrutiny or criticism as a result of the legitimate concerns Plaintiff Simon was raising about the operations of the City and its Department of Human Services, and the impact of their actions on the health, safety, and welfare of persons experiencing homelessness, and to advance ~~both~~ Defendant Jones ~~and Defendant Advantes Group's~~ agenda of evicting persons experiencing homelessness quietly and swiftly, without public scrutiny~~, so that Defendant Advantes could pursue their real estate development goals~~.

~~182.~~<u>176.</u>     Defendants agreed in these meetings that Mayor Jones would retaliate against Plaintiff Simon to discourage him from engaging in the protected activity of criticizing the Mayor, and after such meetings, in furtherance of this conspiracy, Mayor Jones did retaliate against Plaintiff Simon and violate his constitutionally protected speech by threatening his

34

employer, St. Patrick Center, with the loss of public funding, if they did not terminate Plaintiff
Simon.

~~183.~~177.      During these meetings, Defendants Jones~~,~~ and Scoggin~~, and Advantes~~
acted together under color of state law.

~~184.~~178.      Defendants shared the general conspiratorial objective which was to
retaliate against Plaintiff Simon and ultimately bully, lean on, threaten, coax, cajole, or persuade
St. Patrick Center to either fire Plaintiff Simon or suffer a loss of public income, because the
Mayor would use her power to block public funding of St. Patrick Center's activities.

~~185.~~179.      Defendants participated in the unconstitutional conduct set forth above so
as to effectively insulate themselves from public scrutiny and criticism, and as a result, the
Mayor feels free to engage in the misconduct as aforedescribed, without any fear of sanction or
retribution.

~~186.~~180.      Defendants Scoggin ~~and Advantes~~ furthered the conspiracy by
participating in it from its inception or by participating in the cover-up thereof and/or ignoring
the course of conduct set forth herein so as to insulate ~~themselves~~ himself from liability for the
outrageous and unlawful acts of the Mayor as described herein, showing a tacit understanding to
carry out the prohibited conduct.

~~187.~~181.      As a direct and proximate result of the conspiracy among the Defendants,
Plaintiff Simon was fired without any allegation that he had engaged in any misconduct related
to his employment, and without any allegation that he had failed to properly perform his job
duties.

~~188.~~182.      As a direct and proximate result of the conspiracy amongst the Defendants
named herein, Plaintiff Simon has suffered and will continue to suffer emotional pain and

suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

189.183.        The conduct of the Defendants named herein as set forth above was wanton, willful, and showed a reckless indifference to Plaintiff Simon's constitutional rights as set forth above, justifying an award of punitive damages against these Defendants in their individual capacities.

WHEREFORE, Plaintiff Simon respectfully requests this Court:

a.    Enter judgment in favor of Plaintiff and against the Defendants;

b.    Order Defendants to make Plaintiff whole and award Plaintiff monetary damages in an amount that is fair and reasonable to compensate him for the damages he has suffered, including lost wages, future wages, and other benefits of employment;

c.    Award damages to Plaintiff for his emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress and loss of reputation;

d.    Award Plaintiff punitive damages against the Defendants named herein in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct;

e.    Award Plaintiff reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

f.    Allow such other and further relief as the Court deems just and proper.

### COUNT THREE
**--**
**Due Process Violation Under the Fifth and Fourteenth Amendments to the United States Constitution, Cognizable Under 42 U.S.C. § 1983**
*Against Tishaura Jones and Yusef Scoggin in their official and individual capacities, and against Advantes Group, LLC.*

190.184.     Plaintiff Simon repeats, re-alleges and incorporates by reference all facts and allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

191.185.     Plaintiff Simon had an at-will employment agreement with St. Patrick Center to work as a full-time Coordinated Street Outreach Worker in the City of St. Louis in order to further the St. Patrick Center's mission to combat homelessness in the City of St. Louis.

192.186.     Plaintiff Simon validly and reasonably expected and hoped to continue his employment with St. Patrick Center well into the future.

193.187.     At-will employees, such as Plaintiff Simon, have a due process right to be free from arbitrary government interference in their employment relation.

194.188.     Defendants Jones, Defendant and Scoggin , and Defendant Advantes were aware of the employment agreement between St. Patrick Center and Plaintiff Simon as evidenced by their coordinated efforts to get him fired from that employment.

195.189.     Defendants Jones and Scoggin both knew that as government officials, by demanding that St. Patrick Center fire Plaintiff Simon, they were violating Plaintiff Simon's constitutional rights.

