UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| YITZCHAK SIMON, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-CV-00955 |
| | ) | |
| TISHAURA JONES, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants Tishaura Jones and Yusef Scoggin (collectively, "Defendants"), in their individual and official capacities, and, in support of their Motion for Summary Judgment, state as follows:

## INTRODUCTION

Plaintiff Yitzchak Simon (Simon), a former Coordinated Street Outreach Worker for St. Patrick's Center (SPC), brings this action against the current Mayor of the City of St. Louis (Jones) and the City's former Director of Human Services (Scoggin), asserting they cost him his job by complaining to the CEO of SPC about his behavior at a homeless encampment near the Riverfront (the Encampment) in March 2023. Specifically, Plaintiff brings three claims under 42 U.S.C. § 1983 in Defendants' individual and official capacities for various alleged constitutional violations. (Doc. 28, Counts I, II, III). In Count I, Plaintiff alleges that Jones retaliated against him in violation of the First Amendment by calling the CEO of SPC to complain about his behavior at the Encampment. In Count II, Plaintiff asserts a conspiracy claim, arguing that Jones and Scoggin conspired to get him fired. And in Count III, Plaintiff asserts that Defendants' actions violated his

1

due process rights under the Fifth and Fourteenth Amendment to be free from arbitrary government interference in his employment relation with SPC. Finally, in Count IV, Plaintiff brings a claim against Defendants in their individual capacities for "tortious interference with employment relationship or agreement" under Missouri common law. (Doc. 28, Count IV).

Judgment should be entered for Defendants, and against Plaintiff, for reasons outlined below.

## FACTS

Defendants incorporate by reference their Statement of Uncontroverted Material Facts ("SUMF"), which is filed separately herewith. The material, operative facts, are as follows:

In March 2023, the City of St. Louis decommissioned a homeless encampment at the Riverfront. (UMF #27). The Encampment was decommissioned because of an increase in violent crime, drug activity, overdoses, and its increased size, as well the river's rising. (UMF #30-33). The decision to close the Encampment was followed by months of planning and outreach to the homeless at the Encampment by DHS staff, headed by the Director of DHS, Dr. Yusef Scoggin. (UMF #28). Prior to the encampment's closure, outreach workers from DHS, as well as non-profit partners, began a concerted effort to engage the unhoused at the Encampment with the intent of connecting the unhoused to housing and recovery resources. (UMF #29).

At the time, Simon worked for SPC as a Coordinated Street Outreach Worker. (UMF #8). SPC is a homeless ministries organization that provides sustainable housing and healthcare services to persons experiencing homelessness in the City. SPC works in tandem with City's DHS staff to combat homelessness in the City. SPC is funded by a combination of governmental grants (local, state, and federal), individual donors, and corporate foundations. (UMF #19).

On multiple occasions at the Encampment, Simon interfered with vital outreach to the unhoused. (UMF #36-38). Specifically, on March 8, 2023, after DHS staff had connected several unhoused persons to treatment beds, Simon deterred these individuals from entering placement and told them DHS staff were not being truthful about the immediate resources available. (UMF #37). Then on March 24, 2023, while DHS outreach workers were at the Encampment offering services, Simon followed after the workers telling the unhoused they did not have to leave the area, yelling at City workers, flipping the middle finger to City workers, and calling a black City outreach worker the n-word. (UMF #38). Eventually the situation became so volatile that it required police intervention. (UMF #39).

On March 24, 2023, Jones was informed by DHS staff members and her Director of Operations, Nancy Cross, that a SPC employee was interfering with the delivery of services to the unhoused at the Encampment. (UMF #43). Specifically, Jones was told that a SPC employee, who she later learned was Simon, was telling "the unhoused people that they didn't have to leave as [City's] outreach workers were offering them places to -- places for shelter." (UMF #44). She called up Anthony D'Agostino (D'Agostino), the CEO of SPC, informed him of what she had learned, and expressed her disappointment that an SPC employee would interfere with City's outreach workers and the mission both City and SPC shared – to connect the unhoused with needed services before the Encampment's closure. (UMF #45). After the Mayor's call, D'Agostino instructed Simon to leave the Encampment; he also contacted Simon's supervisor to ensure that Simon left the area. (UMF #49). Simon eventually left the Encampment at the behest of SPC management. (UMF #50).

