```
 1           IN THE UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MISSOURI

 3                     EASTERN DIVISION

 4   YITZCHAK SIMON,                           )
                                               )
 5        Plaintiff,                           )
                                               )
 6   v.                                        ) No. 4:23-cv-00955
                                               )
 7   TISHAURA ONEDA JONES, et al.,             )
                                               )
 8        Defendants.                          )

 9

10

11

12

13

14              DEPOSITION OF TISHAURA JONES

15            TAKEN ON BEHALF OF THE PLAINTIFF

16

17                   DECEMBER 5, 2024

18

19

20

21

22      (Starting time of the deposition:  10:04 a.m.)

23

24

25                                           EXHIBIT 1
```

1  said that?
2       A.   No.  No, I don't know what relationship
3  Mayor Krewson had, but I can -- you can always make
4  things better.
5       Q.   Okay.  Were you aware that there had been
6  protests against Mayor Krewson related to how she
7  treated the homeless issue in the city of St. Louis?
8       A.   No.
9       Q.   Okay.  During your time as mayor, have
10 there been protests against your policies as it
11 relates to the unhoused population?
12      A.   I don't know.
13      Q.   Okay.  You don't -- you're not aware of
14 any protests or demonstrations at City Hall related
15 to the March 2023 eviction of the riverfront --
16      A.   No.
17      Q.   -- encampment?  Do you watch the news?
18      A.   Yes.
19      Q.   Okay.  You're not aware that there is a
20 Channel 5 news story in March of 2023 related to the
21 eviction at the riverfront?
22      A.   No.
23      Q.   Okay.  You're not aware that there was an
24 STLtoday news article criticizing your
25 administration as to how it was handling the

```
 1   riverfront encampment --
 2        A.    No.
 3        Q.    -- eviction?
 4        A.    No.
 5        Q.    You're not aware of that?  Okay.  Do you
 6   believe that how the city handles the unhoused
 7   population can be a political issue in the city of
 8   St. Louis?
 9        A.    Yes.
10        Q.    Okay.  And are you aware generally that
11   there have been protests or demonstrations about the
12   unhoused issue in the city of St. Louis?
13        A.    There are protests about everything that
14   happens in the city.
15        Q.    Okay.  And I'm asking you specifically
16   about the unhoused issue.
17        A.    No.
18        Q.    Okay.  So even though you watch the news
19   and read the paper, you just aren't aware that there
20   were articles or news stories around about the
21   unhoused issue?
22        A.    No, I was not aware.
23        Q.    Okay.  Do you recall when you were a
24   mayoral candidate stating as it pertained to the
25   Continuum of Care that you would "give you what you
```

```
 1         A.    I don't recall.
 2         Q.    Was anyone else on the phone call?
 3         A.    Nancy Cross.
 4         Q.    Okay.
 5         A.    Or Nancy was with me.  She wasn't on the
 6   phone.
 7         Q.    What do you mean?  She was in the same
 8   room as you?
 9         A.    Yes.
10         Q.    Okay.  And you placed that phone call?
11         A.    I don't remember.
12         Q.    Okay.  What do you recall saying to
13   Mr. D'Agostino?
14         A.    I told him how disappointed I was about an
15   employee of his that was interfering with our
16   outreach workers connecting the unhoused to
17   services.
18         Q.    Okay.  What else do you recall saying?
19         A.    That's the gist of the conversation.
20         Q.    Okay.  And what do you recall
21   Mr. D'Agostino saying to you?
22         A.    He was very apologetic and -- about the
23   employee and did not know that the employee was
24   interfering.
25         Q.    How did you know that the employee was
```

```
 1   disappointed with his employee interfering with our
 2   outreach, what did you mean by "interfering"?
 3        A.   I was told that this particular employee
 4   told the unhoused people that they didn't have to
 5   leave as our outreach workers were offering them
 6   places to -- places for shelter.
 7        Q.   Anything else you were told?
 8        A.   That -- that's all I was told.
 9        Q.   Okay.  And why did you decide to call
10   Mr. D'Agostino?  What was the purpose of it?
11        A.   To express my disappointment in his
12   employee interfering with our outreach workers.
13        Q.   So it was solely for the purpose of
14   expressing disappointment?
15        A.   Yes.
16        Q.   Okay.  Was it to try to get his employee
17   to do or not do something?
18        A.   No, just to express my disappointment of
19   his employee interfering with our outreach workers.
20        Q.   Okay.  And do you typically call private
21   employers to express your disappointment with their
22   employees' behavior?
23        A.   I'm not sure I understand the question.
24        Q.   Sure.  Have you ever called another
25   private employer?  So, in other words, not a
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



