IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

YITZCHAK SIMON,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 ) Case No.
                                   ) 4:23-cv-00955
TISHAURA ONEDA JONES,              )
et al.,                            )
                                   )
        Defendants.                )

DEPOSITION OF NANCY CROSS

TAKEN ON BEHALF OF THE PLAINTIFF

SEPTEMBER 25, 2024

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179

LEXITAS

EXHIBIT 7

```
 1  or explained to you --

 2          A.    No.

 3          Q.    -- his outreach work?

 4          A.    It was my understanding that his job at

 5  St. Patrick Center was his first job with the

 6  unhoused.

 7          Q.    Okay.  Have you ever heard of Tent

 8  Mission?

 9          A.    Yes.

10          Q.    Okay.  Do you know whether or not Mr.

11  Simon had been involved with Tent Mission?

12          A.    I do not.

13          Q.    What is Tent Mission?

14          A.    It's a volunteer organization that

15  works -- goes out and does outreach work with the

16  unhoused.

17          Q.    Does the St. Louis City staff work with

18  Tent Mission in any way?

19          A.    Not clear to me at this point.

20          Q.    Are you aware of any type of protests

21  or demonstrations that Tent Mission has been

22  involved in against the St. Louis City policies as

23  they relate to the unhoused?

24          A.    Yes.

25          Q.    Okay.  What are you aware of?
```



Nancy Cross                                                September 25, 2024

Page 46

1          A.    That they've had a demonstration in

2    front of city hall that they were part of, I believe

3    it was organized by a different organization.  And

4    it was sometime in March of 2023.

5          Q.    During this decommissioning of the --

6          A.    No, in between.

7          Q.    Let me make sure I understand.  You

8    were aware in March of 2023 that Tent Mission

9    participated in a demonstration in front of city

10   hall in March of 2023?

11         A.    I can't answer that question the way

12   it's worded.

13         Q.    Explain to me why.

14         A.    Because Tent Mission is an organization

15   that is not -- is horizontally -- is a horizontal

16   structure.  So there are one or two people that I

17   had interactions with from Tent Mission, but I don't

18   know the scope of who they are or who actually is

19   part of their organization.

20              I know that there was another

21   organization in town that led a demonstration from

22   the riverfront to city hall, and if they were part

23   of that, they were part of that.  But to the best my

24   knowledge it was not a Tent Mission sanctioned event

25   for lack of a better term, like, accredited event.

Nancy Cross                                          September 25, 2024

Page 47

1          Q.    What was the other organization?

2          A.    **ArchCity Defenders.**

3          Q.    And it's your understanding that this

4   demonstration was organized by ArchCity Defenders?

5          A.    **Yes.**

6          Q.    Okay.  And explain to me everything you

7   know about this demonstration?

8          A.    **I know that we had tried to**

9   **decommission on March 10th, the activists prevented**

10  **that from happening.  It was at the end of the day,**

11  **we decided not to continue that.**

12               **We had some conversations -- "we" being**

13  **me, I should say, had some conversations about what**

14  **we were trying to do and that we had housing and**

15  **things for the people.**

16               **And then within a short period of time**

17  **after that -- so if March 10th was a Friday or**

18  **Thursday, the following week, and then there was a**

19  **demonstration led by Blake Strode.**

20         Q.    Say -- Blake?

21         A.    **Blake Strode, S-t-r-o-d-e, who's the**

22  **Executive Director of ArchCity Defenders.  And there**

23  **were probably other activists groups with them at**

24  **that time.**

25         Q.    Okay.  So let me back up here.  You

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com          California Firm Registration #179



1  **motivation.**

2  BY MS. BARTH:

3       Q.   Okay.  Have you ever had anyone tell

4  you that some of these activists do not agree with

5  these services that the city has alleged to provide

6  for these unhoused people?

7       **A.   Yes.**

8       Q.   Okay.  What have you been told that the

9  activists disagree about whether or not these are

10  appropriate services for these people at the

11  encampment?

