UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| YITZCHAK SIMON, | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-CV-00955 |
| | ) | |
| TISHAURA JONES, et al., | ) | |
| | ) | |
|    Defendants. | ) | |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFEENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Yitzchak Simon ("Plaintiff" or "Simon") and for his Memorandum in Opposition to Defendants' Motion for Summary Judgment, states as follows:

### INTRODUCTION AND FACTUAL BACKGROUND

The reason that Defendants' Motion for Summary Judgment should be denied is apparent on the first page of their Memorandum – their motion is not based upon uncontroverted material facts as required. In fact, the entire premise upon which their arguments lie is the most controverted fact in this case – whether or not Defendants Mayor Tishaura Jones ("Jones") and Yusef Scoggin ("Scoggin") threatened the funding of a private employer because its employee exercised his First Amendment rights in disagreeing with the Mayor and Scoggins in how they were treating the unhoused population of the City of St. Louis, which resulted in the termination of the employee. Defendants' claim that Plaintiff asserts that Defendants' "complaining" about his behavior cost him his job. That is not the Plaintiff's claim. Plaintiff's claim is that the Mayor, specifically, assisted by Scoggin, *threatened* the funding of St. Patrick Center based upon Simon disagreement with the City's policies and actions around evictions of the unhoused in

1

March of 2023.  The Defendants have denied that such a threat was made.  Plaintiff has presented solid evidence that this did, in fact, occur. Most notably, the termination letter provided to Simon by St. Patrick Center states that very fact!  It reads, "Your actions on March 24, 2023 resulted *in the threat* of Saint Patrick Center losing funding and created conflict with our funders and supporters and is the *primary* reason for termination." See Plaintiff's Additional Statement of Controverted Material Facts Making Summary Judgment Inappropriate ("PSMF"), ¶70.  Further, on the day that the Mayor made her threats, the CEO of St. Patrick Center, Anthony D'Agostino ("D'Agostino"), told Simon that the Mayor had threatened St. Patrick Center's funding, and D'Agostino told Savanna Goossens ("Goossens") that the Mayor had threatened St. Patrick Center's funding.  PSMF, ¶¶ 136.  Goossens testified that she was told to terminate Simon and she was told that THE reason for his termination was that the Mayor had threatened the funding of St. Patrick Center. PSMF, ¶¶ 142-144.

      D'Agostino still works in the homeless service arena with Peter & Paul, whereas Goossens no longer is beholden to the City's funding as she has left the field. See Plaintiff's Response to Defendants' Statement of Facts, ¶5, and PSMF, ¶ 141.   Who is telling the truth is the main factual question that must be resolved by the jury.

      Further, the alleged conduct of Simon that was reported by the City is completely controverted as well.  In short, it is the Plaintiff's position that Dixon and Scoggins lied about his activities and conduct because Simon disagreed with the way the City was conducting the evictions at the Riverfront Encampment.  The City claims that Simon was interfering with the services the City was attempting to provide the unhoused at the Riverfront Encampment and was acting inappropriately, by doing such things as flipping off City workers.  The City has no evidence that this occurred, and the photographs they have produced show the opposite – Simon

was actually holding up peace signs to the man who was inappropriately photographing Simon. PSMF, ¶ 131, It is simply not believable that someone like Simon, who everyone agrees is passionate about providing services and care for the unhoused, would ever dissuade an unhoused person from appropriate services. PSMF, ¶ 98. His supervisor, Goossens testified that she did not believe the City regarding what they claimed Simon was doing at the Riverfront Encampment, and she was aware that Scoggins had already lied once about what her team (which included Simon) had done at the Riverfront Encampment two weeks before the final eviction on March 24, 2023. PSMF, ¶¶ 113-117, 127, 130. In contrast, Goossens and Poole's interactions with Dixon were not good either, and they found him to be rude and to not provide unhoused persons with correct or appropriate information. PSMF, ¶¶ 109-110. Simon's experience with Dixon was that he doubted Dixon had any training because Dixon's actions were completely contrary to the training provided by the Continuum of Care. PSMF, ¶ 111.

There is little doubt that what the City was doing in the way that they were evicting the unhoused from the Riverfront Encampment was not in line with the Continuum of Care and the policies that advocates for the unhoused are expected to follow. PSMF, ¶¶ 102-107. No one at St. Patrick Center, including Simon, agreed with the way the City was conducting the evictions. PSMF, ¶¶ 99, 121. It became a hot political issue in the City of St. Louis in March of 2023, during which protests occurred at City Hall and multiple news stories ran in the local media. PSMF, ¶¶ 75-80. Simon is a known advocate and participated in multiple protests and demonstrations against the City's policies relating to its treatment of the unhoused. PSMF, ¶¶ 95 – 101. Even within the Mayor's office, the issue became so large after the evictions, that an "After Action" meeting was required (the first of its kind) to discuss what happened and how to improve going forward. PSMF, ¶¶ 81-86.

