**UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
MISSOURI EASTERN DIVISION**

| | |
|---|---|
| YITZCHAK SIMON, | ) |
| | ) |
|     PLAINTIFF, | ) |
| | ) |
| v. | )   **Case No. 4:23-CV-00955** |
| | ) |
| TISHAURA JONES, et al., | ) |
| | ) |
|     DEFENDANTS. | ) |

## DEFENDANTS' RESPONSES TO PLAINTIFF'S STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS

COME NOW Defendants, and for purposes of this motion only, state as follows to Plaintiff's Statement of Additional Uncontroverted Material Facts:

## DEFENDANTS' RESPONSE TO PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTROVERTED MATERIAL FACTS

70. St. Patrick Center told Simon he was terminated because of a threat to St. Patrick Center's funding. His termination letter stated "Your actions on March 24, 2023 resulted *in the threat* of Saint Patrick Center losing funding and created conflict with our funders and supporters and is the *primary* reason for termination." See Exhibit 2, "Termination of Employment Letter," dated March 30, 2023 (emphasis added).

**RESPONSE:**

**Admitted in part and denied in part. Admitted that this statement accurately quotes the termination letter. But denied to the extent that the statement implies that Simon was terminated solely because of an alleged "threat to St. Patrick Center's funding." Ex. H, at 77-78; Ex. I, at 75:20-25.**

71. St. Patrick Center's annual revenue was north of $20 million, and is funded through

governmental grants, individual donors and corporate funding. Governmental grants constituted approximately two-thirds of St. Patrick Center's budget. Exhibit 8, D'Agostino Depo, 13:8-19, 16:20-24.

**RESPONSE:**

**Admitted.**

72. Of the government funding provided to St. Patrick Center, much of the funding is provided to the City and the City distributes the funds. Exhibit 8, D'Agostino Depo, 20:5-12, 22:14-25, 23:1-6; see also, Exhibit 7, Cross Depo, 111:1-24.

**RESPONSE:**

**Admitted.**

73. Mayor Jones agreed that how the City handles the unhoused population is a political issue in the City of St. Louis. Exhibit 1, Jones Depo, 18:5-9.

**RESPONSE:**

**Denied that this is a material fact. Moreover, denied in that the cited material does not support this fact; Jones agreed that "how the city handles the unhoused population *can* be a political issue in the City of St. Louis." Jones Depo, 18:5-9.**

74. Mayor Jones admitted that she watches the news and reads the paper. Exhibit 1, Jones Depo, 17:17-18; 18:18-22. But she denied any knowledge of knowing there were protests about the March Riverfront Encampment evictions on the steps of City Hall, which were covered on the local news and in the St. Louis Post-Dispatch. Exhibit 1, Jones Depo, 17:9-25; 18:1-25.

**RESPONSE:**

**Admitted.**

75. Cross was aware that the unhoused issue is a political issue and there had been protests about

the unhoused issue in the City of St. Louis, and that the issue had been the subject of newspaper articles, and an issue the Mayor had to deal with during her tenure. Exhibit 7, Cross Depo, 53:9-25, 54:1-21, 55:11-25, 56:1-11.

**RESPONSE:**

**Admitted in part and denied in part. Denied to the use of the term political issue in that it is unclear what is meant by "political issue." Per the transcript, it "is an issue that politicians, such as the mayor, alderman and activists talk about and discuss." Cross Depo, 53:9-15.**

76. Cross knew of Tent Mission and was aware that Tent Mission had been involved in protests against the City regarding its policies towards the unhoused; she was also aware that there had been a protest at City Hall about the March 2023 evictions at the Riverfront Encampment. Exhibit 7, Cross Depo, 45:7-25, 46:1-4.

**RESPONSE:**

**Admitted.**

77. The Riverfront Encampment evictions of March 2023 became a matter of public interest and the City was fielding multiple media inquiries about the issue. Exhibit 7, Cross Depo, 120:15-25; 121:1-25.

**RESPONSE:**

**Objection to the extent this statement calls for legal conclusion as to the terms "matter of public interest." If the Court overrules the objection, admit that the cited material shows that the Mayor's communications director received multiple media inquiries about the Riverfront closure. Otherwise, denied that the cited material demonstrates that the Riverfront closure was "a matter of public interest" in that media interest is not necessarily indicative of public interest. Exhibit 7, Cross Depo, 120:15-25; 121:1-25.**

78. There was such an uproar about the initial eviction planned for March 10, 2023, that the eviction did not occur that day. Exhibit 7, Cross Depo, 47:8-11.

