UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

YITZCHAK SIMON,                        )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )        Case No. 4:23 CV 955 CDP
                                       )
TISHAURA ONEDA JONES, et al.,          )
                                       )
        Defendants.                    )

## MEMORANDUM AND ORDER

In July 2023, plaintiff Yitzchak Simon brought this action under 42 U.S.C. §

1983 against two former officials of the City of St. Louis – former Mayor Tishaura

Oneda Jones and former Director of the Department of Human Services, Yusef

Scoggin – alleging that they interfered with his employment at St. Patrick's Center

(SPC) in retaliation for his exercise of his First Amendment rights, conspired to

retaliate against him, and violated his right to due process.  He also brought a state

law claim of tortious interference with employment relationship.  I granted

defendants summary judgment on Simon's conspiracy claim, as well as his

retaliation and due process claims to the extent those claims were brought against

defendants in their official capacities.  I denied defendants qualified immunity to

the extent Simon's retaliation and due process claims were brought against them in

their individual capacities, finding that there were genuine disputes of fact material

to the immunity issue.  I also denied defendants official immunity on Simon's state law claim of tortious interference given the existence of genuine factual disputes material to that claim.  Finally, I denied defendants summary judgment on their assertion that Simon suffered no damages from their alleged actions.  (ECF 65, Memo. & Ord., Apr. 7, 2025.)

Defendants appealed my denial of qualified and official immunity to the Eighth Circuit Court of Appeals, who remanded the matter to me for further examination and explanation of the facts underlying my decision that defendants are not entitled to such immunity on Simon's claims.  Without reaching the merits of defendants' immunity defense, the court of appeals vacated that portion of my earlier Memorandum and Order that denied qualified and official immunity to the defendants.  The remainder of that Order is intact.  Accordingly, this Memorandum and Order addresses only defendants' assertion that they are entitled to qualified and official immunity on Simon's retaliation, due process, and tortious inference claims.[1]

## I.  Background

On March 30, 2023, Simon was terminated from his employment at SPC where he worked as a Coordinated Street Outreach Worker.  In this civil rights

---

[1] I stayed this action while the immunity issue was pending before the court of appeals.  This Memorandum and Order likewise lifts that stay.

action, he claims that SPC terminated his employment in response to a threat made by Mayor Jones that she would withhold City funding from SPC because of Simon's protected speech made at and during the City's decommissioning of an encampment of unhoused persons near the St. Louis Riverfront on March 24, 2023. Simon asserts that Director Scoggin provided the information to Mayor Jones regarding Simon's speech and purported actions that formed the basis for the mayor's threat. Simon alleges that defendants' conduct constituted First Amendment retaliation and a violation of due process, as well as interference with his employment relationship. Defendants argue that they are entitled to qualified and official immunity on the claims.

## II.  Evidence Before the Court on the Motion

St. Patrick's Center is an arm of Catholic Charities that provides housing, employment, and healthcare services to the underserved in the St. Louis community. It operates on a $20 million budget, which is funded through governmental grants, individual donors, and corporate foundations. Governmental grants make up about two-thirds to three-fourths of SPC's funding and comprises local, state, and federal monies. The majority of SPC's federal monies are sourced from two federal programs: 1) the Continuum of Care (COC) program through the U.S. Department of Housing and Urban Development, and 2) the American Rescue Plan Act. Funds from those programs are awarded to and held by the City who

then distributes them to various agencies, including SPC, based on grant applications.

Plaintiff Yitzchak Simon is a long-time advocate for the unhoused in St. Louis.  He was trained to and performed volunteer outreach work to the unhoused, participated in public demonstrations and protests against City policy toward the unhoused, and was employed as an outreach worker at SPC.  Since 2020, Simon also participated in several public protests and demonstrations directed at City policies that did not involve homelessness.  Local media covered several of the protests that Simon was involved in.

Simon began his employment at SPC in the summer of 2021 as a shelter worker.  He eventually moved into the role of an outreach worker and became a salaried member of SPC's outreach team in early 2022.  In that role, Simon went out into the field and provided supplies and shelter assistance to the unhoused.  Over the course of that work, Simon established rapport and relationships with several unhoused persons.  At all relevant times, Savanna Goossens supervised SPC's outreach team, including Simon.  Goossens reported directly to Megan Poole, SPC's Senior Director of Programs.  Anthony D'Agostino was the CEO of SPC.

Through his training, both independently and through SPC, Simon followed the guidelines of the COC program that was established by the federal government

- 4 -

to reduce homelessness.  The COC employed a housing-first approach with the goal of establishing permanent housing rather than mere enrollment in short-term treatment-type programs, which was believed to increase the likelihood of persons returning to the street.  The COC philosophy also included recognizing an unhoused individual's autonomy in making decisions regarding whether to seek or accept housing, treatment, or other services.  It did not require participation in treatment programs or other services in order to obtain housing or shelter.  Through his field work, Simon observed that some City officials did not follow COC guidelines.