196.190.     Defendants Jones, Scoggin, and Advantes also knew that by demanding that St. Patrick Center fire Plaintiff Simon, they would set in motion a series of acts by others which they knew or reasonably should have known would cause Plaintiff Simon injury.

197.191.     Defendants Jones, Scoggin, and Advantes all knew that the exercise of their authority over a private employer, such as St. Patrick Center, demanding the discharge of an employee, would violate the employee's right to due process.

WHEREFORE, Plaintiff Simon respectfully requests this Court:

a.     Enter judgment in favor of Plaintiff and against the Defendants;

37

b.      Order Defendants to make Plaintiff whole and award Plaintiff monetary damages in an amount that is fair and reasonable to compensate him for the damages he has suffered, including lost wages, future wages and other benefits of employment;

c.      Award damages to Plaintiff for his emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress and loss of reputation;

d.      Award Plaintiff punitive damages against the Defendants named herein in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct;

e.      Award Plaintiff reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

f.      Allow such other and further relief as the Court deems just and proper.

## COUNT FOUR
## --
## Tortious Interference with Employment Relationship or Agreement
## Under Missouri Common Law
*Against Advantes Group, LLC, and iI*n the alternative to Counts I, II, and III against Tishaura Jones and Yusef Scoggin in their individual capacities, *if they are found by the Court to have acted in their individual, and not official capacities.*

198.192.      Plaintiff Simon repeats, re-alleges and incorporates by reference all facts and allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

199.193.      Defendants Jones, Scoggin, and Advantes Group were aware of the employment agreement and Simon's reasonable expectation that such relationship would continue between St. Patrick Center and Plaintiff Simon, as evidenced by their coordinated efforts to get him fired from that employment.

200.194.    Defendants intentionally and improperly interfered with Plaintiff Simon's employment agreement and reasonable expectation that such employment would continue with St. Patrick Center when they, among other things: placed phone calls to members of management at St. Patrick Center and complained that Plaintiff Simon's Protected Activities were "interfering" with their actions in evicting and displacing persons experiencing homelessness, and destroying their personal property to punish them, and when Defendant Jones instructed Chief Executive Officer Anthony D'Agostino to terminate Plaintiff Simon's employment immediately, or face the Mayor's retaliatory animus.

201.195.    As a direct result of the actions taken by Defendants, and immediately following Defendant Jones's phone conversation with Chief Executive Officer Anthony D'Agostino on March 24, 2023, St. Patrick Center terminated Plaintiff Simon's employment on March 30, 2023.

202.196.    But for the actions of Defendant Jones and Defendant Scoggin in interfering with his employment, Plaintiff Simon would not have been terminated from St. Patrick Center.

203.197.    The actions of Defendant Jones and Defendant Scoggin in securing Plaintiff Simon's termination of employment from St. Patrick Center were taken in bad faith with bad motive, and without legal justification.

204.198.    The actions of Defendant Jones and Defendant Scoggin in securing Plaintiff Simon's termination of employment from St. Patrick Center were taken to retaliate against Plaintiff Simon for engaging in Protected Activities, were intended to silence and suppress Plaintiff Simon and intimidate others who may engage in similar Protected Activities in opposition to Mayor Jones's agenda, and were intended to and did cause harm to Plaintiff Simon.

39

~~205.~~199.        As a result of the actions of Defendant Jones and Defendant Scoggin in securing Plaintiff Simon's termination of employment from St. Patrick Center, Plaintiff Simon suffered damages that include, but are not limited to, lost wages, lost benefits, emotional distress and damages of the mind, and additional damages to be established at trial, plus costs, reasonable attorneys' fees, and other relief as allowed by law.

WHEREFORE, Plaintiff Simon respectfully requests this Court:

a.        Enter judgment in favor of Plaintiff and against the Defendants;

b.        Award Plaintiff monetary damages in an amount that is fair and reasonable to compensate him for the damages he has suffered, including past and future lost wages;

c.        Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

d.        Allow such other and further relief as the Court deems just and proper.

## CONCLUSION

**WHEREFORE**, Plaintiff Yitzchak Simon prays for judgment against the Defendants on all counts, for an award of money damages against them for compensatory and punitive damages in an amount that is fair and reasonable, for the costs of this action, including reasonable attorney's fees; and for such other and further relief as the Court deems fair and appropriate under the circumstances.

Dated: ~~July 31, 2023~~October 13, 2023.

Respectfully submitted,

NEWTON BARTH, L.L.P