That same day, Ms. Goossens, Simon's supervisor, wrote an email to SPC management staff expressing "concern regarding Yitzy's behavior at the riverfront." (UMF #51). She opined

that Simon's behavior violated SPC's Rule 504.0, Conflict of Interest, which states that "it is the policy of the Agency to prohibit employees from engaging in any activity…which conflicts with, or appears to conflict with, the interests of the Agency, its clients, or its suppliers…Employees are not to engage in, directly or indirectly, either on or off the job, any conduct that is disloyal, disruptive, competitive with, or damaging to the Agency or to the Federation." (UMF #52). Ultimately, Simon's supervisor felt "it would be best to move forward with termination." (UMF #53). On March 27, 2023, the Senior Director of Programs at SPC, Megan Poole, concurred with Ms. Goossens and recommended that SPC move forward with terminating Simon. (UMF #54). On March 30, 2023, Simon was called in for a meeting with SPC management. (UMF #61). Attendees at that meeting were various SPC management staff, including D'Agostino, Goossens, Poole, and Anitra Cole, the Senior Director of Human Resources for SPC. (UMF #61). At the meeting, SPC determined that Simon would be terminated. (UMF #62). In considering his termination, SPC considered Simon's previous disciplinary history, including two corrective actions for unprofessional and disruptive behavior. (UMF #64-65).

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of his motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which he believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323.

4

After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In order to withstand the motion for summary judgment, the nonmoving party must substantiate his allegations with "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Gregory v. Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992). If the evidence is not significantly probative, the state officials are entitled to summary judgment as a matter of law. *Anderson*, 477 U.S. at 248- 52. Further, because the burden is on the plaintiff to overcome a defense of qualified immunity, the plaintiff opposing summary judgment must demonstrate the existence of triable issues of fact precluding summary judgment. *Conrod v. Davis*, 120 F.3d 92, 95 (8th Cir. 1997), citing *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987).

## ARGUMENT

I.    **Plaintiff's claim for First Amendment retaliation (Count I) fails against Defendants as a matter of law.**

A.    Defendants, in their individual capacities, are entitled to qualified immunity from Plaintiff's claims of First Amendment retaliation.

The doctrine of qualified immunity shields government officials from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). A government official is entitled to qualified immunity unless (1) he violated a plaintiff's constitutional right and (2) that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

5

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Once a defense of qualified immunity is raised, a plaintiff must offer 'particularized' allegations of unconstitutional or illegal conduct." *Conrod*, 120 F.3d at 95, citing *Anderson*, 483 U.S. at 639–40. Qualified immunity is both a defense to liability and a limited "entitlement not to stand trial or face the other burdens of litigation." *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Context is critical in determining qualified immunity. *See Estate of Leon Walker, Jr. v. Wallace, et al.*, 881 F.3d 1056, 1061 (8th Cir. 2018), citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). "[O]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004).

a.  Plaintiff did not engage in clearly established protected activity.

In order for a right to be clearly established "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. "In other words, the right violated must have been established 'beyond debate.'" *Mendoza v. U.S. Immigration and Customs Enforcement*, 849 F.3d 408, 417 (8th Cir. 2017) citing *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 989 (8th Cir. 2015) (quoting *City & Cty. of S.F., Cal. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015)).

Further, it is a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) citing *Ashcroft v. al-Kidd*, 563 U. S. 731, 742 (2011). "The clearly established law must be 'particularized' to the facts of the case." *White*, 137 S.Ct. at 552 citing *Anderson*, 483 U. S. at 640. "Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified

6

liability simply by alleging violation of extremely abstract rights." *White*, 137 S.Ct. at 552 citing *Anderson*, 483 U. S. at 639. Qualified immunity gives "government officials breathing room to make reasonable but mistaken judgments." *Mendoza*, 2017 WL 676526, at *4 quoting *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014) (quoting *Stanton v. Sims*, 571 U.S. 3, 134 S.Ct. 3, 5 (2013)).