```
 1      A.    That I have what?
 2      Q     (By Ms. Barth) Do you believe as the mayor
 3  of St. Louis you have the right to interfere with a
 4  private citizen's right to free speech?
 5      A.    No, I don't have the right to interfere.
 6      Q.    Okay.  Do you believe as the mayor of
 7  St. Louis you have the right to retaliate against a
 8  private citizen based upon their freedom of --
 9  exercise of their freedom of speech?
10            MS. HAMILTON:  Same objection.
11      A.    I would not retaliate against anyone for
12  expressing their right to free speech.
13      Q     (By Ms. Barth) Okay.  Okay.  After the
14  eviction at the riverfront, were there discussions
15  in the office about whether or not the evictions had
16  been carried out properly?
17      A.    There were discussions in the office about
18  just -- not necessarily if they were proper, but
19  just discussions about the process.
20      Q.    Were people -- let me back up.
21            Are you aware that people in your office,
22  there were some employees in your office that were
23  displeased with how the eviction process had taken
24  place?
25      A.    I don't remember.
```

```
 1         Q.    Okay.  Was there an after action meeting
 2   that took place related to the riverfront evictions?
 3         A.    Yes.
 4         Q.    Okay.  Explain to me what you remember
 5   about that.
 6         A.    We discussed the process that we used to
 7   notify and the process used to actually connect
 8   people to services and the storage of their goods.
 9         Q.    Why was that after action meeting called?
10         A.    We typically do after action meetings of
11   several different things in the office.  So it's not
12   something that we -- it's part of our normal
13   procedure.
14         Q.    And are they called after action meetings?
15         A.    After action or debriefs.
16         Q.    Okay.  So this is something that happens
17   regularly in --
18         A.    Yes.
19         Q.    Okay.  Who decided to call this particular
20   after action meeting?
21         A.    I don't remember.
22         Q.    Do you know who Sara Baker is?
23         A.    Yes.
24         Q.    Okay.  Does she still work in your mayor's
25   office?
```



```
 1    I think you said was your scheduler --
 2         A.    Yes.
 3         Q.    -- to Nancy Cross?  Okay.  And then if you
 4    look at the next page, this is titled "After Action
 5    Agenda."  And you've had time to review this?
 6         A.    Yes.
 7         Q.    Okay.  Do you recall seeing this before?
 8         A.    Yes.
 9         Q.    Okay.  And were you present at this after
10    action meeting?
11         A.    I believe I was, yes.
12         Q.    Okay.  Why did you decide to attend this
13    meeting?
14         A.    Because it was important for me to
15    understand what happened.
16         Q.    Why was it important for you to understand
17    what happened?
18         A.    I was concerned about -- I was concerned
19    about what happened when we decommissioned this
20    encampment.
21         Q.    Why were you concerned?
22         A.    I wanted to make sure that people were
23    connected to services.
24         Q.    Okay.  Was there -- were you concerned
25    because there had been criticisms about whether or
```