12      **A.   There are some activists that have said**

13  **they don't want people to be put into shelters, that**

14  **they want people to go into permanent housing right**

15  **away.**

16           **There are some activists that say that**

17  **we should have housing that allows people to -- very**

18  **low barrier housing, which means that there are no**

19  **rules around drugs, alcohol and weapons.**

20           **There are some that just believe**

21  **also -- I don't know how much they're included in**

22  **the group, but have said that people should be**

23  **allowed to live in and just live and they're not**

24  **necessarily doing any harm.**

25      Q.   So one of the things you said is they

1  don't want people to be put in shelters, is moving

2  people from an encampment and into shelters a

3  long-term solution to an unhoused person's problems?

4      **A.    No, and it is not our long-term**

5  **solution.**

6      Q.   Okay.  Is that one of the services you

7  were providing to -- in other words, providing a

8  shelter, is that one of the services that was being

9  offered to the unhoused during this March 5th

10  through March 10th decommissioning?

11     **A.    Yes.  Or it could be -- there's**

12  **different forms.  There's shelters, where everybody**

13  **is in like a dormitory that they really don't like.**

14  **And then there are shelters like Little Sisters**

15  **Mission where you'd have your room and sometimes**

16  **your own bathroom, or you might depending on the**

17  **floor share a bathroom, but you're in a room of your**

18  **own.**

19     Q.   Okay.  But you would agree with some of

20  these activists that moving persons from an

21  encampment to a shelter isn't necessarily a

22  long-term solution to their unhoused issue?

23     **A.    I agree it is not a long-term solution.**

24  **And it is not the long-term solution of the city.**

25  **It's the first step.**



Nancy Cross                                          September 25, 2024

Page 52

1        Q.   But is it accurate that some -- at

2   least some of the unhoused that were at the

3   encampment between March 1st and March 10th, moving

4   them to a shelter was one of the services that the

5   city had provided for them?

6        A.   Yes.

7        Q.   Okay.  And so is it fair to say that

8   some of these activists were actively disagreeing

9   with the services that your city staff were

10  providing to those persons at the encampment as far

11  as whether or not they thought they was a reasonable

12  solution?

13            MS. DUNCAN:  I'm going to object to

14  speculation.  Subject to that, you can answer.

15            **THE WITNESS:  I'm sure there are some**

16  **of them that don't agree.**

17  BY MS. BARTH:

18       Q.   Okay.  And in general would you agree

19  that -- how to deal with the unhoused population in

20  the City of St. Louis is a political issue for the

21  city and for certain activists in this area?

22            MS. DUNCAN:  Object as vague.  Subject

23  to that, you can answer.

24            **THE WITNESS:  I don't know how to**

25  **answer that.**



1  BY MS. BARTH:

2       Q.   You would agree that the mayor, you

3  have heard, has made statements while she's been

4  running for office about how to deal with the

5  unhoused issue, correct?

6       **A.   I'd have to see it to recall exactly**

7  **what she said, because I don't know that off the top**

8  **of my head.**

9       Q.   Okay.  Are you saying you are unaware

10  of whether or not the unhoused issue in the City of

11  St. Louis is an issue that politicians, such as the

12  mayor, alderman and activists talk about and

13  discuss?

14       **A.   I think it's an issue that they have**

15  **discussed at some point.**

16       Q.   Okay.  And in fact there's a whole city

17  department that is related to the unhoused issue in

18  the city?

19       **A.   Subdepartment, yes.**

20       Q.   Yes.  It's a subdepartment but --

21       **A.   Of Human Services.**

22       Q.   Okay.  But it is a department, correct?

23       **A.   Yes.**

24       Q.   Okay.

25       **A.   It's a division.**



Page 54

1        Q.    It's a division, okay.  And you know

2   that there have been protests about how the city has

3   handled the unhoused population in the City of St.

4   Louis?

5        **A.    Correct.**

6        Q.    There have been multiple demonstrations

7   about it, correct?

8        **A.    I only know of one -- two -- I only**

9   **know of two.**

10       Q.    Okay.  It has been the subject of --

11  how the city is dealing with the unhoused population

12  has been the subject of newspaper articles, correct?

13       **A.    Yes.**

14       Q.    Okay.  And some persons disagree, some

15  organizations that deal with the unhoused population

16  disagree with how the city has dealt with the

17  unhoused; is that correct?

18       **A.    Correct.**

19       Q.    Including under Mayor Jones's tenure,

20  correct?