Mayor Jones testified that as the Mayor of the City of St. Louis she was aware that she does not have the right to interfere with a private citizen's right to free speech or retaliate against anyone for expressing their right to free speech.  PSMF, ¶¶ 87-88. Jones agreed that she did not, in March of 2023, have the authority to order any private citizen not to speak to the unhoused at the Riverfront Encampment. PSMF, ¶ 89. Mayor Jones also agreed that if a person was at the Riverfront Encampment, speaking to the unhoused and disagreeing with what the City was doing, she could not stop them or control what people do.  PSMF, ¶ 90. Mayor Jones also agreed that even if Simon was interfering with the City's outreach workers at the Riverfront Encampment [which Plaintiff disputes] he had the right to do it, and she cannot control what people do.  PSMF, ¶ 91. Mayor Jones testified that her understanding of what Simon was saying to the unhoused persons at the Riverfront Encampment was that "you don't have to leave" and/or "you don't have to go into the shelter that the city is allegedly providing" and Jones testified that – if Simon made those statements – those were true statements and "they [the unhoused] are of their own volition whether or not they want to leave or stay." PSMF, ¶ 92. Cross testified that she does not believe the First Amendment protects a person's right to disagree with how the Mayor is handling the unhoused population.  PSMF, ¶ 93. Cross testified that persons may "protest, they come in front of city hall, they send letters, emails, they call, things of that nature, and that's – they have the right to do that."  But, when a person disagrees with city staff members while they are talking to populations of the unhoused, Cross testified that "I feel like that is crossing a line and interfering with the staff people's ability to do the job that they were assigned to do."  PSMF, ¶ 94.

In short, all of the material facts of this case are disputed, making this case inappropriate for summary judgment.

## ARGUMENT

I.   **Summary Judgment Standard**

The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has "the obligation to come forward with specific facts showing that there is a genuine issue for trial." *Dahl v. Rice Cnty., Minn.*, 621 F.3d 740, 743 (8th Cir. 2010). Summary judgment is only appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "[A]lthough the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Wingate v. Gage Cnty. Sch. Dist.*, No. 34, 528 F.3d 1074, 1078–79 (8th Cir.2008).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

II.   **Defendants are not Entitled to Qualified Immunity.**

A government official is entitled to qualified immunity unless (1) he violated a plaintiff's constitutional right and (2) that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "A citizen's right to exercise First Amendment freedoms without facing retaliation from government officials is clearly established." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (per curiam). *See also Hartman v. Moore*, 547 U.S.

5

250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out.").

To state a First Amendment retaliation claim under 42 U.S.C. § 1983, [a plaintiff] must allege that: "(1) [s]he engaged in a protected activity, (2) the government official[s] took adverse action against [her] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir. 2016).

As of 1989, the right to be free from government interference with an employment relation was clearly established by our court in *Chernin v. Lyng,* 874 F.2d 501 (8th Cir.1989). *Waddell v. Forney*, 108 F.3d 889, 893 (8th Cir. 1997); *Helvey v. City of Maplewood*, 154 F.3d 841 (8th Cir. 1998); s*ee Korb v. Lehman,* 919 F.2d 243, 244–45, 248 (4th Cir.1990), *cert. denied,* 502 U.S. 808, 112 S.Ct. 51, 116 L.Ed.2d 28 (1991) (suggesting that private employee had free speech claim against government official who retaliated against employee for exercising his First Amendment rights by causing employee to be fired by private employer).

Defendants state that "A lot of standing around" has never been an established right under the First Amendment. However, the right to watch police interactions without interference is a clearly established right. *Walker v. City of Pine Bluff*, 414 F.3d 989, 992-93 (8th Cir. 2005) (recognizing as clearly established the right to watch police-citizen interactions at a distance and without interfering as of June 1998); *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 984-85 (8th Cir. 2019) (denying qualified immunity to officer who arrested a man who drove by him during a

6

traffic stop and yelled an expletive) In *Walker*, the Courts found that in a democracy, public officials have no general privilege to avoid publicity and embarrassment by preventing public scrutiny of their actions and that the assertion that one more silent, non-interfering on-looker…created a distraction that prevented [the police] from safely completing [a] traffic stop [was], in a word, preposterous. *Id*. at 993.