**RESPONSE:**

**Denied that the cited material supports the fact that there was "such an uproar about the initial eviction…that the eviction did not occur that day." Instead, the cited material shows that "activists prevented [the closure] from happening" on March 10, 2023. Cross Depo, 47:8-11.**

79. The situation necessitated Cross having a meeting the Board of Alderman Megan Green and Christina Ingrassia to discuss issues relating to the eviction. Exhibit 7, Cross Depo, 90:1-25, 92:20-25, 93:9-12.

**RESPONSE:**

**Admitted that Cross had a meeting with the Megan Green and Christina Ingrassia to discuss the Riverfront closure, but denied that the cited material supports the fact that Cross' meeting with them was "necessitated" because of "the situation." Cross' testimony reveals that she met with Green and Ingrassia before the first attempted closure on March 10th. Exhibit 7, Cross Depo, 90:1-25, 92:20-25, 93:9-12.**

80. Cross was aware that activists in the unhoused issue did not agree with the services the City was alleging to provide to the evicted unhoused persons, and particularly that moving persons to temporary shelters was not a long-term solution to the unhoused issue. Exhibit 7, Cross Depo, 50:3-7, 51:19-25, 52:7-16.

**RESPONSE:**

**Admitted, but denied to the extent that Plaintiff uses this fact to imply that Cross or any City official knew that Plaintiff was an activist. Ex. E, Cross Dep., at 44-45 (has no knowledge of**

Plaintiff's involvement with the unhoused population or with the Tent Mission organization).

81. Because of other City's employee's displeasure about how the Riverfront Encampment Eviction had been carried out, an "after action meeting" took place at City Hall. See Exhibit 13.

**RESPONSE:**

**Admitted, but deny this is a material fact to this motion.**

82. The purpose of the meeting set out was: "Our goal is to protect the integrity of the Mayor and City government." See Exhibit 13.

**RESPONSE:**

**Admitted, but deny this is a material fact to this motion.**

83. The objective of the meeting was set as: "Produce an operational encampment protocol that aligns with the mayor's platform." Exhibit 1, Jones Depo, 45:18-22; Exhibit 13.

**RESPONSE:**

**Admitted, but deny this is a material fact to this motion.**

84. The Mayor was not able to provide any information about what that platform would be. Exhibit 1, Jones Depo, 45:23-25.

**RESPONSE:**

**Admitted that at the time of the Mayor's deposition, when given a handout of the after-action agenda, she did not know what was meant by "Objectives: Produce an operational encampment protocol that aligns with the mayor's platform." Exhibit 1, Jones Depo, 45:23-25. Otherwise, denied that this is a material fact to this motion, and further deny to the extent that the cited material implies that the Mayor does not know, or cannot provide, any information about her own platform regarding the unhoused. *See* Exhibit 1, Jones Depo,**

**45:23-25.**

85. Although Jones claimed that an "after action meeting" was part of "our normal procedure" that happens regularly, Cross testified differently, stating "this was the only one that ever happened." Exhibit 1, Jones Depo, 39:10-18; Exhibit 7, Cross Depo, 150:6-12.

**RESPONSE:**

**Admitted that Jones and Cross so testified, but deny that this is a material fact to this action.**

86. Mayor Jones stated that she attended the "after action meeting" because she was "concerned about what happened when we decommissioned this encampment." Exhibit 1, Jones Depo, 41:16-20.

**RESPONSE:**

**Admitted. Further answering, Jones was concerned about, she "wanted to make sure that people were connected to services." Jones Depo, 41:21-23.**

87. Mayor Jones testified that as the Mayor of the City of St. Louis she was aware that she does not have the right to interfere with a private citizen's right to free speech. Exhibit 1, Jones Depo, 38:2-5.

**RESPONSE:**

**Objection to the extent this fact calls for a legal conclusion. If the Court overrules Defendants' objection, admitted.**

88. Mayor Jones also testified that she would not retaliate against anyone for expressing their right to free speech. Exhibit 1, Jones Depo, 38:6-12.

**RESPONSE:**

**Admitted.**

89. Jones agreed that she did not, in March of 2023, have the authority to order any private citizen

not to speak to the unhoused at the Riverfront Encampment. Exhibit 1, Jones Depo, 48:3-9.