In early March 2023, members of the SPC outreach team became aware through social media posts that the City planned to decommission – that is, evict – a tent community of unhoused individuals located near the St. Louis Riverfront on March 10.  The City did not inform SPC of this planned eviction, nor did it communicate with SPC regarding what services the City planned to offer the soon-to-be displaced individuals.  The SPC outreach team went to the encampment on March 8 to assist the unhoused individuals with the upcoming eviction.  Goossens went with the team members to the Riverfront, and she accompanied Simon personally as he spoke to various unhoused individuals regarding their options, which included not leaving the encampment if they did not want to leave but with the caution that the City planned to clear them out including their belongings.  As

to those who planned to leave the encampment and go elsewhere, Simon asked where they were going so that he could connect with them and maintain services for them after their move.  According to Goossens, Simon did not provide incorrect information to the unhoused on March 8.

In an email dated March 9, 2023, titled "Outreach Interference," Director Scoggin wrote to SPC CEO D'Agostino regarding the planned decommissioning of the Riverfront encampment on March 10.  Scoggin described the SPC outreach team's efforts at the encampment on March 8 as counterproductive to ensuring that unhoused individuals would receive appropriate services.  Scoggin reported that SPC staff suggested to the individuals that the City was not being truthful about the availability of immediate resources and, further, that SPC staff discouraged individuals from entering placement or treatment.  Scoggin stated in the email that the actions of the SPC outreach team did not align with the "mission of partner organizations funded by the City of St. Louis," and he specifically named Simon several times as an SPC team member who engaged in "unprofessional behavior." Other than noting that he spoke to Goossens regarding Simon's behavior, Scoggin named no other SPC staff member in the email.  Scoggin copied Jared Bryson, President of Catholic Charities, and Nancy Cross, the City's Executive Director of Operations, on the email.  (ECF 60-13, Mar. 9, 2023, Scoggin email.)

In his email response to Scoggin, D'Agostino alluded to the City's failure to

provide necessary information to and diminished communication with SPC as contributing to the problem and, further, that Simon denied engaging in the alleged behavior but that SPC would nevertheless counsel him on proper practices.  (ECF 61-3, Mar. 10, 2023, D'Agostino email.)

Scoggin admits that the content of his March 9 email to D'Agostino was based on reports he received from City outreach staff and not from his own personal observation.  Goossens, who accompanied Simon on March 8 as he spoke to unhoused individuals, described Scoggin's email as untruthful as the SPC team did not disrupt the City's work, and the information Simon provided to unhoused persons was consistent with COC guidelines.  Goossens understood that the "funding" aspect of Scoggin's email referred to the City's funding of SPC because SPC was on "thin ice" with the City given the strained relationship regarding the outreach program.  Goossens testified that it was well known at SPC that they had to stay on the City's good side because the City could defund SPC.  Goossens noted that Scoggin's singling out Simon in the email was consistent with her belief that Simon had a target on his back because he was a well-known advocate for the unhoused who publicly spoke out against City policies.  (ECF 60-9, Goossens dep. at pp. 33-43.)

The SPC outreach team, including Goossens and Simon, was present at the Riverfront decommissioning on March 10.  Goossens described tension between

Simon and a City outreach worker, Richard Dixon, because Dixon wanted an individual to enter a treatment facility but Simon was making calls to find an alternative housing option, which turned out to be successful.  Goossens opined that that type of miscommunication could have been avoided if the City had openly communicated with SPC regarding its plans for the decommissioning.  Goossens testified that in order to assure that the process went smoothly that day and to try to create a more cohesive relationship with the City, she set up the SPC outreach table far away from the encampment and remained with the outreach team during the decommissioning.

Although the City began the eviction process on March 10, the process was not completed.

The City scheduled a second decommissioning of the Riverfront encampment for Friday, March 24, 2023, but the SPC outreach team was not made aware of that fact.  Goossens had already decided, however, that she would not send the SPC outreach team to a second eviction given that Scoggin and Dixon disapproved of the team, and she wanted to protect the team from Scoggin's and Dixon's manipulative conduct, which had already included filming and photographing team members at the earlier eviction and sending emails that misrepresented their behavior.  Goossens was concerned that additional untruthful reports from Scoggin or Dixon could be manipulated in such a way as to result in

the City defunding SPC.