Although Defendants maintain that on March 24, 2023, Simon interfered with City outreach workers at the Encampment by telling the unhoused with which City workers engaged that they did not have to leave the area, yelling at City workers, flipping the middle finger to City workers, and calling a black City outreach worker the n-word, in the light most favorable to Plaintiff, Simon alleges that he arrived at the Encampment and "asked [a City worker] what was going on. [He] probably spoke with the two homeless outreach police officers, and [] spoke to a few unhoused people, just saying, 'Hello,' and asking them what led – what happened." (UMF #39). Otherwise, he remembers that he did "a lot of standing around…that's pretty much it." (UMF #40).

There are some First Amendment activities that are unequivocally protected, like burning the American flag, *Texas v. Johnson*, 491 U.S. 397, 406 (1989), burning draft cards, *O'Brien*, 391 U.S. at 376, and marching in a parade, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 568-70 (1995). "A lot of standing around" has never been an established right under the First Amendment. Moreover, it is not clearly established that Plaintiff's speaking to City outreach workers, the unhoused, and/or City police is a right within the purview of the First Amendment. Because Plaintiff cannot, and will not be able to, establish his activity was clearly established under the First Amendment, Defendants are entitled to qualified immunity.

      b. <u>Defendants did not take adverse action against Plaintiff for engaging in protected activity.</u>

7

To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, "the plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014). It is the plaintiff's burden to show the retaliatory motive was a "substantial factor" or a "but-for" cause of the action. *Barbibeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010). "If the [adverse action] was driven not by 'animus' but by the defendant's understanding—however mistaken—of their official duties, then it was not retaliatory.'" *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022).

Initially, it is important that if Simon's account of his actions on March 24, 2023 are taken as true – namely, that Simon was merely standing around and speaking to people at the Encampment – there would be no way for Defendants to know that he was engaged in First Amendment activity because such activities are not clearly protected under the First Amendment. And because Simon's actions were not clearly protected, any action by Defendants could not have been in retaliation for him exercising protected activity. Thus, Defendants are entitled to qualified immunity.[1]

In any event, even assuming for the sake of argument that Simon was engaged in protected activity while at the Encampment, Defendants' actions of complaining to his employer about his behavior was not driven by animus but by Defendants' understanding of Simon's actions at the

---

[1] Plaintiff alleges in his Complaint that on March 8, 2023, he participated in a protest in front of City Hall. The protest targeted City's policies regarding the unhoused. Notably, neither Jones nor Scoggin knew of the protest in front of City Hall or who attended it. (UMF #67). Plaintiff cannot, and will not be able to, show Defendants had a retaliatory animus against Simon for attending a protest they never knew occurred. In his Complaint, Plaintiff also alleges that Jones and Scoggin retaliated against him for being part of a voluntary organization called "Tent Mission." Notably, Jones is unfamiliar with Tent Mission. (UMF #68). Thus, Plaintiff cannot, and will not be able to, show Defendants had a retaliatory animus against Plaintiff for participation in an organization they know nothing about.

Encampment- namely, that he was interfering with City workers who were trying to provide shelter to a vulnerable population before the Encampment's closure. Specifically, Jones was told that a SPC employee, who she later learned was Simon, was telling "the unhoused people that they didn't have to leave as [City's] outreach workers were offering them places to -- places for shelter." (UMF #44). She called up Anthony D'Agostino (D'Agostino), the CEO of SPC, informed him of what she had learned, and expressed her disappointment that an SPC employee would interfere with City's outreach workers.[2] (UMF #45). Similarly, Scoggin was informed that Simon was at the Encampment flipping off City workers, and interfering with the services being offered to the homeless. (UMF #41). After learning of Simon's behavior on March 24, 2023, Scoggin then spoke by phone to D'Agostino no more than twice "to inform him of the engagement [with Simon] and to make sure he was aware of the interference and behavior that [Scoggin] didn't believe [D'Agostino] would find appropriate by staff that were on [D'Agostino's] team." (UMF #42). Defendants' actions, therefore, were not motivated by any animus against Simon; instead, Defendants' motivation was to provide shelter and services to the unhoused at the Encampment, and Simon's actions stood in the way of effectively providing those services. Because Plaintiff cannot, and will not be able to, show that animus was the but-for cause of Defendants' actions, they are entitled to qualified immunity on Plaintiff's First Amendment retaliation claim.