```
 1      Q    (By Ms. Barth) Okay.  You just know that
 2   the timeline in general was discussed?
 3      A.   Yes.
 4      Q.   Okay.  Another bullet point says, "What
 5   went well and why."  Do you recall that being
 6   discussed?
 7      A.   No.
 8      Q.   Okay.  And then another bullet point says,
 9   "How was information shared internally and
10   externally."  Do you see that?
11      A.   Yes.
12      Q.   Okay.  Was that discussed?
13      A.   I don't remember.
14      Q.   Was there anyone in your office who had
15   felt like information hadn't been shared internally
16   within your staff?
17      A.   I don't remember.
18      Q.   Okay.  So then when you see on this page,
19   it says:  "Objectives:  Produce an operational
20   encampment protocol that aligns with the mayor's
21   platform."  Do you see that?
22      A.   Yes.
23      Q.   Do you know what this means as it relates
24   to what your platform is?
25      A.   No.
```

```
 1   had the authority to order anyone's removal from --
 2   well, let me back up.
 3           In March of 2023 do you believe you had
 4   the authority to order any private citizen not to
 5   speak to the unhoused at the riverfront encampment?
 6           MS. HAMILTON:  And I'm going to object
 7   that it calls for a legal conclusion.  Subject to
 8   that, you can answer.
 9       A.  No.
10       Q   (By Ms. Barth) Okay.  In other words, if
11   someone was down at the riverfront encampment
12   speaking to the unhoused, disagreeing with what the
13   city was doing, that would be completely appropriate
14   legally for them to do that?  Is that --
15           MS. HAMILTON:  Same objection.
16       Q   (By Ms. Barth) -- your understanding?
17           MS. HAMILTON:  Excuse me.  Same objection.
18   Go ahead.
19       A.  I can't control what people do.
20       Q   (By Ms. Barth) Okay.  And persons have the
21   right to tell the unhoused anything they want;
22   correct?
23           MS. HAMILTON:  Same objection.
24       A.  I can't control what people do and what
25   they say.
```

888-893-3767  
www.lexitaslegal.com   Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.  California Firm Registration #179



```
 1      Q    (By Ms. Barth) Okay.  And so in this
 2   situation when you called Mr. D'Agostino, you
 3   weren't trying to stop Mr. Simon from saying or not
 4   saying anything; you were just expressing your
 5   disappointment?
 6      A.   I was expressing disappointment at
 7   Mr. Simon interfering with our outreach workers
 8   removing people and connecting them to services.
 9      Q.   But you agree if Mr. Simon was
10   interfering, as you call it, he had every right to
11   do that?
12           MS. HAMILTON:  Objection, it calls for a
13   legal conclusion.  Subject to that, you can answer.
14      A.   I can't control what people do or what
15   they say.
16      Q    (By Ms. Barth) Okay.  So you agree with
17   that statement?
18           MS. HAMILTON:  Asked and answered.
19   Subject to that, you can answer.
20      A.   I can't control what people do or what
21   they say.  I'm not going to agree or disagree.
22   Again my answer is I can't control what people do or
23   what they say.
24      Q    (By Ms. Barth) The police couldn't have
25   arrested anyone or physically removed someone
```

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179

LEXITAS

```
 1   STATE OF MISSOURI)
                      )ss
 2   CITY OF ST. LOUIS)

 3        I, Christine Hoenig, Certified Court Reporter in
 4   and for the State of Missouri, do hereby certify that
 5   the witness whose testimony appears in the foregoing
 6   deposition was duly sworn by me; that the testimony of
 7   the said witness was taken by me to the best of my
 8   ability and thereafter reduced to typewriting under my
 9   direction; that I am neither counsel for, related to,
10   nor employed by any of the parties to the action in
11   which this deposition was taken, and further that I am
12   not a relative or employee of any attorney or counsel
13   employed by the parties thereto, nor financially or
14   otherwise interested in the outcome of the action.
15                    [signature: Christine R Hoenig]
16              Christine Hoenig, MO-CCR
```

888-893-3767        Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                                     California Firm Registration #179

LEXITAS