21       **A.    Correct.**

22       Q.    All right.  So with that said, it's

23  fair to say this is an issue that is discussed

24  widely in the City of St. Louis in newspaper

25  articles, activists demonstrations and within the

1  city government of St. Louis?

2          MS. DUNCAN:  I'm going to object to

3  speculation.  Subject to that, you can answer.

4          **THE WITNESS:  And I don't agree.**

5  BY MS. BARTH:

6          Q.   So why don't you agree?

7          **A.   Because I don't think it's widely**

8  **discussed in the form of -- in the way that you're**

9  **describing.**

10         Q.   How would you describe it?

11         **A.   I would say that there are people that**

12 **are concerned about the way that we -- the city**

13 **administration is handling the unhoused issues.**

14 **Some people have not moved off of the previous**

15 **administration's position on unhoused.  Some**

16 **activists keep pointing back to something that**

17 **happened before we got into office.**

18         **There are a lot of people in the city**

19 **that want the unhoused to go away and be unseen.**

20 **And so I don't believe that there are -- that**

21 **everyone that's talking about this is talking about**

22 **it in the way that you're trying to portray it.**

23         Q.   Okay.  And what I was getting at before

24 is just saying that it is a political issue, whether

25 or not you agree with what the mayor has done, or

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                              California Firm Registration #179

LEXITAS

1  you disagree, it is a political issue within the

2  City of St. Louis?

3          MS. DUNCAN:  I'm going to object to the

4  phrasing of that as vague.  Subject to that, you can

5  answer.

6          **THE WITNESS:  I would need you to**

7  **define to me what you mean by "political".**

8  BY MS. BARTH:

9          Q.   An issue that is something that the

10  mayor of St. Louis has to deal with?

11          **A.   Yes.**

12          Q.   Okay.  And you went to law school, we

13  talked about that earlier, right?

14          **A.   Uh-huh.**

15          Q.   You have a general idea of what the

16  First Amendment is about, right?

17          **A.   Uh-huh.**

18          Q.   Would you agree if someone disagrees

19  with how the city or the mayor is handling the

20  unhoused population that is a matter that is

21  protected by the First Amendment?

22          MS. DUNCAN:  I'm going to object --

23          **THE WITNESS:  No.**

24          MS. DUNCAN:  -- legal conclusion.

25  Subject to that, you can answer.

Page 58

1   how the mayor of the City of St. Louis is handling

2   an issue such as the unhoused population, your

3   disagreement is something that is protected by the

4   First Amendment?

5              MS. DUNCAN:  Objection, legal

6   conclusion.  Subject to that, you can answer.

7              **THE WITNESS:  I would -- frankly, I**

8   **would need you to tell me -- let me see the First**

9   **Amendment.**

10  BY MS. BARTH:

11         Q.   You don't know what the First Amendment

12  says?

13         **A.   I know what the First Amendment says to**

14  **a degree, but I haven't been in law school in over**

15  **35 years, so I am not comfortable answering a**

16  **question where you're asking me --**

17         Q.   Okay.

18         **A.   -- to -- I know there's a list of**

19  **things.  I know it's freedom of speech, freedom of**

20  **religion and --**

21         Q.   And I in particular am talking about

22  the freedom of speech.

23         **A.   Okay.  So ask your question again.**

24         Q.   Your ability to disagree with how the

25  mayor or the City of St. Louis is handling the



1  unhoused situation is protected under your freedom

2  of speech rights under the First Amendment?

3              MS. DUNCAN:  Objection, legal

4  conclusion.  Subject to that, you can answer.

5              **THE WITNESS:  I don't agree, so.**

6  BY MS. BARTH:

7        Q.   Okay, you disagree.  Okay.  And you are

8  the Director of Operations for the City of St. Louis

9  --

10       **A.   Correct --**

11       Q.   -- and you disagree that statement?

12       **A.   -- I am the Director of Operations for**

13  **the City of St. Louis.**

14       Q.   And you disagree with that last

15  statement?

16       **A.   The way you're asking the question is**

17  **not helping me be able to answer it.**

18       Q.   Okay.  Well, explain to me what you

19  understand a private citizen or any person can do

20  that is protected by the First Amendment if they

21  disagree with how the city or the mayor is handling

22  the unhoused situation.