Even if Mr. Simon was, as the Defendant's maintain, spewing profanities, with limited exceptions….is protected speech. *See, e.g., Cohen v. California*, 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (holding where defendant walked through courthouse corridor wearing jacket bearing the words "F**k the Draft" in place where women and children were present and no showed no intent to incite disobedience to or disrupt the draft, state lacked power to punish defendant for underlying content of message the inscription conveyed). Criticism of law enforcement officers, even with profanity, is protected speech. *See City of Houston, Texas v. Hill*, 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).

The main issue that the City complained of was that Simon was present at the Riverfront Encampment, listening to what Dixon was stating to the unhoused, and disagreeing with what Dixon was saying. There is also no doubt that Simon was well known to Dixon and Scoggin as someone who was critical of their department, and specifically how the City was conducting the March 2023 evictions. Apparently, the City was so concerned about what Simon was saying and doing at the Riverfront (even though the Mayor acknowledged that she had no right to force him to leave or not to say or do anything) that multiple calls were made to his boss by the Mayor herself, Cross and Scoggin. The City's argument, now, that it did not view Simon as expressing disagreement with the City's policies as it pertained to the evictions is not believable. The evictions

7

had become a major political issue, resulting in protests at the City Hall, and repeated news stories and media coverage.

### III. Defendants are Not Entitled to Summary Judgment on Plaintiff's Civil Conspiracy Claim.

To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim. *Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 798 (8th Cir. 2013).

The intra-corporate conspiracy doctrine provides that "a local government entity cannot conspire with itself through its agents acting within the scope of their employment*." Kelly v. Cty of Omaha*, 813 F.3d 1070, 1078 (8th Cir. 2016). The 8th Circuit has never definitively addressed the issue whether the doctrine applies to § 1983 conspiracy claims. See *Burbridge*, 2 F.4th at 782-83 (declining to address the question because it was first raised on appeal). Other circuits have addressed the issue. Two have expressly held that the doctrine applies to § 1983 conspiracy claims, but its application in a particular case is subject to recognized exceptions. See *Jackson v. City of Cleveland*, 925 F.3d 793, 817-20 (6th Cir. 2019), cert. denied, ––– U.S. –––, 140 S. Ct. 855, 205 L.Ed.2d 460 (2020); *Grider v. City of Auburn*, 618 F.3d 1240, 1261-63 (11th Cir. 2010). Others have questioned whether the doctrine should apply, at least "[w]here 'equal protection' is at issue." *Stathos v. Bowden*, 728 F.2d 15, 20-21 (1st Cir. 1984); see *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126-27 (10th Cir. 1994).

Regarding the intra-corporate conspiracy doctrine, Defendants cite to *Kelly v. City of Omaha*, 813 F.3d 799 (8th Cir. 2016). Assuming Defendants are referencing 813 F.3d 1070. That case held that the intra-corporate conspiracy doctrine precluded *§ 1985(2) and (3) conspiracy claims* because "a local government entity cannot conspire with itself through its agents acting within the scope of their employment," even if the plaintiff "alleges improprieties in the execution of these duties." *Kelly v. City of Omaha*, 813 F.3d 1070, 1078-79 (8th Cir. 2016) (cleaned up). Here, Count II is alleging "Conspiracy to Violate Simon's Constitutional Rights Cognizable Under *42 U.S.C. § 1983*" (emphasis added). The Eighth Circuit has not definitively addressed whether the intra-corporate doctrine applies to § 1983 conspiracy claims. *See Faulk v. City of St. Louis*, 30 F.4th 739, 749 (8th Cir. 2022) ("[W]e have never definitively addressed the issue whether the [intracorporate conspiracy] doctrine applies to § 1983 conspiracy claims"); *Torres v. City of St. Louis*, 39 F.4th 494, 507 (8th Cir. 2022) (same).

## IV. Count III

The standards for determining when conduct might "chill a person of ordinary firmness" from engaging in protected activity: The ordinary-firmness test is ... designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment. *Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003).

The ordinary-firmness test is well established in the case law and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment. *See Bart v. Telford*, 677 F.2d 622 (7th Cir.1982). We have adopted and applied this standard. *See Naucke v. City of Park Hills*, 284 F.3d 923 (8th Cir.2002). The court in *Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003), wrote:

9

In applying this "test," we are mindful of the words of Judge Posner in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982):

The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable.