**RESPONSE:**

**Objection to the extent this fact calls for a legal conclusion. If the Court overrules Defendants' objection, admitted.**

90. Mayor Jones also agreed that if a person was at the Riverfront Encampment, speaking to the unhoused and disagreeing with what the City was doing, she could not stop them or control what people do. Exhibit 1, Jones Depo, 48:10-19.

**RESPONSE:**

**Objection to the extent this fact calls for a legal conclusion. If the Court overrules Defendants' objection, denied the cited material supports this fact. In response to counsel's question regarding whether the Mayor believed it would be "completely appropriate legally" for someone to be down at the riverfront encampment speaking to the unhoused, the Mayor responded by stating: "I can't control what people do." Exhibit 1, Jones Depo, 48:10-19.**

91. Mayor Jones also agreed that even if Simon was interfering with the City's outreach workers at the Riverfront Encampment [which Plaintiff disputes] he had the right to do it, and she cannot control what people do. Exhibit 1, Jones Depo, 49:9-15.

**RESPONSE:**

**Objection to the extent this fact calls for a legal conclusion. If the Court overrules Defendants' objection, deny that the cited material supports this fact; instead, the Mayor emphasized again when questioned about whether Plaintiff "had every right to" interfere with City outreach workers, that she "can't control what people do or what they say." Exhibit 1, Jones Depo, 49:9-15.**

92. Mayor Jones testified that her understanding of what Simon was saying to the unhoused

persons at the Riverfront Encampment was that "you don't have to leave" and/or "you don't have to go into the shelter that the city is allegedly providing" and Jones testified that – if Simon made those statements – those were true statements and "they [the unhoused] are of their own volition whether or not they want to leave or stay." Exhibit 1, Jones Depo, 52:22-25; 53:1-9.

**RESPONSE:**

**Admitted.**

93. Cross testified that she does not believe the First Amendment protects a person's right to disagree with how the Mayor is handling the unhoused population. Exhibit 7, Cross Depo, 56:18-23, 58:24-25, 59:1-5.

**RESPONSE:**

**Objection to the extent this fact calls for legal conclusion. Moreover, objection to the extent that the question asked of Cross is vague. Cross was asked whether the First Amendment protects a person's right to disagree with how the city or the mayor is handling the unhoused population; however, *how* a person disagrees determines whether one's actions fall under the purview of the First Amendment, and this context was not provided in the question to Cross. If the Court overrules these objections, admitted.**

94. Cross testified that persons may "protest, they come in front of city hall, they send letters, emails, they call, things of that nature, and that's – they have the right to do that." But, when a person disagrees with city staff members while they are talking to populations of the unhoused, Cross testified that "I feel like that is crossing a line and interfering with the staff people's ability to do the job that they were assigned to do." Exhibit 7, Cross Depo, 59:25, 60:1- 16.

**RESPONSE:**

**Admitted.**

95. Simon is an advocate for many causes, and has attended and participated in many protests throughout the St. Louis area, including Black Lives Matter events, protests relating to conditions at the City jail, and numerous protests relating to the treatment of the unhoused. Exhibit 5, Deposition of Yitzchak Simon ("Simon Depo"), 30:16-25, 31:6-16, 32:19-25, 39:10-25, 40:1- 15.

**RESPONSE:**

**Admitted that Plaintiff so testified.**

96. During protests relating to the unhoused issue in the City of St. Louis, Simon would speak to the unhoused about their issues, and try to work as a mediator between the unhoused and the City officials to try to figure out the best course of action for the unhouse and where they were supposed to go. Exhibit 5, Simon Depo, 35:7-25, 36:1-8.

**RESPONSE:**

**Admitted in part, denied in part. Admitted that Plaintiff testified he would speak to the unhoused about their issues, but denied that the cited material supports the statements that Plaintiff acted as a "mediator between the unhoused and the City officials." Simon Depo, 35:7-25, 36:1-8.**

97. Simon was aware of the shelter options for the unhoused because it is published publicly and no other organization, including the City, has any greater access or knowledge of available services. Exhibit 5, Simon Depo, 36:9-25.