Simon had the day off of work on March 24, 2023.  He received a call that morning, however, from an unhoused person who informed him that dump trucks, bulldozers, and police were at the Riverfront encampment.  Simon decided to go down to the Riverfront to find out what was going on.  He arrived there between 8:00 and 9:00 a.m. and saw no other advocates for the unhoused, although some arrived shortly thereafter.  No SPC representatives were there.  Simon was not wearing any SPC insignia or other SPC identification.  According to Simon, there was just a lot of standing around when he arrived, with not a lot going on.  To find out what was happening, Simon spoke to Dixon, the police, and unhoused persons, and he followed Dixon as Dixon spoke to unhoused persons so he could learn what information was being shared.  Simon testified that he had no other interaction with City employees that day, except for assisting the police in having someone move their car.  Simon testified that he assisted some of the unhoused by driving them to other sites where they wanted to go and by trying to make them feel safe and "okay."  He also testified that he was aware that Representative Cory Bush's staff was communicating with the mayor's office regarding the eviction, and he stayed at the encampment to "see how that would play out."  (ECF 60-1, Simon dep. at pp. 110-25.)

According to Dixon, Simon blocked his access to some unhoused persons at

the Riverfront on March 24 and was telling unhoused persons that they did not have to leave the encampment. Dixon took photographs of Simon, attempting to show Simon's interference with the decommissioning; but Dixon admits that the photos were taken from a distance and do not show any type of interference or Simon talking with any unhoused persons. Some photographs show Simon walking on a public sidewalk, and others show him in an area away from the encampment. Dixon took those photos to send to his superior, Executive Director Cross, to show that Simon was in the area and causing "major interference." (ECF 60-6, Dixon dep. at pp. 48-54.) Dixon described one photograph as depicting Simon raising his middle finger at him, and he testified that Simon used a racial slur toward him at that time. Simon testified, however, that he never uses racial slurs, did not use a racial slur toward Dixon, and that he did not raise his middle finger but rather displayed a peace sign. Upon further questioning, Dixon admitted that the photograph shows Simon displaying a two-finger peace sign. (*Id.* at pp. 47-49; *see also* ECF 60-14, photo.) Simon also testified that at one point when Dixon was taking a photograph of him, Dixon said to him, "I'm going to get you fired." (ECF 60-1, Simon dep. at pp. 126-27.)

Director Scoggin went to the encampment on March 24 at around 10:00 a.m. and saw Simon from a distance. He did not interact with Simon directly but instead watched him walk in an area near the encampment. Scoggin testified that

City staff informed him that Simon was interfering with services being offered to the unhoused, with such inference comprising giving misinformation to the unhoused about availability of resources and the degree to which the City was providing those resources. (ECF 60-4, Scoggin dep. at pp. 57-58.) Scoggin testified that City staff also informed him that Simon was flipping them off and engaging in adversarial behavior. Scoggin understood that City staff took photographs of Simon to validate his behavior because "it would be denied otherwise." (*Id.* at pp. 65-66.) Scoggin remained at the Riverfront till around 6:00 p.m. on March 24. He does not recall having any issues with individuals interfering with the decommissioning process other than Simon. (*Id.* at p. 69.) But during the several hours Scoggin was at the Riverfront, he did not personally witness Simon engage in any of the behavior that was described to him by City staff. (*Id.* at pp. 64-68.)

Scoggin called Cross from the Riverfront the morning of March 24 and relayed to her the information that City staff had relayed to him regarding Simon's purported interference with the City's decommissioning of the encampment. Cross was specifically told that while City outreach members were helping unhoused individuals pack their things, Simon was telling them that they did not have to leave the encampment and could stay. Scoggin also talked with Mayor Jones and shared that same information with her. According to Cross, Jones became upset

upon being advised of Simon's reported behavior, and she decided to call D'Agostino at SPC.  Jones's first attempt to call D'Agostino was unsuccessful.

After Scoggin's initial calls to Cross and Mayor Jones, several additional calls and communications occurred on March 24, which are central to Simon's claims raised in this action:

- At 10:16 a.m., Cross called D'Agostino and told him that Simon was at the Riverfront telling people to not go into any shelters.  D'Agostino called Megan Poole at SPC and directed her to contact Simon and instruct him to leave the Riverfront.

- Ten minutes later, at 10:26 a.m., Cross called D'Agostino again to tell him that Simon was still at the Riverfront.

- At 11:30 a.m., Cross and Scoggin called D'Agostino to tell him that Simon was interfering with the decommissioning and was flipping off City staff.

- At 12:20 p.m., D'Agostino called Cross to tell her that Simon was on vacation that day and that they were doing what they could to expedite his departure from the Riverfront.

- At 1:10 p.m., D'Agostino called Simon himself and asked him to leave the Riverfront, although he acknowledged to Simon that he could not tell him what to do since he was on vacation.  Simon reported to D'Agostino that what the City was telling D'Agostino about his behavior was not true.