B. Defendants, in their official capacities, are entitled to judgment as a matter of law where Plaintiff, cannot, and will not be able to, show that City retaliates against persons who exercise their First Amendment rights.

---

[2] In his complaint, Plaintiff alleged that Jones called up D'Agostino threatening to withhold public funding from SPC if he did not terminate Simon. After sufficient time for discovery, Plaintiff cannot, and will not be able to, produce any evidence of such. The Mayor denied ever making such a threat. (UMF #46). The Mayor's Director of Operations, Nancy Cross, who was on the call with Jones and D'Agostino does not recall the Mayor ever making such a threat. (UMF #47). And when D'Agostino was asked whether Jones made the threat, D'Agostino said "I don't remember her mentioning anything about funding." (UMF #48).

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). "The Supreme Court has set a high bar for establishing municipal liability under section 1983, and demands careful analysis from district courts, to avoid any risk that liability could be imposed under a theory of respondeat superior." *Soltesz v. Rush Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947 (8th Cir. 2017), citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

"[A] local government is liable under § 1983 for its policies that cause constitutional torts. These policies may be set by the government's lawmakers, 'or by those whose edicts or acts may fairly be said to represent official policy.'" *McMillian v. Monroe Cnty.*, 520 U.S. 781, 784, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), *quoting Monell*, 436 U.S. at 694, 98 S.Ct. 2018. "Municipal liability 'may be imposed for a single decision by municipal policymakers' who possess 'final authority to establish municipal policy with respect to the action ordered.'" *Hamilton v. City of Hayti*, 948 F.3d 921, 929 (8th Cir. 2020), *quoting Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81, (1986) (majority opinion). "[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion), *citing Pembaur*, 475 U.S. at 482-83, and n.12, 106 S.Ct. 1292 (plurality opinion).

As the Director of Human Services, Scoggin is not a lawmaker, nor does he possess final authority to establish municipal policy with respect to the Department of Human Services. Instead, he is hired by, and serves at the pleasure of, the Mayor; he has various responsibilities, multiple divisions under him, one of which is homelessness, which he manages and oversees. (UMF #8).

None of Scoggin's official responsibilities include making official policy for the City. Jones, on the other hand, is the Mayor of the City of St. Louis; she is the "chief executive officer of the city." (UMF #4, citing St. Louis, Mo., City Charter art. VII, § 1). As such, liability may be imposed against City for her actions under *Monell* in certain circumstances, but not on the facts at issue here.

The holding in *Felts v. Green*, 91 F.4th 938 (8th Cir. 2024), although distinguishable, is instructive on this point. In *Felts*, the plaintiff sued the President of the Board of Aldermen, in his official capacity, for blocking her Twitter account on the President's official governmental Twitter account in violation of the First and Fourteenth Amendment. *Id.* at 940. As the President of the Board of Aldermen, the President "had the final authority regarding communication on behalf of the Office of President of the Board of Aldermen for the City of St. Louis." *Id.* at 942. The Eighth Circuit found that "[w]hen Reed blocked Felts on Twitter, he executed a final municipal policy in his area of the City's business, the office of the President of the Board of Aldermen" and noted that the President had blocked at least five other specific individuals from his account who criticized him as an elected official. *Id.* at 943. In holding that Reed's "choice to block Felts on a government account was unilateral, unreviewable, and not subject to other policies," the Court determined "he created municipal policy in his area of the City's business." *Id.* at 944.

In contrast, here, Jones does not have unilateral or unreviewable control over Simon, his employment with SPC, or any decision (employment or otherwise) within SPC. Plaintiff may argue that Jones' actions of allegedly threatening to withhold public funds from SPC unless SPC fired Simon constitutes an action by City. While such claims are utterly baseless (see UMF #46-48), even if true, Jones does not have unilateral, unreviewable control over the distribution of public funds. There is bidding process for an award of public funds; that bidding process is outlined

11

in City Ordinance No. 64102. Money is set aside from the City's general fund (and/or from funding from the federal government) for designated purposes as determined by the City's legislative body, the Board of Aldermen. (UMF #22). Some of those funds are set aside for various unhoused issues.