23              MS. DUNCAN:  I'm going to object to

24  legal conclusion.  Subject to that, you can answer.

25              **THE WITNESS:  So I mean people protest,**

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                        California Firm Registration #179

LEXITAS

1    they come in front of city hall, they send letters,

2    e-mails, they call, things of that nature, and

3    that's -- they have the right to do that.

4    BY MS. BARTH:

5        Q.   Okay.  Can persons disagree with city

6    staff members while they are talking to populations

7    of the unhoused --

8            MS. DUNCAN:  Objection --

9        Q.   -- is that protected by the First

10    Amendment?

11           MS. DUNCAN:  Objection, calls for a

12    legal conclusion.  Subject to that, you can answer.

13           **THE WITNESS:  I feel like that is**

14    **crossing a line and interfering with the staff**

15    **people's ability to do the job that they were**

16    **assigned to do.**

17    BY MS. BARTH:

18        Q.   Okay.  So let's go back through a

19    couple of these things.  One of the things that you

20    talked about earlier was that you were informed that

21    persons were encouraging the some of the unhoused to

22    stay at the riverfront encampment, correct?

23        **A.   Uh-huh.**

24        Q.   Do you agree or disagree that

25    encouraging unhoused members to stay at the



Nancy Cross                                                September 25, 2024

Page 61

1  riverfront encampment is protected by the First

2  Amendment?

3              MS. DUNCAN:  Objection, calls for a

4  legal conclusion.

5              **THE WITNESS:  I disagree.**

6  BY MS. BARTH:

7         Q.   You disagree, okay.  And what is

8  disagreement based upon?

9         **A.   That there was never anything cited as**

10 **to them being upset with what the city was doing,**

11 **that they were telling people that they could stay**

12 **because they had the right to stay there.  So**

13 **they're giving advice, not protesting people having**

14 **to leave.**

15        Q.   Okay.  Do you agree or disagree that

16 persons telling unhoused persons not to accept

17 certain services that the city was offering, do you

18 agree that form of speech is protected by the First

19 Amendment?

20             MS. DUNCAN:  Objection, legal

21 conclusion.  Subject to that, you can answer.

22             **THE WITNESS:  I don't believe that is**

23 **protected.**

24 BY MS. BARTH:

25        Q.   Why?



1    A.    Yep.

2    Q.    -- from Christine Ingrassia?

3    A.    Yes.

4    Q.    And in March of 2023 who was Christine

5    Ingrassia?

6    A.    She was an alderwoman -- no -- that's

7    what's getting me screwed up.  She works for

8    President Megan Green with the Board of Aldermen.

9    Q.    She was no longer an elected alderman

10   at that time?

11   A.    Correct.

12   Q.    She was --

13   A.    She's the Operations Manager for their

14   internal stuff.

15   Q.    And her e-mail on March 6th, 2023,

16   says:  In anticipation of visiting the encampment

17   and to prepare for her Wednesday morning meeting

18   with Director Cross, President Green would like to

19   have an understanding of any issues causing the

20   timing of this eviction, whether any identified

21   concerns were addressed with the residents of the

22   encampment, what the plan is for rehousing

23   individuals, what outreach has been done to date and

24   if the city moves forward Friday how any belongings

25   left behind will be handled --

888-893-3767     Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.

www.lexislegal.com     California Firm Registration #179


LEXITAS

1   e-mail.

2        Q.   Okay.  And did you bring material --

3   information to that meeting on Wednesday?

4        **A.   Very little in writing.  Mostly what I**

5   **brought to them was the information to answer -- my**

6   **ability to answer their questions as to what we were**

7   **doing.**

8        Q.   When you say "very little in writing",

9   does that mean you did take some stuff?

10       **A.   No.  I talk across the table and tell**

11  **them what we were doing.**

12       Q.   So when you said "very little in

13  writing" what I'm asking you is was there any

14  written material?

15       **A.   No.**

16       Q.   Okay.

17       **A.   Not that I recall.**

18       Q.   What do you recall occurring during

19  this meeting?

20       **A.   They asked about it, we told them why**

21  **the decision was made to do this, what the process**

22  **had been, what we were doing, that we had -- what we**

23  **had for preparations for rehousing the individuals,**

24  **the outreach that had been done and where their**

25  **belongings would be stored.**

Page 93

1    Q.   Who did most of the talking on behalf

2   of the city, yourself or Grace?