The test is an objective one, not subjective. The question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done...., but rather what would a person of "ordinary firmness" have done in reaction to the [adverse action]? Would he or she have simply ignored [it], or would he or she have been slowed down, at least to some degree? *Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003). In *Garcia*, a mayor's issuance of $35 in retaliatory parking tickets over less than two months was enough to chill a person of ordinary firmness and supported a jury verdict on the plaintiff's retaliation claim. 348 F.3d at 729.

"In some cases, embarrassment, humiliation and emotional distress may be sufficient to support a § 1983 claim." *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002). But an adverse action is more likely shown when an official causes the plaintiff to experience "concrete consequences." *Scheffler v. Molin, 743 F.3d 619, 622* (8th Cir. 2014).

To establish causation generally, "must show that a reasonable jury could find that a retaliatory motive of the government official was a 'but-for cause' of the adverse action, 'meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" *Graham v. Barnette*, 5 F.4th 872, 889 (8th Cir. 2021) (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). "[U]nless the issue of causation is 'so free from doubt as to justify taking

10

it from the jury,' the issue should be tried." *Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1044 (D. Minn. 2010) (quoting Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004)); *De Rossitte v. Correct Care Sols.*, LLC, 22 F.4th 796, 804 (8th Cir. 2022) (same).

Causation may be shown by a government official's exertion of influence or authority over a private actor—i.e., a plaintiff's employer—to effect some act of retaliation against a third party. *See Helvey v. City of Maplewood*, 154 F.3d 841, 844 (8th Cir. 1998) (First Amendment retaliation claim supported by allegation that police officer "used his position of authority to cause [plaintiff's boss] to fire her in retaliation for the testimony she gave"); Pendleton, 178 F.3d at 1010–11 (First Amendment retaliation claim supported by allegations that state actor conspired with private employer to "force[ ] [plaintiff] to resign").

In addition, we have recognized that an at-will employee's right to be free from arbitrary government interference in his employment relation gives rise to a due process right. *See Chernin v. Lyng*, 874 F.2d 501, 505–06 (8th Cir.1989). This right arises when government officials, through exercise of their regulatory authority over an employer, demand the discharge of an employee. *Id*. at 502–03, 506; *see also Waddell v. Forney*, 108 F.3d 889, 893 (8th Cir.1997) (recognizing the clearly established right to be free from government interference with an employment relationship).

The doctrine of official immunity "protects a public official from liability if that official acts within the course of his official duties and without malice." *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. 2019). Official immunity does not apply, and a public official may be held personally liable for the damages the official caused, in two narrow exceptions: (1) when a public official fails to perform a ministerial duty required of the official by law, or (2) when a

11

public official acts in bad faith or with malice. *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446 (Mo. banc 1986).

"A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Alsup,* 588 S.W.3d at 190 n.7 (*quoting Twiehaus*, 706 S.W.2d at 446). In order for the plaintiff to show malice there must be evidence that the official had an actual intent to injure the plaintiff. *State ex rel. Love v. Cunningham*, 689 S.W.3d 489, 498 (Mo. 2024).

Plaintiff's first amended complaint alleges that Mayor Jones stated to the Chief Executive Officer of St. Patrick Center, Anthony D'Agostino that if he did not fire Plaintiff Simon, she would ensure that St. Patrick Center would not receive public funds from the City of St. Louis, and that she would block St. Patrick' attempts at securing funding to continue their operations. Plaintiff also describes in their amended complaint that that forty-eight percent of St. Patrick Center's just over $25,000,000 budget came from Government Funding (Amended complaint ¶135-136).

## **CONCLUSION**

This is a case full of factual disputes that must be determined by a jury. The reason that the Mayor, and multiple other City officials, called Simon's employer on March 24, 2023, was because he was at the Riverfront Encampment and made it known there and during protests at City Hall that he disagreed with the way the City was evicting the unhoused. He was trying to assist the unhoused and make sure they understood what was happening and their rights, and the City took offense to this. And Defendants response was to call his employer, who is funded by the City, and threaten its funding. The law is clear that a government entity cannot retaliation against

12

a private employee by making threats to get that employee fired for exercising his First Amendment rights. Defendants' Motion for Summary Judgment should be denied.

                                        Respectfully submitted,

                                        **NEWTON BARTH, L.L.P**

By:    */s/ Brandy B. Barth*
           Brandy B. Barth, MO56668
           brandy@newtonbarth.com
           555 Washington Ave., Ste. 420
           St. Louis, Missouri 63101
           (314) 272-4490 – Office
           (314) 762-6710 – Facsimile

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify the foregoing was electronically filed on March 10, 2025 with the Court for service by means of Notice of Electronic Filing upon all attorneys of record.

                                        */s/ Brandy B. Barth*