**RESPONSE:**

**Admitted in part, denied in part. Admitted that Simon so testified, but denied to the extent that this statement implies that Simon knew of all shelter options available to the unhoused**

at the Riverfront. Scoggin testified about the extensive preparations undergone by City to prepare for encampment closures such as this one, including the gathering of resources outside of what is publicly available to all organizations, to account for the influx of shelter needed after a closure, and Plaintiff would not necessarily have access to these additional resources gathered by City. Ex. D, Scoggin Dep. at 14-16.

98. Simon's co-workers knew him as someone who was very passionate about providing services to the unhoused and did not believe he would ever dissuade any unhoused member from accepting shelter or treatment options. Exhibit 9, Poole Depo, 31:12-25; 32:1-14; 50:7-17; Exhibit 6, Goossens Depo, 25:24-25, 26:1-18; Exhibit 8, D'Agostino Depo, 29:4-13.

**RESPONSE:**

**Admitted in part and denied in part. Admitted to the extent that Simon's coworkers knew him as someone passionate about providing services to the unhoused. Objection to the extent that the citations from Poole Deposition stating Simon "would not discourage anyone from going into treatment" calls for speculation and is improper character evidence and impermissible habitual evidence. Moreover, denied to the extent that the citation from the D'Agostino Deposition shows that Simon "would ever dissuade any unhoused member from accepting shelter or treatment options." D'Agostino agreed merely that Simon was "passionate about provided services to unhoused individuals." D'Agostino Depo, 29:11-13.**

99. Simon disagreed with how the City was conducting the evictions at the Riverfront Encampment because it was not in line with the policies and best practices put in place by the Continuum of Care, which all unhoused advocate agencies follow, and the St. Patrick's team in general also agreed that the City was not acting in accordance with the Continuum of Care policies in how they were evicting the unhoused from the Riverfront Encampment. Exhibit 9,

Poole Depo, 58:1-25; Exhibit 6, Goossens Depo, 26:19-25, 27:1-13.

**RESPONSE:**

**Admitted that the Plaintiff so testified, but deny to the extent this statement implies that Plaintiff voiced or demonstrated any such disagreements at the Riverfront on March 24th. Ex. A, Simon Dep. at 111-112.**

100.    The March 2023 evictions of the unhoused from the Riverfront Encampment was a political issue that was covered on the local news and caused protests by unhoused advocates, including an organization that Simon was part of called "Tent Mission" at City Hall. Exhibit 5, Simon Depo, 50:23-25; 51:1-15.

**RESPONSE:**

**Admitted.**

101.    Simon helped organize and participated in the protest about the Riverfront Encampment eviction at City Hall though Tent Mission, and was interviewed by media and appeared on the news holding signs protesting the City's eviction. See Exhibit 10 and 12; Exhibit 5, Simon Depo, 93:5-24.

**RESPONSE:**

**Admitted.**

102.    The team at St. Patrick's Center always does outreach at encampments, especially when an eviction is occurring, to provide aid, housing assistance, supplies, and outreach to the unhoused at the encampments. Exhibit 9, Poole Depo, 10:11-25.

**RESPONSE:**

**Admitted.**

103.    St. Patrick's Center was not aware of the eviction of the Riverfront Encampment until the

day that it was announced by the City. Exhibit 9, Poole Depo, 8:3-6, 10:7-1,; 29:1-25; Exhibit 6, Goossens Depo, 15:1-8, 16:13-18.

**RESPONSE:**

**Admitted that Goossens so testified; Poole does not recall whether St. Patrick Center was aware of the eviction of the Riverfront Encampment until the day that it was announced. Poole Depo, 10:7-10; 29:7-12.**

104.    Simon learned of the March 2023 eviction from personally viewing the notice that was posted at the Riverfront Encampment. He informed his supervisor, and posted the about the notice to the Continuum of Care communication platform. Exhibit 5, Simon Depo, 91:1-25.

**RESPONSE:**

**Admitted.**

105.    In March of 2023, the outreach team of St. Patrick's Center, in general, did not agree with how the City was conducting the eviction of the Riverfront Encampment and was frustrated with the City for the lack of notice of the Riverfront Encampment eviction. Exhibit 9, Poole Depo, 16:4-8; 27:1-25; 28:14.

**RESPONSE:**

**Admitted, but deny this is a material fact to this motion.**

106.    The team also did not feel that the City was providing adequate services or choices for the unhoused at the Riverfront Encampment. Exhibit 9, Poole Depo, 32:17-24.