- At 1:21 p.m., D'Agostino received a call from Mayor Jones with Nancy Cross on the line.  Jones describes the call as her merely expressing disappointment that an SPC staff member was behaving as reported.  D'Agostino describes the call as Jones demanding that SPC ensure that Simon leave the encampment.  Cross describes the call as Jones being upset and expressing to D'Agostino that they had an understanding on wanting to provide shelter to affected persons but that Simon was not living up to SPC's mission.  According to Cross, Jones told D'Agostino that he should be able to tell his staff what to do, and both Cross and Jones told

D'Agostino to tell Simon to leave the Riverfront. D'Agostino was surprised by the mayor's call. Neither Cross nor D'Agostino recall discussing SPC funding during the call. Jones denies that she mentioned SPC's receipt of City funding during the call.

- D'Agostino called Simon again at 1:33 p.m. to tell him that the mayor had called and that she was adamant about him leaving the site. D'Agostino told Simon that the mayor believed he was telling people not to go into housing, but Simon again told D'Agostino that that report was not true. As D'Agostino was not there personally and he had "two people saying completely different things," he felt that the best way to handle the matter was for everyone to walk away. (ECF 60-7, D'Agostino dep. at p. 73.)

- At 1:37 p.m., D'Agostino received a call from Bryson, President of Catholic Charities, who reported that he had heard from the City about Simon's activities.

- Because of the call from Bryson, D'Agostino called Goossens at 1:43 p.m. and instructed her to go to the Riverfront. D'Agostino also called Poole because of Bryson's call. Poole agreed that Simon should leave the encampment regardless of what was reported in order to protect him, SPC, and the relationship SPC had with the City.

- According to Goossens, D'Agostino told her during the call that the mayor had threatened SPC's funding, and that she needed to go get Simon from the Riverfront. Goossens then called Simon who told her that he was leaving the site. Goossens arrived at the Riverfront around 2:45 p.m. and saw Simon near the casino at Laclede's Landing and away from the encampment. Goossens offered to give Simon a ride home, but he said he was waiting for a friend to pick him up. Goossens texted D'Agostino that Simon was no longer at the Riverfront, and she left the area. Thereafter, in an email to Jones, Scoggin, and Cross, D'Agostino informed them that Goossens had confirmed that Simon was at the casino and no longer at the encampment.

- At 2:47 p.m., Simon called D'Agostino to tell him that he was at the casino and had left the encampment. Simon testified that he thereafter remained near the casino and never went back "down the hill" to where the unhoused people were. (ECF 60-1, Simon dep. at pp. 123-24.)

- At 4:20 p.m., Cross called D'Agostino to tell him that Simon was still at the Riverfront.  Cross based that call on photographs that Dixon had sent her. D'Agostino did not immediately follow up on that call as it was the end of the workday and workweek.  He determined that he would deal with the matter on Monday, March 27.

When D'Agostino called Goossens on March 24 and directed her to get Simon from the Riverfront, Goossens understood that Simon would be fired given D'Agostino's representation to her that Mayor Jones had threatened SPC's funding because of Simon's alleged conduct and Scoggin's and Dixon's singling out Simon.  Later in the day on March 24, Goossens reached out to Poole about what next steps to take regarding Simon, given the reports that Simon had flipped off City officials, that there reportedly was a photograph depicting that gesture, and that SPC would lose funding because of Simon's alleged conduct.  Poole advised Goossens to write an email setting out the reasons why Simon's conduct warranted termination.  (ECF 60-9, Goossens dep. at pp. 95-103.)  In an email sent to D'Agostino and Poole at 4:54 p.m. that day, Goossens wrote that she was perplexed but that it appeared that Simon's reported behavior at the encampment violated SPC policy regarding conflict of interest and that it would be best to move forward with termination.  (ECF 60-2 at p. 6, Mar. 24, 2023, Goossens email.)

Poole emailed SPC's HR department on March 27, 2023, with a copy to Goossens, wherein she described the calls D'Agostino received from Cross, Jones, and Bryson on March 24 and the information relayed by them regarding Simon's

alleged conduct at the encampment. Poole further described a conversation she had with D'Agostino the morning of March 27 wherein D'Agostino reported that the City had a photo of Simon flipping off City officials. Given those reported events of March 24 and the detriment to SPC's relationship with the City, Poole recommended moving toward terminating Simon's employment at SPC. (ECF 60-2 at pp. 4-5, Mar. 27, 2023, Poole email.)

In an email dated March 28, 2023, SPC's HR department stated that after speaking with SPC's legal department, it was determined that Simon's employment would be terminated. The email stated specifically that "The threat of losing funding and creating conflict with our funders and supporters is the primary reason for termination." (ECF 60-7, D'Agostino dep. at pp. 88-89.) HR asked D'Agostino to be a part of the termination meeting since "he was mainly involved in the incident." (*Id.*) D'Agostino had never before been involved in a termination meeting at SPC. (*Id.* at pp. 95-96.) D'Agostino testified that he did not make the ultimate decision to terminate Simon's employment, but that he trusted the respective department and HR to make the decision and do it properly. (*Id.* at pp. 89-90.)