The City then accepts bids for the designated work; organizations apply to do the work for which there is funding. (UMF #23). The bids are then evaluated by a committee staffed by representatives of the Mayor's Office, Board of Aldermen, and the Comptroller's Office. (UMF #24). That committee then makes a recommendation to the Board of Estimate and Apportionment (BEA), who then finally votes to approve the committee's recommendation. (UMF #25). The Board of Estimate and Apportionment is made up of the Mayor, the Comptroller, and the President of the Board of Aldermen. (UMF #26). So, even if Jones threatened to withhold public funds from SPC if they did not fire Simon, she would not have had the unilateral, unreviewable authority to do so.

Therefore, unlike in *Felts* where municipal liability attached because of the official's unilateral and unreviewable actions, here, no such liability should attach. Moreover, unlike in *Felts*, where the President of the Board of Aldermen blocked numerous Twitter accounts from the President's page, here, Jones does not remember ever calling a private employer to complain about the behavior of their employee. (UMF #69). Thus, the facts here demand an opposite holding than in *Felts*, and judgment should be entered for City, and against Plaintiff, on Count I.

Municipal liability may also be established if Plaintiff shows that City had an unconstitutional custom of retaliating against persons for exercising their First Amendment rights. To establish a claim of liability based on "custom," the plaintiff must demonstrate: 1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; 2) deliberate indifference to or tacit authorization of such conduct by the

governmental entity's policymaking officials after notice to the officials of that misconduct; and 3) that plaintiff was injured by acts pursuant to the governmental entity's custom i.e., that the custom was the "moving force" behind the constitutional violation. *Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013). Under the second element, a municipality may not be held liable on the basis of custom unless there is "a pattern of 'persistent and widespread' unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law." *Jane Doe "A" v. Special School Dist*., 901 F.2d 642, 646 (8th Cir. 1990); *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978).

In this case, Plaintiff has not alleged, nor will he be able to show, an unconstitutional pattern of City retaliating against persons for exercising their First Amendment rights that is so well-settled as to have the effect and force of law, and thus, judgment is warranted for City, and against Plaintiff on Count I.

## II. Defendants are entitled to summary judgment on Plaintiff's civil conspiracy claim (Count II).

### A. By federal law, there can be no conspiracy in this case against City, or against Jones and Scoggin their official capacities.

Because a conspiracy by its nature involves multiple parties, the intracorporate conspiracy doctrine provides that "a local government entity cannot conspire with itself through its agents acting within the scope of their employment." *Kelly v. Cty of Omaha*, 813 F.3d 1070, 1078 (8th Cir. 2016), citing *L.L. Nelson Enters., Inc. v. Cty. of St. Louis, Mo.*, 673 F.3d 799, 812 (8th Cir. 2012). Government agents can act within the scope of their employment duties "even though [a] complaint alleges improprieties in the execution of these duties." *L.L. Nelson Enters., Inc.,* 673 F.3d at 812 (8th Cir. 2012) (holding that "[t]he referral of moving companies to property owners seeking the execution of evictions was within the scope of employment for deputies and staff

members in the sheriff's office" even where employees used those referrals to execute a kickback scheme and to punish a moving company seeking to end that scheme); *see also Cross v. Gen. Motors Corp.*, 721 F.2d 1152, 1157 n.7 (8th Cir. 1983) (finding alleged acts of company's agents within the scope of their employment where those acts included making "false entries" in plaintiff's employment records, improperly denying the plaintiff overtime pay, and "physically batter[ing]" the plaintiff).

Here, Plaintiff argues that Defendants conspired to violate plaintiff's civil rights. This case is similar to *Kelly v. City of Omaha*, 813 F.3d 799 (8th Cir. 2016). In that case, the plaintiff brought a conspiracy claim against the City of Omaha alleging violations of her civil rights under the Fourth, Fifth, and Fourteenth Amendments. *Id.* The Eighth Circuit affirmed the district court's dismissal of the city, holding that although the plaintiff alleged improprieties in the execution of the city employees' duties, this fact alone was insufficient to evade the intracorporate conspiracy doctrine. *Id.* at 1079. Here, similarly, plaintiff does not allege, and cannot show, that Defendants were acting outside the scope of their employment duties; plaintiff merely alleges improprieties in the execution of their duties. Like in *Kelly*, this Court should find plaintiff's allegations of Defendants' improprieties, without more, are insufficient to state a claim for civil conspiracy against City, as said claims are barred by the intracorporate conspiracy doctrine.