3    **A.   Me.**

4    Q.   Okay.  Did anyone in particular do most

5   of the talking on what you said the three other

6   people, Christine, Megan or Jay?

7    **A.   I think a lot of it was Christine and**

8   **Megan.**

9    Q.   Let's start with Cristine Ingrassia.

10  Was she in favor of how the city was planning to

11  decommission the riverfront encampment?

12   **A.   My opinion is she was not.**

13   Q.   Okay.  What did she express to you that

14  made you believe that she did not agree with how the

15  city was planning to decommission the riverfront --

16   **A.   I don't --**

17   Q.   Hold on a minute.  Riverfront

18  encampment on March 10th, 2023?

19   **A.   I don't believe that she -- there was**

20  **anything specific that I can recall that she said,**

21  **it's just her general demeanor at the meeting.**

22   Q.   And how would you describe her general

23  demeanor?

24   **A.   She had a concern over how the unhoused**

25  **people were being removed from -- in her words, from**

1      Q.   Do you know what Mr. Scoggin meant by

2  "partner organizations funded by the City of St.

3  Louis"?

4      **A.   So we get funding -- we had ARPA**

5  **funding, we had COVID funding at some point and we**

6  **get funding from HUD for helping homeless people.**

7           **And we do -- and our fee process to**

8  **award bids to particular organizations, depending on**

9  **the criteria, and those become our partners.  They**

10 **tend to be people that -- we're partnering with**

11 **people that want to find a long-term cure -- not**

12 **cure, but a long-term solution to unhoused issues,**

13 **not just get money from the city.**

14     Q.   Okay.  And is it a fair summary to say

15 that the city is kind of the holding place of those

16 funds that then get disbursed to --

17     **A.   Yes.**

18     Q.   -- those types of organizations?

19     **A.   Yes.**

20     Q.   And was St. Patrick's one of those

21 organizations that was at least partially funded by

22 those types of funds by the City of St. Louis?

23     **A.   They get a variety of funds from the**

24 **City of St. Louis.**

25     Q.   Okay.  I'm going to the next paragraph:

1          **A.    Yes.**

2          Q.    And then at the bottom-ish it says:

3    List of clients that we attempted to engage and they

4    refused services at The Landing, given bus tickets

5    to go to their choice of housing; do you see that?

6          **A.    Yes.**

7          Q.    And then on the page here there's

8    someone named Nick Desideri?

9          **A.    Yes.**

10         Q.    Who is that?

11         **A.    He was the Communications Director for**

12   **the mayor's office.**

13         Q.    Okay.  I'm trying to understand, is

14   this an e-mail from Nick to you?

15         **A.    It's from me to Nick.  So what it is is**

16   **that Nick -- there were two Nicks -- Nick Dunne, who**

17   **was assigned to DHS as a communications person, and**

18   **Nick Desideri that was his manager.**

19              **Dunne was out.  Desideri was getting**

20   **questions -- the same questions over and over again.**

21   **And I responded that we've already answered these**

22   **questions and we need to start trying to come up**

23   **with feeding into the bad information, that we need**

24   **to give the information we have and that's the**

25   **information that's attached here, so.**

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                              California Firm Registration #179

LEXITAS

1         Q.    Okay.  So let me make sure I understand

2    this.  When you say we were getting the same

3    questions over and over again, what are you

4    referring to?

5         **A.    Press.**

6         Q.    And what do you consider the press?

7         **A.    It would have been whatever newspaper**

8    **or reporters are calling, those two on a regular**

9    **basis.**

10         Q.    Okay.  And when you say you were

11    getting the same question over and again, what type

12    of questions were you getting?

13         **A.    We would get:  How many people were at**

14    **the encampment, how many people were housed, how**

15    **many people didn't get housed, when were they**

16    **housed, where were they housed, how long is the**

17    **housing for and a series of questions along those**

18    **lines, depending on who the reporter is and how**

19    **in-depth they want to go.**

20         Q.    And it was related to this March 10th

21    decommissioning?