**RESPONSE:**

**Admitted, but deny this is a material fact to this motion.**

107.    St. Patrick's Center follows a "housing first philosophy," which has been adopted by the Continuum of Care and HUD (the federal government), which means their team does not

forced unhoused individuals into shelters or treatment programs. Exhibit 9, Poole Depo, 17:18-25; 18:14-21.

**RESPONSE:**

**Admitted, but deny this is a material fact to this motion.**

108.     Any employee who was following the "housing first philosophy" and explaining to the unhoused at the Riverfront Encampment that they had choices would have been in alignment with the policies of St. Patrick's Center. Exhibit 9, Poole Depo, 18:1-6; 33:1-9; 46:16-24.

**RESPONSE:**

**Admitted, but deny this is a material fact to this motion.**

109.     Goossens had difficulties with Richard Dixon during her employment with St. Patrick's Center: her interactions with him were "never good", he would film her and her team while they were doing outreach, he belittled her, and disagreed with her, and was disrespectful. Exhibit 6, Goosen Depo, 12:7-25; 13:1-2.

**RESPONSE:**

**Admitted that Goossens so testified, but deny this is a material fact to this motion.**

110.     Poole had experienced Dixon trying to force an unhoused person into treatment when they were "not ready for treatment whatsoever," and Dixon becoming very upset when Simon and other St. Patrick's Center staff tried to make alternative arrangements for the client. Exhibit 6, Goossens Depo, 13:6-25.

**RESPONSE:**

**Admitted that Goossens so testified, but deny this is a material fact to this motion.**

111.     Simon's experience with Dixon was similar in that Dixon was rude to other outreach workers, showed little compassion or understanding for the unhoused, to the point that Simon

doubted that Dixon had taken part in the training required by the Continuum of Care in that he did and said things to the unhoused that was in direct conflict with that training. Exhibit 5, Simon Depo, 67:24-25, 68:1-25, 69:1-25, 70:1-21.

**RESPONSE:**

**Admitted that Plaintiff did not believe that Dixon was properly trained, but denied that the cited material demonstrates that Plaintiff experienced Dixon being rude or the Plaintiff believed that Dixon lacked compassion. Exhibit 5, Simon Depo, 67:24-25, 68:1-25, 69:1-25, 70:1-21.**

112.    Scoggin sent an email to D'Agostino on March 8, 2023. See Exhibit 3.

**RESPONSE:**

**Admitted.**

113.    During the first eviction in March of 2023, the one individual that Mr. Dixon was upset about Simon allegedly "interfering" with, Simon's outreach efforts were successful and Simon was able to make alternative arrangements for this person that was more appropriate. Exhibit 6, Goossens Depo, 34:7-17.

**RESPONSE:**

**Admitted that is Goossens testimony, but deny this is a material fact to this motion.**

114.    During the first eviction attempt on March 7, 2023, Goossens testified that her and her St. Patrick's team, including Simon, in no way interfered with the City's eviction process. Goossens Depo, 33:16-25, 34:1-6. Goossens disagreed with what Scoggins reported about Simon's actions in his email as not true. Exhibit 6, Goossens Depo, 48:14-17.

**RESPONSE:**

**Admitted that is Goossens testimony.**

115.    Simon testified that he was trying to mediate between city officials and the unhoused during a very stressful, forcible eviction of the unhoused and the seemingly non-compassionate responses being provided by Mr. Dixon. Exhibit 5, Simon Depo, 98:1-25, 99:1-25, 100:1-25, 101:1-16.

**RESPONSE:**

**Admitted that Simon so testified regarding his activity at the Riverfront on March 8th. Ex. A, Simon Dep. at 96-100.**

116.    Goossens was very upset when she received Mr. Scoggins email dated March 8, 2023 because the allegations he made about Simon's activities and that of her teams was "not true" and that Scoggins framing of the issue as "Outreach Interference" was not a fair description of what had occurred. Exhibit 6, Goossens Depo, 35:3-11, 36:6-18.

**RESPONSE:**

**Admitted that Goossens so testified, but deny this is a material fact to this motion.**

117.    In Scoggins untrue March 8, 2023 email, Scoggins made a specific reference to St. Patrick's Center being funded by the City, and Goossens interpreted that as a "reminder … that we had City funding and we were on a thin, thin ice." Exhibit 6, Goossens Depo, 39:4-24.