Poole and SPC's HR Director told Goossens that SPC was terminating Simon's employment and that she was to contact Simon and direct him to come to SPC for a meeting. The meeting was held on March 30, 2023. In addition to

- 15 -

Simon, also present at the meeting were D'Agostino, Poole, Goossens, and the HR Director.  Before the meeting began, Goossens was told that she would be the one telling Simon that he was fired, and Goossens responded that she would need to know the reason for termination.  Poole gave Goossens a prepared letter that was addressed to Simon from the HR department, and Goossens read from that letter at the meeting.  (ECF 60-9, Goossens dep. at pp. 104-06.)

In that letter, Simon was informed that his SPC employment was terminated because of his "failure to conduct [himself] in a professional and efficient manner." (ECF 60-2 at p. 2, Termination Letter.)  The letter further stated:

> Your actions on March 24th, 2023, resulted in the threat of Saint Patrick Center losing funding and created conflict with our funders and supporters and is the primary reason for termination.  Your actions were a violation of Saint Patrick Center Catholic Charities Handbook 501.0 Standards of Conduct (d) Violations of conditions of employment.  Simply put, this is considered gross misconduct as you brought Saint Patrick Center into serious disrepute with the City of St. Louis and other potential funding sources, which would be a detriment to the organization.  This is also in violation of the Saint Patrick Center Catholic Charities Handbook 504.0 Conflict of Interest policy which clarifies that employees are not to engage in, directly or indirectly, either on or off the job, any conduct that is disloyal, disruptive, competitive with, or damaging to the Agency or to the Federation.

(*Id.*)  Neither Goossens, D'Agostino, nor Poole knows who drafted the letter, but Poole believes it was someone in HR.  After Simon was presented with the letter, he asked D'Agostino if he was being fired because of the mayor's call.  According to Simon, D'Agostino responded only with a statement of appreciation for his

- 16 -

work with the unhoused. (ECF 60-1, Simon dep. at pp. 131-32.) During his tenure at SPC, Simon never received any negative feedback or reviews from SPC regarding his work with the unhoused.[2] (*Id.* at pp. 142-43.)

Poole testified that she based her recommendation to terminate Simon's employment on Simon's reported conduct at the encampment that was alleged to have occurred on March 24 as well as Goossens' description in her March 24 email that Simon's conduct violated SPC policy that required termination. (ECF 60-8, Poole dep. at pp. 76-78.) Goossens testified that the substance of her March 24 email was based on only the statements made by City officials to D'Agostino that Simon was flipping people off at the Riverfront and their representation that they had evidence of that conduct. But upon learning later that the purported documented evidence did not portray such a gesture, and given her knowledge that Scoggin had previously given untruthful information about Simon's conduct, she regretted recommending that Simon be terminated from SPC. (ECF 60-9, Goossens dep. at pp. 96-111.)

## III. Discussion

A.   Qualified Immunity – First Amendment Retaliation and Due Process

Qualified immunity protects government officials who are sued in their

---

[2] Simon received two disciplinary reprimands during his employment at SPC. Both involved the substance of conversations he had with coworkers.

individual capacities for money damages under § 1983. *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013); *Wolfe v. City of Town & Country*, 599 F. Supp. 3d 784, 790 (E.D. Mo. 2022). The qualified immunity analysis involves two inquiries: (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the violation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008). With respect to the "central facts of the case," I must "view the evidence . . . in the light most favorable to" Simon, the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). "If there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Morris v. Zefferi*, 601 F.3d 805, 808 (8th Cir. 2010) (citation modified).

At all times relevant to Simon's allegations, the law was clearly established that a government official may not retaliate against an individual for his exercise of his First Amendment right to free speech by inducing another to take adverse action against him on account of such speech where the adverse action would not have otherwise occurred. *See Hartman v. Moore*, 547 U.S. 250 (2006); *Scott v. Tempelmeyer*, 867 F.3d 1067, 1070-71 (8th Cir. 2017). *See also Waters v.*

- 18 -

*Churchill*, 511 U.S. 661, 674-75 (1994) (Speech by private people can interfere with government's operation, "but this does not allow the government to suppress it. . . . The government cannot restrict the speech of the public at large just in the name of efficiency."). This prohibition extends to government actions directed to private entities who depend on government sources for their income. *Cf. O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996) (in exercising discretion to terminate an at-will relationship, government officials cannot impose conditions on expressing, or not expressing, specific political views).