Moreover, Plaintiff's civil conspiracy claim against City fails because the underlying claims, upon which the conspiracy claim is premised, fail. In the absence of a violation, there is no actionable conspiracy claim. *Cook v. Tadros*, 312 F.3d 386, 388-89 (8th Cir. 2002), citing to *Hanten v. School Dist. of Riverview Gardens*, 183 F.3d 799, 809 (8th Cir. 1999) (affirming dismissal of violation of employees' right of free association claim under section 1983, holding that a civil conspiracy claim does not set forth an independent cause of action, but is sustainable

only after an underlying violation has been established); and *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990) (holding that a conspiracy claim is not actionable without an actual violation of section 1983) (vacated in part on other grounds).

As demonstrated throughout this memorandum, Plaintiff fails to establish any constitutional violation. Because Plaintiff cannot, and will not be able to, establish that Defendants violated his civil rights, Plaintiff's civil conspiracy claim against City must fail, as it is not an independent cause of action.

> B. Defendants are entitled to qualified immunity on Plaintiff's conspiracy claim in their individual capacities.

Defendants, in their individual capacities, are entitled to qualified immunity on Plaintiff's conspiracy claim where it is not clearly established whether or not the intracorporate conspiracy doctrine applies to Defendants. The Eighth Circuit's holding in *Street* controls here.

In *Street*, the plaintiffs brought suit against various City police officers for surrounding and arresting them at an anti-police protest in September 2017; one of their counts included a claim for conspiracy under Section 1983. *St. v. Leyshock*, 41 F.4th 987, 990 (8th Cir. 2022). The officers asserted they were entitled to qualified immunity on the plaintiffs' conspiracy claims because of the unsettled nature of the intracorporate conspiracy doctrine as it applied to them. *Id.* at 990. The Court noted the holdings in *L.L. Nelson Enters. v. County of St. Louis*, 673 F.3d 799 (8th Cir. 2012), *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), and *Faulk v. City of St. Louis, Missouri*, 30 F.4th 739 (8th Cir. 2022), and awarded the officers qualified immunity on the conspiracy claim, where "neither the Supreme Court nor this court had definitively addressed the issue whether the doctrine applies to § 1983 conspiracy claims," *Street*, 41 F.4th at 990, citing *Faulk*, 30 F.4th at 749.

15

Moreover, as addressed throughout this memorandum, Plaintiff cannot, and will not be able to, show that Defendants violated his civil rights. And without this underlying violation, Defendants are entitled to qualified immunity on Count II.

III.    **Count III fails as a matter of law where Plaintiff cannot, and will not be able, to establish a violation of his due process rights under the Fifth and Fourteenth Amendments.**

      A.    Plaintiff fails to establish that City has an unconstitutional policy of custom of depriving persons of their due process rights under the Fifth and Fourteenth Amendments.

City, or Defendants in their official capacities, is entitled to judgment as a matter of law where Plaintiff has failed to establish that City had an unconstitutional policy and custom of denying persons due process under the Fifth and Fourteenth Amendments. As addressed above, in order to establish *Monell* liability against Defendants, he must demonstrate the City maintained an unconstitutional policy and/or unconstitutional pattern so well-settled as to have the effect and force of law. As with his allegations under the First Amendment, Plaintiff cannot make any such showing as to his due process rights. Indeed, the Amended Complaint does not even allege any other incidences wherein City violated persons due process rights by interfering with their employment. At best, the Amended Complaint asserts one other outlandish and inflammatory allegation that a member of Jones' senior staff told Board of Alderman President Megan Green that the Mayor wanted her to know that if Green " 'interferes with the City evicting the homeless encampments, the Mayor will cut off all communications with you, 'black list' you, and no one will work with you, and you will not be able to get anything done,' or words to that effect." (Doc. 28, ¶ 152). Notably, however, Plaintiff has failed, and will not be able, to substantiate this assertion. And even if he could, such rhetoric to a fellow politician is a far cry from interfering with Green's due process rights to employment, nor does this alleged isolated incident create an unconstitutional

16

policy or custom. Thus, because Plaintiff has failed to show that City has an unconstitutional policy or custom of depriving persons of their due process rights under the Fifth and Fourteenth Amendments, Count III against City must fail.