22         **A.    I'm assuming, yes.**

23         Q.    Okay.  Because this is --

24         **A.    March 21st.**

25         Q.    -- this e-mail is March 21st, before

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                        California Firm Registration #179

LEXITAS

1  that was the second event at the decommissioning of

2  the riverfront encampment, correct?

3      **A.   Correct.**

4      Q.   And why was it necessary to have a

5  second decommission?

6      **A.   Because there had been activity and**

7  **people back down at that location and that was not a**

8  **safe place for people to be.**

9      Q.   Do you know whether or not

10 Mr. Scoggin's office prior to the March 27th event

11 had any conversations, planning, preparing for that

12 event with St. Patrick Center?

13     **A.   I am not aware of that -- or I do not**

14 **know.**

15     Q.   What involvement did you have on

16 March 27th at the decommissioning?

17     **A.   I was not at the site because I had --**

18 **I forget, there was something else going on that**

19 **day.  We made sure that they had the -- what they**

20 **needed as far as bags for people who wanted to take**

21 **stuff with them, the ability for their stuff to be**

22 **put in storage, where it was going to go, and people**

23 **to clean up the needles and other paraphernalia once**

24 **people were moved out.**

25     Q.   When did you personally get involved in

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


1    alerted the chief of staff and the mayor that there

2    were -- and the communications people that there

3    were some issues happening with that

4    decommissioning, and I wasn't sure it was going to

5    be completed, and that there was a -- we were having

6    activists interfering in our ability to move people.

7         Q.   And again, when you talk about

8    interfering in your ability to move people it's all

9    those things we talked about before?

10        A.   Uh-huh.

11        Q.   Okay.  So what did you after that,

12   after you informed the chief of staff and mayor?

13        A.   I didn't do anything at that particular

14   moment.  The mayor said she would like to call

15   D'Agostino and talk to him about what was going on,

16   so she made a phone call and he did not pick up.

17             He then called me, and she was with me,

18   and she and I proceeded to have a conversation with

19   him about the behavior of his staff person and the

20   work -- what we were trying to do, and how we

21   thought we had an understanding that we were all

22   moving in the same direction.

23        Q.   What did you or the mayor say to

24   Mr. D'Agostino specifically?

25        A.   That he had a staff person down there

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                       California Firm Registration #179

LEXITAS

1    that it wasn't -- that -- it's not specifically, but

2    the gist of it was he had a staff person down there

3    who was interfering with our ability to move people.

4    We thought we had an understanding that we were all

5    trying to move people into shelters and housing.  We

6    had facilities for people and that he was in the --

7    his staff person was not living up to what the St.

8    Patrick's mission was.

9           Q.   Would this phone call have been in the

10   morning?

11          A.   It was probably around noon-ish.

12          Q.   All right.  Does it refresh your

13   recollection that the first phone call between you

14   and Mr. D'Agostino was sometime around 10:00 a.m.?

15          A.   No.

16          Q.   Okay.  You don't think that happened?

17          A.   It might have happened, I don't -- you

18   asked me if it refreshed me, I'm not -- I usually

19   have a standing 10 o'clock meeting with the health

20   director, so.

21          Q.   So during the first phone call that you

22   and the mayor had with Mr. D'Agostino did you

23   discuss the funding of St. Patrick Center?

24          A.   Not that I recall.

25          Q.   Okay.  Did you have a second phone call

Nancy Cross

1   This staff person was trying to again stop people

2   from taking the services and moving to a different

3   location, which would provide them with housing.

4        Q.   Okay.  That was your position.  What

5   was Mr. D'Agostino's position?

6        A.   He didn't necessarily disagree, but he

7   added that he had checked and Mr. Simon was on a

8   vacation day.

9        Q.   And so was not down at the riverfront

10  encampment actually working for St. Patrick Center?

11       A.   Allegedly, right.

12       Q.   Well, what do you mean by "allegedly",

13  you didn't believe Mr. D'Agostino?

14       A.   It's not a matter of believing.  They

15  agreed to a certain mission and how their staff was

16  going to work with us, and this person whether he

17  was there as a volunteer or not, was not holding up

18  what they had had conversations with Yusef Scoggin

19  about.

20       Q.   And what was your purpose in making

21  this phone call to Mr. D'Agostino?