**RESPONSE:**

**Objection in that this statement is argumentative in that it states that Scoggins' March 8th email was "untrue." If the Court overrules the objection, admitted that Goossens interpreted Scoggins' email as such.**

118.    Goossens was aware that St. Patrick's Center relationship with the City was "not going well" and was aware that "Yitzy [Simon] has spoken out against the City many times openly…" Exhibit 6, Goossens Depo, 40:2-9.

**RESPONSE:**

**Admitted that Goossens so testified, but deny this is a material fact to this motion.**

119.    It was well known at St. Patrick's Center that if they spoke out against the City "they [the City] won't fund us. They won't sign;" and the City would defund St. Patrick's. Exhibit 6, Goossens Depo, 40:19-25, 41:1-11.

**RESPONSE:**

**Objection to the extent that Goossens speculates as to what every person employed at St. Patrick's Center knew. If the Court overrules this objection, admitted that Goossens so testified.**

120.    Goossens knew that Simon was a "walking target" because he was involved in Tent Mission and openly spoke out against the City and its policies towards the unhoused, and when he spoke out it often made it to the media. Exhibit 6, Goossens Depo, 42:9-20; 64:1-10.

**RESPONSE:**

**Objection- Goossens' testimony on this point is speculative. Goossens admitted she did not know of any City official who knew of Plaintiff's affiliation with Tent Mission or his speaking out against City. If the Court overrules this objection, admitted this is Goossens testimony. Ex. I, Goossens Dep. at 90-92.**

121.    According to Goossens, during the first March eviction, the City was providing the unhoused persons at the Riverfront Encampment with incorrect information about the housing option they claims to be providing. Exhibit 6, Goossens Depo, 47:7-13.

**RESPONSE:**

**Admitted this is Goossens testimony, but denied this is a material fact to this motion.**

122.    According to Goossens that planned completion date for the original eviction date of March

10, 2023 was not completed because "it was poorly planned [by the City], and there wasn't enough low barrier shelter options available for these individuals." Exhibit 6, Goossens Depo, 49:18-25.

**RESPONSE:**

**Admitted that is Goossens testimony.**

123.    Simon was on vacation the day of the second eviction on March 24, 2023. Exhibit 5, Simon Depo, 110:24-25, 111:1-10.

**RESPONSE:**

**Admitted.**

124.    Goossens was aware that Simon was on vacation on March 24, 2023, the second eviction, and told Simon "you can do what you want on your off time, just nothing, don't wear St. Patrick Center swag, I said remain professional to the best of your ability." Exhibit 6, Goossens Depo, 50:12-24.

**RESPONSE:**

**Admitted.**

125.    When D'Agostino called Simon, he acknowledged that Simon was on vacation, but that the mayor's office was calling D'Agostino complaining about Simon being at the Riverfront. Simon Depo, 113:13-18. D'Agostino did not tell Simon he had to leave, but wanted Simon to understand that amount of pressure that he was receiving from the mayor's office. Exhibit 5, Simon Depo, 120:24-25, 121:1-6; Exhibit 8, D'Agostino Depo, 64:11-19.

**RESPONSE:**

**Objection to the extent the statement contains hearsay not within any exception. If the Court overrules the objection, admitted in part, denied in part. Admitted that D'Agostino called**

**Plaintiff, acknowledged Plaintiff was on vacation, told him the Mayor called him, and did not tell Simon he had to leave. Denied in that D'Agostino did not communicate an "amount of pressure" SPC was receiving from the mayor's office. Rather, D'Agostino told Simon that he "would suggest [Simon] leaving." This came independent of any mention of the mayor's office, according to D'Agostino Depo, 64:11-19.**

126.    It is not against St. Patrick Center policy for an employee to attend a protest or demonstration if it is the employee's day off and the employee is not representing St. Patrick's Center and there is no logo, no badge, no St. Patrick's Center vehicle – then the employee has their freedom. Exhibit 6, Goossens Depo, 30:13-24.

**RESPONSE:**

**Admitted that is Goossens recollection of St. Patrick's Center policy; however, St. Patrick Center's Conflict of Interest Policy states that "it is the policy of the [SPC] to prohibit employees from engaging in any activity…which conflicts with, or appears to conflict with, the interests of the Agency, its clients, or its suppliers…Employees are not to engage in, directly or indirectly, either on or off the job, any conduct that is disloyal, disruptive, competitive with, or damaging to the Agency or to the Federation." Ex. B, at St. Patrick_017.**

127.    Simon denied at the time, and continues to deny, that he was telling the unhoused persons at the Riverfront Encampment not to accept services or interfering with the City. Exhibit 8, D'Agostino Depo, 63:18-25.