Likewise, the law was clearly established that because an at-will employee has a right enforceable in law against third parties who unlawfully interfere with his employment relation, that employee's right to continue in employment is sufficient to give him a constitutional cause of action challenging state action that compelled his employer to fire him. *See Truax v. Raich*, 239 U.S. 33, 38 (1915). "[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment . . . ." *Greene v. McElroy*, 360 U.S. 474, 492 (1959). *See also Chernin v. Lyng*, 874 F.2d 501, 505 (8th Cir. 1989) (recognizing that the Supreme Court has "continued to hold that both employees and employers have an interest in the employment relation protected from arbitrary government action by the Due Process Clause.") (citing *Greene*, 360 U.S. at 492).

- 19 -

Here, material predicate facts remain in dispute on whether Simon engaged in constitutionally protected speech or conduct, or whether defendants perceived that he did; and, if so, whether defendants retaliated against Simon and unreasonably interfered with his employment on account of that protected activity, in violation of Simon's clearly established right to be free from such retaliation and interference. But when viewed in the light most favorable to Simon, the evidence shows such protected activity and shows defendants' retaliatory and unreasonable interference in response. Defendants are therefore not entitled to qualified immunity.

1.      *Constitutionally Protected Speech or Conduct*

To prevail on his retaliation claim, Simon must show that the defendants took adverse action against him because he engaged in protected First Amendment activity. The defendants' reason for their action "is what counts." *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272-73 (2016). Accordingly, defendants may be found liable for First Amendment retaliation if they acted against Simon because of his *actual* exercise of conduct that constitutes protected activity or for conduct they *thought* he engaged in that constitutes protected activity, even if he did not actually engage in that activity. *Id.; see also Molina v. City of St. Louis, Mo.*, 59 F.4th 334, 338, 342-43 (8th Cir. 2023). The "upshot" is that adverse government action "based upon an [official's] belief that the [individual] has

- 20 -

engaged in protected activity can cause the same kind, and degree, of constitutional harm" whether that belief is or is not factually correct. *Heffernan*, 578 U.S. at 274.

Here, a careful look at the record shows that there are substantial disputes of material fact as to the speech and conduct Simon actually engaged in at the Riverfront on March 24, 2023, as well as the conduct defendants believed he engaged in, and thus whether his conduct – actual or perceived – constituted protected activity. For example, defendants argue that Simon testified to merely "standing around" and saying hello to the unhoused on March 24, and that such conduct is not constitutionally protected. While mere presence in a public place, without more, does not trigger First Amendment protection, *see City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989); *Ramos v. City of Miami*, 115 F. Supp. 3d 1372, 1375 (S.D. Fla. 2015), there are disputes as to whether Simon was merely present at the encampment with nothing more, or whether he was actively engaged, expressing his opinions regarding City actions, and/or gathering or dispensing information regarding City processes.

Viewing the disputed facts in favor of Simon, his conduct and speech at the Riverfront encampment on March 24, 2023 – whether actual or as perceived by defendants – constituted protected First Amendment activity. While Simon testified to "a lot of standing" around when he first arrived at the encampment, he later took actions and said things that, if proven at trial, would constitute protected

activity.  Assuming the facts most favorable Simon, as the day went on he walked around the encampment, following and speaking to Dixon about what the City was doing, speaking to police, and speaking to unhoused persons to learn what information they had been told.  He was also explaining rights to the unhoused and telling them that they were not required to do what the City officials were telling them they had to do.  Defendants perceived Simon to be disagreeing with City officials and City policy and to be actively discouraging the unhoused to accept the City's assistance.  Whether Simon actually engaged in those activities or defendants perceived that he did, that conduct nevertheless is protected activity under the First Amendment and Simon is protected from retaliation therefor.

A review of the record also shows disputed facts regarding whether Simon directed racial slurs or obscene gestures toward City officials at the encampment. Simon denies such conduct, but City officials say it happened.  Viewing the disputed facts in favor of Simon, however, whether Simon actually engaged in the alleged conduct or defendants perceived that he did, it would be protected by the First Amendment.  *See Virginia v. Black*, 538 U.S. 343, 358 (2003) (First Amendment protects symbolic or expressive conduct as well as actual speech.); *Thurairajah v. City of Fort Smith, Ark.*, 925 F.3d 979, 985 (8th Cir. 2019) (citing *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987)) (criticism of government officials, even with profanity, is protected speech); *Buffkins v. City of Omaha*, 922

- 22 -

F.2d 465 (8th Cir. 1990) (calling police officer "asshole" was protected speech); *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1989) (a plaintiff's use of expletives and an obscene hand gesture toward police officers was protected speech). And even if the City officials were factually incorrect regarding Simon's conduct, there is evidence that Scoggin acted on that information, which in turn caused Jones to act in making her call to D'Agostino. As set out above, defendants' action in response to protected conduct – whether actual or perceived – is what counts. *Heffernan,* 578 U.S. at 272-73.