### B. Defendants are entitled to qualified immunity on Plaintiff's due process claim.

Defendants are entitled to qualified immunity in Count III where Plaintiff will not, and cannot, show that Defendants violated Plaintiff's clearly established due process rights.

While an at-will employee, like Plaintiff, has no property interest in his employment for Fourteenth Amendment purposes, the Eighth Circuit has recognized that an at-will employee's right to be free from arbitrary government interference in his employment relation gives rise to a due process right. *See Chernin v. Lyng,* 874 F.2d 501, 505–06 (8th Cir. 1989). This right arises when government officials, through exercise of their regulatory authority over an employer, demands the discharge of an employee. *Id.* at 502–03, 506 (where a government agency required a private employer over whom it had regulatory authority to fire an employee against the employer's own judgment or will); *Waddell v. Forney*, 108 F.3d 889, 893 (8th Cir.1997) (where the defendants required First Family to fire *Waddell* immediately or lose the insurance on its deposit funds); *Helvey v. City of Maplewood*, 154 F.3d 841, 843 (8th Cir. 1998) (where the City Manager threatened to shut down a bar and revoke its liquor license if the bar owner did not fire one of its employees who testified against the city's police).

Here, however, as seen above, Defendants had no regulatory authority over SPC. SPC's funding resources came from many different sources, including state funds, federal funds, individual donors, and foundation funds. (UMF #19). The origin of any funds SPC received from City resulted from a multiple-step committee process, of which the Mayor was not personally involved. (See UMF #24). And even at the Board of Estimate and Apportionment level, she is

merely one of three votes. (UMF #26). Therefore, unlike in *Cernin*, *Waddell*, and *Helvey*, Defendants had no regulatory authority, or other authority, over SPC.

Nor is there any probative evidence Defendants demanded that Plaintiff be terminated. D'Agostino made clear that SPC made an independent decision to terminate Simon, and that the decision to terminate Simon was not for City officials to make. (UMF #66). Nancy Cross, who participated in the Mayor's conversation with D'Agostino, never heard Jones threaten Plaintiff's employment. (UMF #47). In fact, as a member of the Mayor's senior staff, Cross took the affirmative step of telling D'Agostino *not* to fire Simon after the March 24th debacle. (UMF #56). SPC management noted that Simon's interaction with City officials on March 24, 2023, was just one of two other prior examples where Simon's disruptive and unprofessional behavior crossed a line. (UMF #12, 14). Simon was terminated because his unprofessional interaction with City officials at the Encampment was his third strike. (UMF #15-17). Based on these facts, Plaintiff cannot, and will not be able, to show that Defendants threatened or otherwise interfered with Simon's employment in violation of Plaintiff's Fifth and Fourteenth Amendment rights.

In *Paul v. Davis*, 424 U.S. 693 (1976), the Supreme Court determined that the due process clauses do not by itself "extend to a person a right to be free of injury whenever the State may be characterized as the tortfeasor." Therefore, to prevail on these due process claims, a plaintiff must allege more than mere injury. Rather, a plaintiff must bring some tangible element that has risen to the level of a *protectible* property interest. *Zutz v. Nelson*, 601 F.3d 842, 849 (8th Cir. 2010) (emphasis added). To survive summary judgment on their due process argument, a plaintiff must allege actions by a government official which 'violated one or more fundamental constitutional rights' and were 'shocking to the contemporary conscience.'" *Id.* at 850 (8th Cir. 2010), quoting *Flowers v. City of Minneapolis,* 478 F.3d 869, 873 (8th Cir. 2007). Plaintiff has failed to show any

conduct by Defendants that is "shocking to the contemporary conscience." As such, Defendants are entitled to qualified immunity.