22       A.   To have Mr. Simon pulled back and not

23  continue.

24       Q.   Pulled back in what way?

25       A.   Have him leave the riverfront and let

1  us do the work that we were doing.

2       Q.   I thought you said this phone call

3  happened late Friday or early Monday?

4       A.   Okay.  The late Friday, early Monday

5  was he called me again, I know he's not on the

6  company time and everything.  And he said they were

7  going look into it and they would do some kind of

8  discipline and they were going to do what they

9  needed to do.

10          At some point, I don't know which day

11  it was that he and I talked, I suggested that since

12  Mr. Simon had not been there for a long time that

13  they use this as a teaching experience, that they

14  not terminate him, that they figure out how to have

15  some conversations with him about what the

16  expectations were with people that worked for St.

17  Patrick's and what their expectations were to be

18  working with us.

19       Q.   So you claim that you told

20  Mr. D'Agostino not to terminate?

21       A.   I definitely told him not to terminate

22  him.

23       Q.   How did the issue of termination come

24  up?

25       A.   He said they were going to look into it

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



1  were correct in telling Mr. D'Agostino what he

2  should tell one of his employees to do?  What gave

3  you that authority?

4        **A.    It's kind of who I am, and that I'm**

5  **trying to get something accomplished, and he is**

6  **interfering with the work we're trying to do on**

7  **behalf of unhoused people, and that he should not be**

8  **interfering in that work.**

9        Q.    Would you agree that Mr. D'Agostino

10  could have said, No, I'm not telling him to leave?

11        **A.    Yes.**

12        Q.    Okay.  At some point do you remember

13  calling Mr. D'Agostino later in the day and telling

14  him that you believe Mr. Simon had returned to the

15  encampment and was creating more problems?

16        **A.    Yes.**

17        Q.    Okay.  And what was your information

18  based upon?

19        **A.    Photographs that were sent to me by the**

20  **outreach worker.  Richard Dixon in particular.**

21        Q.    Okay.

22        **A.    That he never actually left, so.**

23        Q.    And do you specifically recall having

24  -- after March 27th, 2023, do you specifically

25  recall having additional conversations with

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                                    California Firm Registration #179



1  with Yusef, the captain of the police, the Refuse

2  Department and Forestry Department.  She was not

3  involved in those conversations.

4       Q.   And that's what she was upset about?

5       A.   Yes.

6       Q.   So looking at this After Action Agenda,

7  Topic:  Encampments, based upon what we've talked

8  about, is it fair to say that an After Action

9  meeting -- this wasn't a regularly scheduled

10 meeting?

11      A.   This was the only one that ever

12 happened.

13      Q.   Okay.  And you'll see it says:  Ground

14 Rules, mutual respect for colleagues, avoid personal

15 attacks.  Our goal is to protect the integrity of

16 the mayor and city government; do you see that?

17      A.   Yes.

18      Q.   Okay.  Do you know -- and if you don't,

19 that's fine.  Do you know what that's talking about:

20 Our goal is to protect the integrity of the mayor

21 and city government?

22      A.   No, that's not wording or -- that's a

23 Sara Baker thing.

24      Q.   Okay.  Framing Questions, regarding the

25 riverfront:  What was our goal, what did we expect

1                    CERTIFICATE OF REPORTER

2     STATE OF MISSOURI   )
                          ) ss.
3     CITY OF ST. LOUIS   )

4

5               I, Ashley C. Huelsmann, a Certified

6     Court Reporter (MO), Certified Shorthand Reporter

7     (IL), Registered Professional Reporter, do hereby

8     certify that the witness whose testimony appears in

9     the foregoing deposition was duly sworn by me

10    pursuant to Section 492.010 RSMo; that the testimony

11    of said witness was taken by me to the best of my

12    ability and thereafter reduced to typewriting under

13    my direction; that I am neither counsel for, related

14    to, nor employed by any of the parties to the action

15    in which this deposition was taken, and further that

16    I am not a relative or employee of any attorney or

17    counsel employed by the parties thereto, nor

18    financially or otherwise interested in the outcome

19    of the action.

20

21

22            _____

23                    Certified Court Reporter

24               within and for the State of Missouri

25

888-893-3767    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com              California Firm Registration #179

LEXITAS