**RESPONSE:**

**Objection to the extent this statement contains hearsay statements that D'Agostino heard Plaintiff make out of court. If the Court overrules the objection, admitted that D'Agostino recalls Plaintiff saying on March 24th that he was not encouraging people to stay outside and**

**not seek shelter.**

128.    Dixon told Simon on March 24, 2023, "I'm going to get you fired." Exhibit 5, Simon Depo, 126:22-25.

**RESPONSE:**

**Admitted that is Plaintiff's testimony.**

129.    The only reason that Simon was asked to leave the Riverfront Encampment that day was because St. Patrick's Center wanted to stay in "good standing" with the City, and to protect St. Patrick's Center funding. Exhibit 9, Poole Depo, 40:14-25; 51:22-25; 52:1-8.

**RESPONSE:**

**Admitted in part and denied in part. Admitted that Poole's understanding was that Plaintiff was asked to leave the Riverfront because he was creating issues with the city trying to evict this encampment, and [SPC] did not want to cause any problems with City. Deny that the cited material supports that Plaintiff was asked to leave to "protect St. Patrick Center funding." Poole Depo, 40:16-17.**

130.    Goossens believes that the City officials, Scoggins and Dixon, were not being truthful about their reports relating to Simon's actions at the Riverfront Encampment on March 24, 2023, and she was told she was receiving a photograph of Simon flipping someone off, which ended up being a false accusation. Exhibit 6, Goossens Depo, 103:4-12, 109:14-25, 110:3-8.

**RESPONSE:**

**Admitted that is Goossens testimony, but deny this is a material fact of this motion.**

131.    Goossens had been told that she was being sent a picture of Simon "flipping off the camera," but when she zoomed in, it looked like more of a "peace sign." Goossens Depo, 58:18- 25, 59:1-5. Exhibit 11.

**RESPONSE:**

**Admitted this is Goossens testimony.**

132.    Mayor Jones admits that she called Anthony D'Agostino in March of 2023 about Plaintiff Simon, and testified that she "told him how disappointed I was about an employee of his that was interfering with our outreach workers connecting the unhoused to services." Exhibit 1, Jones De.po, 26:12-17.

**RESPONSE:**

**Admitted.**

133.    Mayor Jones cannot recall a single other time she called a private employer to "express disappointment" about their employee's behavior. Exhibit 1, Jones Depo, 29:20-25; 30:1- 24.

**RESPONSE:**

**Admitted.**

134.    Mayor Jones testified that when she said "interfering" she meant that the employee (Simon) "told the unhoused people that they didn't have to leave as our outreach workers were offering them places to – places for shelter." Exhibit 1, Jones Depo, 29:1-6.

**RESPONSE:**

**Admitted.**

135.    Mayor Jones testified that her only purpose in calling D'Agostino was to "express my disappointment in his employee interfering without our outreach workers." Exhibit 1, Jones Depo, 29:9-15.

**RESPONSE:**

**Admitted to the extent Mayor Jones called to express her "disappointment in his employee interfering with our outreach workers." Jones Depo, 29:11-12. (emphasis added).**

136.    D'Agostino told Goossens that he "received a phone call from the Mayor threatening funding." Exhibit 6, Goossens Depo, 57:22-25. Goossens was told by D'Agostino that "he was getting calls from city officials, the Mayor called him herself, and was threatening funding if we don't get Yitzy off the riverfront because Yitzy was causing issues, is what we were told." Exhibit 6, Goossens Depo, 59:13-19; 63:16-25.

**RESPONSE:**

**Objection- Goossens testimony contains hearsay within hearsay statements. If the Court overrules the objection, admitted in part and denied in part. Admitted to the extent that is Goossens testimony, and admitted that D'Agostino received a phone call from the Mayor. Denied to the extent that the Mayor threatened to withhold funding to SPC. Jones Depo, 30:25 & 31:1-7; *see also*, Ex. G, D'Agostino Dep., at 94 (Q: Did anyone make a threat to you that St. Patrick Center could lose funding because of what Mr. Simon did? A: "I did not – no one told me that.").**

137.    D'Agostino testified that when the Mayor called him, she "demanded" that Yitzy Simon leave the encampment and was "adamant" that Simon leave. Exhibit 8, D'Agostino Depo, 66:15-24, 73:10-18, 74:1; see also, Exhibit 7, Cross Depo, 129:11-25, 130:1-8, 132: 20-25.