In short, on the record before the Court, although there are numerous genuine issues of material fact regarding Simon's conduct and the nature of his statements made at and during the decommissioning of the Riverfront encampment on March 24, 2023, as well as defendants' perception of such, viewing the evidence most favorably to Simon shows that he engaged in clearly established protected conduct under the First Amendment and, further, that the conduct that defendants perceived he engaged in, including making racial statements, also constituted clearly established First Amendment activity.

2.    *Retaliation and Employment Interference*

A careful look at the record also shows disputes of material fact relating to the truthfulness of Scoggin's representations to Jones, to other City officials, and to D'Agostino regarding Simon's conduct at and during the Riverfront

- 23 -

decommissioning on March 24 and whether Scoggin's representations, false or otherwise, induced another to take adverse action against Simon for his protected conduct where such action would not have otherwise occurred. Again, assuming the facts most favorably to Simon, defendants took actions to punish Simon for his exercise of First Amendment activity, and the punishment handed down would not have occurred but for defendants' retaliatory actions. And because defendants' interference with Simon's employment was based on untruths, unverified allegations, and vindictive motives, as well as his constitutionally protected activity, that interference was unreasonable in violation of Simon's right to due process.

Dixon threatened to have Simon fired because of Simon's statements made to unhoused persons, to the police, and to City officials. Scoggin knew Simon from previous encounters involving the unhoused, and he had previously provided untruthful information regarding Simon's outreach efforts and linked them to City funding, to which D'Agostino pushed back in response. On March 24, Scoggin conveyed information through his calls that Simon was talking to the unhoused, interfering with the City's attempted eviction, and was using profanity and racial slurs toward City officials. That information prompted Mayor Jones to call D'Agostino and demand that Simon leave the encampment and, again assuming the disputed facts in Simon's favor, demand that Simon's SPC employment be

- 24 -

terminated.

There is no dispute that after Scoggin called Jones on March 24 and reported that Simon was interfering with the City's efforts at the encampment, she became upset and decided to call D'Agostino herself, whereupon she demanded that D'Agostino instruct Simon to leave the Riverfront even though Simon was on his own time that day. Evidence shows that Jones told D'Agostino that Simon's reported conduct was inconsistent with SPC's mission; that the Catholic Charities President called D'Agostino regarding the City's own call to him regarding Simon's conduct; that Scoggin had recently linked SPC's mission and Simon's behavior with City funding in an email to D'Agostino; and that Goossens based her recommendation to fire Simon in part on D'Agostino's report to her that Jones threatened SPC funding because of Simon's conduct. The termination letter itself stated that Simon's reported conduct at the encampment "resulted in the threat of Saint Patrick Center losing funding." Considering all this evidence in the light most favorable to Simon, Mayor Jones and Scoggin threatened SPC's funding if SPC did not fire Simon for his constitutionally protected speech that occurred at the Riverfront that day. The evidence viewed in Simon's favor therefore shows that Jones and/or Scoggin induced SPC to terminate Simon's employment on account of Simon's First Amendment conduct at the encampment on March 24, 2023, and that their interference in Simon's employment was unreasonable.

The evidence viewed in that favorable light also shows that Simon's termination would not have occurred without that inducement, as both Goossens' and Poole's recommendations to terminate Simon's employment were based on the information that Jones and Scoggin conveyed to D'Agostino on March 24. Simon's purported conduct that both Goossens and Poole believed constituted a terminable offense – whether on its own or as a third strike under SPC policy – was only that which Jones and Scoggin reported to D'Agostino and which SPC in turn found sufficiently serious to threaten SPC's funding, as stated in the termination letter.  And, upon learning that the reports of Simon's conduct were untrue, Goossens regretted that she recommended Simon's termination from SPC. Indeed, Simon had never received any negative feedback or reviews from SPC regarding his work with the unhoused prior to Jones' and Scoggin's calls to D'Agostino on March 24, 2023.

As demonstrated above, a careful review of the record shows at the very least that there are triable issues of fact on the questions of whether Simon's conduct and speech at the Riverfront encampment on March 24, 2023 – whether actual or as defendants perceived – were protected by the First Amendment; whether and to what extent Jones or Scoggin interfered with Simon's employment interest at SPC because of that speech; and whether Jones or Scoggin induced SPC to take adverse action against Simon where such adverse action would not have

otherwise occurred. When those disputed facts are viewed in a light most favorable to Simon, they demonstrate that 1) Simon engaged in activity on March 24, 2023, that was clearly established as protected activity under the First Amendment, and that the conduct defendants perceived that Simon engaged in was also clearly established as First Amendment protected activity; 2) that Jones and Scoggin unreasonably interfered with Simon's employment interest at SPC in retaliation for Simon's actual and/or perceived protected activity, in violation of Simon's clearly established rights to due process and to be free from retaliation for participating in protected activity under the First Amendment; and 3) that without Jones' and Scoggin's retaliatory interference, SPC would not have terminated Simon's employment.