Lastly, but importantly on Plaintiff's 1983 claims, Plaintiff cannot, and will not be able to, show that Simon suffered any damage from Defendants' actions. "In a § 1983 case, both compensatory and punitive damages are available upon proper proof." *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997). Here, Plaintiff cannot establish with proper proof that he suffered any damage. After his termination, Plaintiff applied to only one other non-profit job before becoming a corporate employee. He currently makes more as a bus driver than he ever did with SPC. Because Plaintiff cannot prove damages that resulted from Defendants' alleged violations of his constitutional rights, judgment should be entered for Defendants.

## IV. Defendants are entitled to official immunity on Plaintiff's claim of tortious interference under Missouri law (Count IV).

The doctrine of official immunity "protects a public official from liability if that official acts within the course of his official duties and without malice." *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. 2019) (citation omitted). "The official immunity doctrine serves an important function in our society. . . . [S]ociety's compelling interest in vigorous and effective administration of public affairs requires that the law protect those individuals who, in the face of imperfect information and limited resources, must daily exercise their best judgment in conducting the public's business." *Kanagawa v. State*, 685 S.W.2d 831, 836 (Mo. banc 1985).

There is, however, "a narrow exception to the application of the official immunity doctrine — i.e., when a public officer fails to perform a ministerial duty required of him by law, he may be personally liable for the damages caused." "Thus, the central question is whether there is any room whatsoever for variation in when and how a particular task can be done. If so, that task — by definition — is not ministerial." *Id.* (citation omitted). "[A] ministerial function is the antithesis of

a function that is left to be performed in a manner the acting official believes to be 'appropriate' or 'suitable.'" *Warren v. State*, 939 S.W.2d 950, 954 (Mo. App. W.D. 1997).

Here, Defendants' act of calling Simon's employer was discretionary, not ministerial. There is no evidence that calling Simon's employer was a task required of Defendants by law. There was much room for variation in when and how Defendants' could call Simon's employer, if at all, and thus, it is undisputed that Defendants are entitled to official immunity as their actions were discretionary, and not ministerial.

Another exception to official immunity is malice. "Official immunity will not protect a public official from liability if that official performs a discretionary duty with malice." *See Laughlin v. Perry*, 604 S.W.3d 621, 625 (Mo. 2020), citing *Alsup*, 588 S.W.3d at 190. In order for the plaintiff to show malice there must be evidence that the official had an actual intent to injure the plaintiff. *State ex rel. Love v. Cunningham*, 689 S.W.3d 489, 498 (Mo. 2024). Reckless or gross negligence does not amount to malice. *Id.* ("Malice…is the only mental state to which official immunity does not apply under Missouri law."); *see also*, *Carlton v. Means*, 688 S.W.3d 625, 631 (Mo. App. E.D. 2024) (expressly distinguishing the malice exception in this state from other jurisdictions that provide exceptions of official immunity for "recklessness or gross negligence.").

Here, there is no indication that Defendants' acted with an actual intent to injure Simon. Jones testified that she did not know Simon personally, and would not know him if she saw a picture of him. (UMF #6). Scoggin knew of Simon before March 24, 2023, and had various interactions with him, but there is no evidence that Scoggin had an actual intent to cause Simon any harm. (UMF #2). Over and over again, Scoggin testified that he called D'Agostino to let him know of Simon's inappropriate behavior, but he did not ask D'Agostino to do anything with

respect to Simon or his employment. (UMF #42). But even if Defendants asked D'Agostino to instruct Simon to leave that is a far cry from an actual intent to injure Simon.

Because Defendants' actions were discretionary and without malice, they are entitled to official immunity.

## CONCLUSION

In conclusion, Plaintiff's claims against Defendants fail as a matter of law, and Plaintiff cannot, and will not be able to, establish facts supporting any claim against Defendants, and so, judgment should be entered for Defendants, and against Plaintiff.

Respectfully submitted,

SHEENA HAMILTON
CITY COUNSELOR

By: /s/ Abby Duncan
Abby Duncan, 67766(MO)
Associate City Counselor
Morgan Henry, 87339 (MI)
Assistant City Counselor
1200 Market Street
City Hall Room 314
St. Louis, Missouri 63103
Phone: (314) 622-4694
DuncanA@stlouis-mo.gov
HenryM@stlouis-mo.gov

*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify the foregoing was electronically filed on February 14, 2025 with the Court for service by means of Notice of Electronic Filing upon all attorneys of record.

/s/ Abby Duncan

21