**RESPONSE:**

**Admitted to the extent that the Mayor wanted whatever SPC employee that was interfering with the Encampment closure to leave the encampment. Denied to the extent that the Mayor knew the identity of the person who was interfering with the decommissioning of the encampment. Jones Depo, 6:14-21.**

138.    It was unusual for the Mayor to call D'Agostino and he was surprised when he received the call. Exhibit 8, D'Agostino Depo, 67:25, 68:1-5.

**RESPONSE:**

**Admitted.**

139.   The final decision of whether to terminate Simon was made by human resources, with D'Agostino involved. Exhibit 9, Poole Depo, 7:7-24.

**RESPONSE:**

**Admitted in part and denied in part. Admitted to the extent that the final decision to terminate Simon was made by SPC human resources and that D'Agostino was involved in making the recommendation to terminate. Denied that human resources and D'Agostino were the only people involved in the recommendation to terminate; other persons, like Poole and Goossens, were involved in the recommendation to terminate Plaintiff. Poole Depo, 7:7-24. Anitra Cole, the senior director of human resources is involved in that decision, as is Poole and Goossens. Poole Depo, 7:15-24.**

140.   Simon's prior, minor counseling sessions did not contribute to his termination and Poole still rated Simon as a "B" employee even after his termination. Exhibit 9, Poole Depo, 68:22-25, 69:1-8.

**RESPONSE:**

**Admitted in part and denied in part. Admitted to the extent that Poole rated Simon as a "B" employee after his termination. Denied in that Simon's prior counseling sessions and disciplinary history did in fact contribute to his termination.  Ex. I, at 103:23-25 & 104:1.**

141.   Goossens is no longer employed by St. Patrick's Center and is no longer in the field of unhoused advocacy. Exhibit 6, Goossens Depo, 8:13-23.

**RESPONSE:**

**Admitted.**

142.    Goossens was told to fire Simon by Anthony D'Agostino. Exhibit 6, Goossens Depo, 57:17-19; 63:16-25.

**RESPONSE:**

**Admitted.**

143.    Goossens testified that THE reason for Simon's termination was that because of the threat by the City to St. Patrick's Center funding. Exhibit 6, Goossens Depo, 71:15-25, 72:3-6.

**RESPONSE:**

**Admitted in part, denied in part. Admitted that is Goossens testimony. But denied in that Simon's previous disciplinary actions and history were taken into account when determining to terminate Simon's employment, denied. See DSUMFs ¶¶ 57, 58.**

144.    Goossen based her decision to recommend terminating Simon on D'Agostino telling her that St. Patrick's Center funding was threatened. Exhibit 6, Goossens Depo, 102:24-25, 103:1-2. Goossens testified that she was "doing what she was told" in recommending termination of Simon. Exhibit 6, Goossens Depo, 107:7-21.

**RESPONSE:**

**Deny that the cited material supports this fact. Goossens testified that she recommended Plaintiff be terminated because "Anthony, Megan, and Anitra" wanted to fire Plaintiff. Exhibit 6, Goossens Depo, 107:7-21.**

145.    Goossens regrets her recommendation to terminate Simon. Exhibit 6, Goossens Depo, 111:16-25.

**RESPONSE:**

**Admitted that Goossens now regrets her recommendation to terminate Plaintiff, but further answering, in March 2023, Goossens believed Plaintiff should have been fired because his**

23

behavior at the Riverfront violated SPC's conflict of interest policy and he already had two prior corrective actions, so his actions at the Riverfront was his third strike. See DSUMFs ¶¶ 51, 52, 53, 54, and citations thereto.

Respectfully submitted,

SHEENA HAMILTON
CITY COUNSELOR

By: /s/ Abby Duncan
Abby Duncan, 67766(MO)
Associate City Counselor
Morgan Henry, 87339 (MI)
Assistant City Counselor
1200 Market Street
City Hall Room 314
St. Louis, Missouri  63103
Phone: (314) 622-4694
DuncanA@stlouis-mo.gov
HenryM@stlouis-mo.gov

*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify the foregoing was electronically filed on March 24, 2025 with the Court for service by means of Notice of Electronic Filing upon all attorneys of record.

/s/ Abby Duncan