Because there are disputed material facts predicate to the qualified immunity issue, and those facts when viewed in Simon's favor show that defendants violated Simon's clearly established constitutional rights to due process and to be free from First Amendment retaliation, there can be no summary judgment on the basis of qualified immunity.

B.    Official Immunity – Tortious Interference with Employment Relationship

To prevail on his state law claim of tortious interference, Simon must establish: "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's

intentional interference; (4) absence of justification; and (5) damages." *Bloodworth v. Kansas City Bd. of Police Comm'rs,* 89 F.4th 614, 622 (8th Cir. 2023) (quoting *Bishop & Assoc., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. banc 2017)).  Defendants raise no argument as to whether Simon can meet these elements.  Instead, they argue only that they are entitled to official immunity on this state law claim.

"Official immunity . . . protects public officials sued in their individual capacities from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts."  *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. banc 2019) (citation modified). Official immunity does not apply to discretionary acts done in bad faith or with malice.  *Green v. Lebanon R-III Sch. Dist.*, 13 S.W.3d 278, 284 (Mo. banc 2000).

> A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another.  An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others . . . . [B]ad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence.  It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.  It also embraces actual intent to mislead or deceive another.

*State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. banc 1986).

    1.    *Director Scoggin*

- 28 -

Genuine issues of material fact exist on the question of whether Scoggin acted in bad faith or with malice in his representations to D'Agostino, Jones, and other City officials regarding Simon's behavior at and during the Riverfront decommissioning on March 24, 2023.

Assuming the facts in favor of Simon, evidence shows that Scoggin's March 9, 2023, email to D'Agostino singled out Simon and falsely reported that he was behaving unprofessionally and against SPC's City-funded mission at the City's first effort at decommissioning.  Scoggin's reports to Jones, to other City officials, and to D'Agostino on March 24 again singled out Simon and reported similarly offending behavior, which again was not true.  Scoggin admittedly did not witness any of Simon's alleged conduct that he reported in his communications on March 9 and March 24, but he knew Simon from his earlier advocacy for the unhoused.

If proven, those facts not only satisfy the elements of Simon's claim, but they also could show that Scoggin intended to mislead D'Agostino, Jones, and other City officials into believing that Simon engaged in detrimental conduct on March 24, with the intent that that misleading information would result in adverse employment action against Simon.  This is especially true given that D'Agostino pushed back on Scoggin's March 9 report regarding Simon's behavior.  It may also be shown that with his continued reporting of untrue information against Simon to both his and Simon's superiors on March 24, Scoggin intended that information to

- 29 -

cause prejudice or harm to Simon, with a reckless indifference to his rights. As Goossens believed that Scoggin had placed a target on Simon's back, a jury could conclude that Scoggin continued to take aim at him.

2. *Mayor Jones*

A careful review of the record also shows genuine issues of material fact on the question of whether Jones acted with malice in her threat to withhold public funding from SPC if SPC did not take adverse action against Simon. As set out above, whether there was such a threat is itself disputed. But based on the evidence that there was, there is sufficient evidence in Simon's favor showing that Jones acted needlessly and contrary to her duty as City mayor when she intentionally and directly threatened SPC, a nonprofit, with a loss of City funding if it did not terminate Simon's employment for his engaging in constitutionally protected conduct involving a matter of public concern. And given that the threat was based on unverified reports, not only do the facts *in toto* satisfy the elements of Simon's claim, a finding could also be made that, in making that threat, Jones was recklessly indifferent to Simon's rights and intended to cause injury to him through the loss of his job.

Assuming the disputed facts in favor of Simon, Simon meets the elements of his state law claim against both Scoggin and Jones. Again assuming those facts in favor of Simon, Scoggin and Jones acted in bad faith or with malice, so defendants

- 30 -

are not entitled to summary judgment on their assertion that they are entitled to official immunity on Simon's state law claim of tortious inference with employment relationship.

Accordingly,

**IT IS HEREBY ORDERED** that the stay previously imposed in this case is **LIFTED**.

**IT IS FURTHER ORDERED** that defendants Tishaura Oneda Jones and Yusef Scoggin are not entitled to qualified immunity on plaintiff Yitzchak Simon's claims that defendants, in their individual capacities, violated his right to due process and retaliated against him for his exercise of his First Amendment rights.

**IT IS FURTHER ORDERED** that defendants Tishaura Oneda Jones and Yusef Scoggin are not entitled to official immunity on plaintiff Yitzchak Simon's state law claim that defendants tortiously interfered with his employment relationship.

The case will be set for a scheduling conference by separate Order for the purpose of setting the matter for trial.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 24th day of April, 2026.

- 31 -